**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

----------------------------------------------------------- x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| FTX TRADING LTD., *et al.*, | : | Case No. 22-11068 (KBO) |
| | : | |
| Debtors. | : | |
| | : | (Jointly Administered) |

----------------------------------------------------------- x

| | | |
|---|---|---|
| | : | |
| FTX RECOVERY TRUST, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Adv. Pro. No. 25-52358 (KBO) |
| | : | |
| GENESIS DIGITAL ASSETS LIMITED, GDA US INC., DDH (NORTH AMERICA) INC., DDH-CHOLLA, LLC, DDH-OK-1, LLC, RASHIT MAKHAT, and MARCO KROHN, | : | |
| | : | |
| Defendants. | : | |
| | x | |

-----------------------------------------------------------

**MEMORANDUM OF LAW OF GENESIS DIGITAL ASSETS LTD., GDA US INC., DDH (NORTH AMERICA) INC., DDH-CHOLLA, LLC AND DDH-OK-1, LLC IN SUPPORT OF THEIR MOTION TO DISMISS PLAINTIFF'S COMPLAINT**

TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ..................................................................................1

FACTUAL BACKGROUND.....................................................................................3

    I.     GDA LIMITED IS A FOREIGN ENTITY ......................................................3

    II.    AS ALLEGED, ALAMEDA INVESTED IN GDA LIMITED DURING
          AN ATTRACTIVE MARKET AND BASED ON ITS "UPSIDE"
          VALUE ..........................................................................................................4

    III.   THE ALAMEDA ENTITIES ONLY INVESTED IN GDA LIMITED ................6

ARGUMENT ............................................................................................................7

    I.     THIS COURT DOES NOT HAVE JURISDICTION OVER GDA
          LIMITED ......................................................................................................7

          A.     The Trust Fails to Plead General Jurisdiction Over GDA Limited ............7

          B.     The Trust Fails to Plead Specific Jurisdiction Over GDA Limited............8

          C.     The Trust Fails to Plead Sufficiently that DDH Entities Were Alter
                Egos........................................................................................................11

    II.    THE TRUST'S CLAIMS ARE BARRED BECAUSE SECTIONS 544,
          548, AND 550 OF THE BANKRUPTCY CODE DO NOT APPLY
          EXTRATERRITORIALY ..............................................................................12

    III.   THE CLAIMS AGAINST DEFENDANTS SHOULD BE DISMISSED
          UNDER RULE 12(B)(6) ..............................................................................15

          A.     The Trust's Actual Fraudulent Transfer Claims (Counts I and II)
                Fail Under Rule 12(b)(6) ..........................................................................16

           B.     The Trust's Constructive Fraudulent Transfer Claims (Counts III
                and IV) Fail Under Rule 12(b)(6) ...............................................................23

          C.     Section 546(e) Bars the Constructive Fraudulent Transfer Claims ..........28

          D.     The Trust's "Claims" for Property Recovery Pursuant to 11 U.S.C.
                § 550(a)(2) (Counts V and VI) Fail Under Rule 12(b)(6) ........................29

CONCLUSION........................................................................................................30

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### CASES

*Action Mfg. Co., Inc. v. Simon Wrecking Co.*,
    375 F. Supp. 2d 411 (E.D. Pa. 2005) ....................................................................12

*Alameda Rsch. Ltd. v. Rocket Internet Cap. Partners II SCS (In re FTX Trading Ltd.)*,
    2024 WL 4562675 ............................................................................... *passim*

*Aldossari v. Ripp*,
    49 F.4th 236 (3d Cir. 2022) ..............................................................................9

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)........................................................................................15

*Baker v. LivaNova PLC*,
    210 F.Supp.3d 642 (M.D. Pa. 2016) ....................................................................12

*Barclay v. Swiss Fin. Corp. Ltd. (In re Bankr. Est. of Midland Euro Exch. Inc.)*,
    347 B.R. 708 (Bankr. C.D. Cal. 2006).................................................................14

*Burtch v. Huston (In re USDigital, Inc.)*,
    443 B.R. 22 (Bankr. D. Del. 2011) .....................................................................29

*Carvel v. Griffin*,
    No. 074-273-JJF, 2008 WL 4922432 (D. Del. Nov. 18, 2008) ...............................9

*Cred Inc. v. Uphold HQ Inc. (In re Cred Inc.)*,
    650 B.R. 803 (Bankr. D. Del. 2023), *aff'd*, 658 B.R. 783 (D. Del. 2024)..............23

*Daimler AG v. Bauman*,
    571 U.S. 117 (2014)......................................................................................7, 8

*Danziger & De Llano, LLP v. Morgan Verkamp* LLC,
    948 F.3d 124 (3d Cir. 2020)...........................................................................8, 10

*Dunn v. Barney*,
    No. 21-50264 (TMH), 2024 WL 667366 (Bankr. D. Del. Feb. 16, 2024) ............3, 7

*E.I. du Pont de Nemours and Co. v. Agfa-Gavaert NV*,
    335 F.Supp.3d 657 (D. Del. 2018)......................................................................12

*Emerald Cap. Advisors Corp. v. BMW A.G.*,
    572 B.R. 117 (Bankr. D. Del. 2017) ...................................................................14

i

*Fid. Nat'l Info. Servs, Inc. v. Plano Encryption Techs, LLC*,
    Civ. No. 15-777-LPS-CJB, 2016 WL 1650763 (D. Del. Apr. 25, 2016) ..............................11

*Friedman v. Wellspring Capital Mgmt. (In re Sportco Holdings, Inc.)*,
    Nos. 19-11299, 20-50554 (JKS), 2021 WL 4823513 (Bankr. D. Del. Oct. 14,
    2021) ........................................................................................................................ *passim*

*FTX Recovery Trust v. Huobi Global Ltd., et al.*,
    No. 24-50219 (KBO) (Bankr. D. Del. Dec. 8, 2025).....................................................7, 11, 12

*Goodyear Dunlop Tires Operations, S.A. v. Brown*,
    564 U.S. 915 (2011)...............................................................................................................7

*Grainer v. Smallboard, Inc.*,
    No. 16-4866, 2017 WL 736718 (E.D. Pa. Feb. 24, 2017) .....................................................10

*Grayscale Invs., LLC v. SEC*,
    82 F.4th 1239 (D.C. Cir. 2023) .............................................................................................4

*Guiliano v. Ferdinand (In re Liquid Holdings Grp., Inc.)*,
    No. 17-50662 (KG), 2018 WL 2759301 (Bankr. D. Del. June 6, 2018) ...............................26

*Hertz Corp. v. Friend*,
    559 U.S. 77 (2010)................................................................................................................7

*Hospitalists of Delaware, LLC v. Lutz*,
    Civ. No. 6221-VCP, 2012 WL 3679219 (Del. Ch. Aug. 28, 2012) .....................................22

*Importers Serv. Corp. v. Aliotta*,
    No. 22-cv-4640, 2024 WL 2765620 (D.N.J. May 30, 2024)...................................................9

*In re Owens Corning*,
    419 F.3d 195 (3d Cir. 2005)................................................................................................16

*In re Rockefeller Center Props., Inc. Securities Litig.*,
    311 F.3d 198 (3d Cir. 2002)................................................................................................16

*In re Nine West LBO Sec. Litig.*,
    87 F.4th 130 (2d Cir. 2023) ................................................................................................28

*Jovanovic v. US Olympic & Paralympic Comm.*,
    No. 22-2098 (ZNQ), 2025 WL 1218155 (D.N.J. Apr. 28, 2025) ..........................................10

*Kapila v. WLN Family Ltd. P'ship (In re Leneve)*,
    341 B.R. 53 (Bankr. S.D. Fla. 2006)...................................................................................18

*King v. Export Dev. Canada (In re Zetta Jet USA Inc.)*,
    624 B.R. 461 (Bankr. C.D. Cal. 2020)...........................................................................13, 15

*LaMonica v. CEVA Grp. PLC (In re CIL Ltd.)*,
    582 B.R. 46 (Bankr. S.D.N.Y. 2018) ...................................................................13

*Loginovskaya v. Batratchenko*,
    764 F.3d 266 (2d Cir. 2014) .............................................................................15

*McTernan v. City of York, Penn.*,
    577 F.3d 521 (3d Cir. 2009) .............................................................................15

*Mellon Bank, N.A. v. Metro Commc'ns Inc.*,
    945 F.2d 635 (3d Cir. 1991) ........................................................................25, 26

*Mervyn's LLC v. Lubert-Adler Grp. IV, LLC (In re Mervyn's Holdings, LLC)*,
    426 B.R. 96 (Bankr. D. Del. 2010) ...................................................................29

*Miller v. Black Diamond Cap. Mgmt., L.L.C. (In re Bayou Steel BD Holdings, L.L.C.)*,
    642 B.R. 371 (Bankr. D. Del. 2022) ...............................................15, 17, 18, 20

*Miller v. Wilson*,
    No. 21-51268, 2022 Bankr. LEXIS 2191 (Bankr. D. Del. Aug. 9, 2022) ..............26

*Morrison v. Nat'l Austl. Bank Ltd.*,
    561 U.S. 247 (2010) ........................................................................................12

*Off. Comm. of Unsecured Creditors of Pack Liquidating, LLC v. Vagenas (In re Pack Liquidating, LLC)*,
    No. 23-50590 (CTG), 2025 WL 2587577 (Bankr. D. Del. Sept. 5, 2025) .............21

*Opioid Master Disbursement Tr. II v Covidien Unlimited Co. (In re Mallinckrodt PLC)*,
    No. 22-50433 (BLS), 2025 WL 2416807 (Bankr. D. Del. Aug. 20, 2025) ............28

*Peltz v. Hatten*,
    279 B.R. 710 (D. Del. 2002) .............................................................................24

*Phillips v. Josmic 2 LLC (In re ONH ACF CS Inv'rs, LLC)*,
    671 B.R. 680 (Bankr. D. Del. 2025) ...................................................................16

*Remick v. Manfredy*,
    238 F.3d 248 (3d Cir. 2001) ...............................................................................8

*RJR Nabisco, Inc. v. European Cmty*,
    579 U.S. 325 (2016) ...............................................................................12, 13, 15

*Round Rock Rsch. LLC v. ASUSTeK Computer Inc.*,
    967 F. Supp. 2d 969 (D. Del. 2013) .....................................................................7

*Sears, Roebuck & Co. v. Sears plc*,
   744 F. Supp. 1297 (D. Del. 1990)..........................................................................11

*Sherwood Invs. Overseas Ltd., Inc. v. Royal Bank of Scotland (In re Sherwood
   Invs. Overseas Ltd., Inc.)*,
   No. 10-00158-KSJ, 2015 WL 4486470 (Bankr. M.D. Fla. July 22, 2015) ...........13

*Sierra v. Trafigura Trading LLC*,
   No. 22-366 (CJB), 2024 WL 3823018 (D. Del. Aug. 14, 2024) ..............................11

*Shubert v. Foulkrod (In re Bentivegna)*,
   597 B.R. 261 (Bankr. E.D. Pa. 2019) .....................................................................26

*Traisman v. Khmelnitsky*,
   19-cv-11045 (KSH) (CLW), 2020 WL 2847751 (D.N.J. June 1, 2020) ................10

*VFB LLC v. Campbell Soup Co.*,
   No. 02-137 (KAJ), 2005 WL 2234606 (D. Del. Sept. 13, 2005)............................25

*Walden v. Fiore*,
   571 U.S. 277 (2014).............................................................................................9, 10

*Wilen v. Pamrapo Sav. Bank, S.L.A. (In re Bayonne Medical Center)*,
   429 B.R. 152 (Bankr. D.N.J. 2010) .........................................................................21

*Williams v. Mortillaro (In re Resource, Recycling & Remediation, Inc.)*,
   314 B.R. 62 (Bankr. W.D. Pa. 2004) .......................................................................29

*Yankees Ent. and Sports Network, LLC v. Hartford Fire Ins. Co.*,
   634 F.Supp.3d 203 (D. Del. 2022)............................................................................9

**STATUTES**

6 *Del. C.*
   § 1304(a)(2) .............................................................................................................26
   § 1304(b)...................................................................................................................20

11 U.S.C.
  § 101(22)(A) ...............................................................................................................28
  § 101(31)(B) ...............................................................................................................21
  § 101(32)(A) ...............................................................................................................26
  § 544 ..................................................................................................................12, 13
  § 546(e) ......................................................................................................................28
  § 547 ..........................................................................................................................13
  § 548 ..........................................................................................................12, 13, 14
  § 548(a)(1)(A) ............................................................................................................16
  § 548(a)(1)(B) ............................................................................................................23
  § 550 ......................................................................................................12, 13, 14, 29
  § 550(a) ......................................................................................................................29
  § 550(a)(2) .................................................................................................................29

## RULES

Fed. R. Bankr. P.
  7009 ............................................................................................................................1
  7012 ............................................................................................................................1
  7012(b) .......................................................................................................................1

Fed. R. Civ. P.
  9(b) ......................................................................................................................16, 21
  12(b)(2) ...........................................................................................................1, 3, 12
  12(b)(6) ...............................................................................................................*passim*

Defendants Genesis Digital Assets Limited ("GDA Limited"), GDA US Inc. ("GDA US"), DDH (North America) Inc. ("DDH (NA)"), DDH-Cholla, LLC, and DDH-OK-1, LLC (collectively, "Defendants") respectfully submit this memorandum of law in support of their Motion to Dismiss (the "Motion") with prejudice all claims asserted against them by Plaintiff FTX Recovery Trust (the "Trust") pursuant to Rules 12(b)(2) and 12(b)(6) of the Federal Rules of Civil Procedure made applicable to these proceedings by Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") 7009 and 7012.  Pursuant to Bankruptcy Rule 7012(b), Defendants do not consent to the entry of final orders or judgments by the Bankruptcy Court in this adversary proceeding.[1]

## PRELIMINARY STATEMENT

Beginning in August 2021, Alameda (as defined below) engaged in a series of transactions to purchase shares of GDA Limited, a Cypriot entity with its headquarters in Dubai and no offices in the United States.  The Trust now asserts fraudulent transfer claims against GDA Limited attempting to recover the funds Alameda used for those purchases—investments which, even as alleged, had significant "upside" value.  The Trust's claims fail for multiple, independent reasons.[2]

*First*, the Complaint fails under Rule 12(b)(2) for failure to establish personal jurisdiction as to GDA Limited.  There is no general jurisdiction because GDA Limited is a Cypriot entity with its headquarters in Dubai and it has no offices and conducts no management in the United States.  Nor does the Trust plead facts sufficient to establish specific jurisdiction because there are no allegations that GDA Limited's claim-related activities were directed at the United States.  The

---

[1] Any capitalized terms used, but not defined herein, have the meanings ascribed to such terms in the Complaint.

[2] The Trust alleges similar claims against two GDA Limited founders, also based outside of the United States, but those claims are not the subject of this Motion.  The "Defendants" described above as bringing this Motion do not include those individuals.

Trust's efforts to evade this defect through an alter ego theory of personal jurisdiction also fail. As in the pleadings this Court found deficient in its recent *Huobi* decision, the Trust pleads no facts showing abuse of the corporate form to justify imputing the DDH Entities' US activities to GDA Limited.

*Second*, and similarly, the alleged conduct at issue was extraterritorial, not domestic, and the Trust's claims do not apply extraterritorially.

*Third*, the Trust's actual and constructive fraudulent transfer claims fail under Rule 12(b)(6) for multiple reasons:

(A) The actual fraudulent transfer claims fail because not only does the Complaint fail to allege fraudulent intent, but it makes clear there were *alternative*, *legitimate* purposes for the Transfers (as defined below), and it does nothing to establish a connection between the FTX Group's alleged fraudulent scheme to these specific transfers.  It is not surprising, then, that the Trust fails to allege any "badges of fraud" with particularity.

(B) The Trust's constructive fraud claims fail to allege sufficient facts to support conclusions of Alameda's insolvency or a lack of reasonably equivalent value in the Transfers. Instead, the Trust's own allegations support the conclusion that Alameda received substantial value, and the expectation of additional value, from its shares in GDA Limited.  And the FTX Group's own documents undermine any insolvency allegations at the time of the GDA Limited Transfers.

(C) The Bankruptcy Code's safe harbor provision in section 546(e) bars the constructive fraudulent transfer claims.

(D) The Trust's property recovery claims fail because such claims are a secondary cause of action that arise only after a trustee has prevailed on an avoidance claim.  The Trust has not

done so here, and the Trust even fails to plead any avoidable transfers exist. Nor does the Trust

plead, with respect to the Second SPA Transfer and Option Transfer (as defined below), that any

DDH Entity was a subsequent transferee.

For these reasons and others described below, the Trust's claims against the Defendants

should be dismissed with prejudice.

## FACTUAL BACKGROUND

## I.    GDA LIMITED IS A FOREIGN ENTITY

GDA Limited is a holding company that was founded, incorporated, and registered as a

private limited liability company in Cyprus on June 15, 2017, and remains incorporated in Cyprus.

Declaration of Evgeny Lvov ("Decl."), filed contemporaneously with the Motion, ¶¶ 4-5.[3]  GDA

Limited is the sole owner of GDA US.  DDH (NA) is wholly owned by GDA US.  DDH-Cholla,

LLC, and DDH-OK-1, LLC (collectively, with GDA US and DDH (NA), the "DDH Entities") are

wholly owned subsidiaries of DDH (NA).  *See* Compl. ¶¶ 17-19, n.2; Decl. ¶ 24.  In addition:

- GDA Limited has maintained one or more Cyprus offices since its founding.  Decl. ¶ 5. From 2017 to 2022, GDA Limited was headquartered outside of the United States in an Eastern European city.  *Id.*  Since September 2022, GDA Limited has been headquartered in Dubai.  *Id.*  Its management is based in Dubai (with the Head of Legal sitting in Cyprus), where officers run GDA Limited's corporate operations.  *Id.*

- GDA Limited has never been incorporated in the United States, and does not have, and has never had, offices, officers, managers, directors, or employees in the US.  *Id.* ¶ 6.[4]

- GDA Limited has one bank account in Puerto Rico holding approximately $10,000.  *Id.* ¶ 7.  GDA Limited holds no other assets in the United States.  *Id.*

---

[3] In a motion to dismiss under Rule 12(b)(2), a defendant "may submit an affidavit contradicting the jurisdictional allegations leveled against" it, and once a defendant has done so, "the plaintiff bears the burden of establishing personal jurisdiction by a preponderance of the evidence."  *Dunn v. Barney*, No. 21-50264 (TMH), 2024 WL 667366, at *3 (Bankr. D. Del. Feb. 16, 2024).

[4] GDA Limited's website lists offices in Dubai and Houston, Compl. ¶ 16, but GDA Limited's headquarters are in Dubai, and the Houston office is the headquarters of DDH (NA).  Decl. ¶ 10.

- GDA Limited's shareholder agreement is governed by English law and contains an exclusive jurisdiction clause to submit disputes to England and Wales courts. *Id.* ¶ 12.

- In 2021 and 2022, GDA Limited undertook three rounds of funding to accelerate growth, expand operations, and increase assets in anticipation of a potential initial public offering and raised a total of $1,095,398,274 funding. *Id.* ¶ 13.

- Through these funding rounds, GDA Limited raised $601,131,862.32 from Alameda Research LLC ("Alameda Research"), Alameda Research Ltd., and Alameda Research Ventures Ltd. ("Alameda Ventures," together with Alameda Research, Alameda Research Ltd., and its affiliates, "Alameda"), which constitutes only approximately 55% of the funding raised across all three funding rounds in 2021 and 2022. *Id.* ¶ 23.

## II.    AS ALLEGED, ALAMEDA INVESTED IN GDA LIMITED DURING AN ATTRACTIVE MARKET AND BASED ON ITS "UPSIDE" VALUE

In early 2021, GDA Limited undertook the first funding round, in which GDA Limited raised a total of $150,000,000 from 2 different entities (with a non-US investor as the lead investor) by selling 360 shares at a price of $416,667 per share, which is approximately 14% of the total funding from the three funding rounds in 2021 and 2022. *Id.* ¶ 14.

In spring through fall of 2021, GDA Limited engaged in a second funding round. *Id.* ¶ 15. In this funding round, GDA Limited raised a total of $431,250,000 from 13 different entities by selling 207 Series A Preferred Shares at a price of $2,083,333.34 per share, approximately 39% of the total funding from the three funding rounds in 2021 and 2022. *Id.* As part of the second funding round, on August 31, 2021, GDA Limited entered into a share purchase agreement (the "First SPA") with Alameda Ventures for the sale of 48 Series A Preferred Shares at $2,083,333.34 per share (based on then-current valuation of GDA at $3.25 billion). *Id.* ¶¶ 18-19, Ex. 1 (First SPA). At this time, the crypto currency market and crypto mining industry were rapidly growing. *See Grayscale Invs., LLC v. SEC*, 82 F.4th 1239, 1251 (D.C. Cir. 2023) ("nearly every measurable metric related to bitcoin futures [in 2021] had trended consistently up."). Indeed, the Complaint pleads that Alameda invested in GDA Limited to "captur[e] [] the upside" of its and bitcoin's

anticipated growth and continued expansion of operations.  Compl. ¶ 110.  Alameda Ventures contributed only approximately 23% of the total funds raised in the second round and only approximately 9% of the total funds raised across all three funding rounds.  Decl. ¶ 19.  On October 5, 2021, Alameda Ventures transferred $100,000,000.32 from Alameda Research Ltd.'s US bank account to GDA Limited's Swiss bank account to purchase shares under the First SPA (the "First SPA Transfer").  Compl. ¶¶ 59-60; Decl. ¶ 19.

In 2022, GDA Limited engaged in a third fundraising round.  Decl. ¶ 16.  In this funding round, GDA Limited raised a total of $514,148,274 from four (4) different entities by selling 158 Series A Preferred Shares at a price of $3,254,103 per share.  *Id.*  This is approximately 47% of the total funding from the three funding rounds in 2021 and 2022.  *Id.*  On February 28, 2022, GDA Limited entered into a second share purchase agreement (the "Second SPA") with Alameda Research for the sale of 77 additional Series A Preferred Shares at a price of $3,254,103 per share, which was based on a then-current valuation of $5.75 billion.  *See id.* ¶ 20, Ex. 2 (Second SPA). On February 28, 2022, Alameda Research transferred $250,565,931 from its US bank account to GDA Limited's Swiss bank account for the purchase of those shares (the "Second SPA Transfer"). *Id.* ¶ 20.  The Second SPA also included options under which (i) GDA Limited could bind Alameda Research to purchase up to 77 additional Series A Preferred Shares at the same share price, (the "Option"), and (ii) Alameda Research could subscribe for up to 116 Ordinary Shares in GDA at the same price ($3,254,103) (the "Call Option").  Second SPA § 1.04.[5]  GDA Limited exercised the Option, and on April 13, 2022, Alameda Research transferred $250,565,931 to GDA Limited's Swiss bank account for the purchase of 77 Series A Preferred Shares (the "Option Transfer," and together with the First SPA Transfer and Second SPA Transfer, the "Transfers").  Compl. ¶ 87;

---

[5] The three other entities involved in this funding round did not receive options.  Decl. ¶ 21 n.2.

Decl. ¶ 22.  Alameda Research never exercised the Call Option.  *See* Compl. ¶ 11.  Alameda

Research's investments under the Second SPA account for approximately 46% of the total funds

raised across all three funding rounds.  Decl. ¶ 22.

Both the First SPA and the Second SPA are governed by English law and contain

agreements to submit disputes to the exclusive jurisdiction of the courts of England and Wales.  In

total, between August 31, 2021 and April 13, 2022, Alameda Ventures and Alameda Research

Holdings acquired 202 Series A Preferred Shares in GDA Limited for $601,131,862.32.[6]

## III.    THE ALAMEDA ENTITIES ONLY INVESTED IN GDA LIMITED

The Trust names the DDH Entities as defendants, despite not having invested in them, to

manufacture jurisdiction through an alleged alter ego theory.  Compl. ¶¶ 11, 20.  However:

- GDA Limited does not control the day-to-day operations of the DDH Entities, which are managed by each subsidiary's own employees and officers, who are primarily located within the United States, including at the DDH (NA) Houston office.  Decl. ¶ 26.

- Each of the DDH Entities is validly incorporated, elects directors/officers, either holds annual board meetings or has unanimous written consents for corporate actions, has bylaws or LLC agreements, enters into contracts in its own name, files or pays property and sales tax in its own name, maintains separate corporate records, and has its own corporate checking and banking accounts.  *Id.* ¶ 29.

- The DDH Entities currently have positive EBITDA and maintain sufficient capital to fund their own operations—*i.e.*, they are not dependent on funding from GDA Limited.  *Id.*

- GDA Limited itself does not build, manage, or scale bitcoin mining and/or hosting facilities.  *Id.* ¶ 4.  Instead, the DDH Entities are in the business of building, managing, and scaling bitcoin mining and/or hosting facilities throughout the world.  *Id.*

- The Trust's allegations that the Transfers were merely passed on to the DDH Entities to expand operations in the United States, Compl. ¶ 107, is inaccurate.  GDA Limited used the funds raised through the 2021-2022 fundraising, including the Alameda investments,

---

[6] There are two additional transfers at issue in the Complaint, made to Marco Krohn and Rashit Makhat (the "Founder Transfers").  Compl. ¶ 11.  The Complaint does not allege that GDA Limited was a transferee of the Founder Transfers, so claims against GDA Limited as to those transfers must be dismissed.  *See id.* ¶ 6 (alleging Founder Transfers "went directly to Makhat and Krohn personally … and convey[] no benefit to GDA itself.").

for a variety of purposes, including to expand operations in Sweden and Kazakhstan. Decl. ¶ 25. Any funds transferred from GDA Limited to the DDH Entities were ultimately controlled by the DDH Entities as separate and distinct entities from GDA Limited. *Id.* ¶ 26.

## ARGUMENT

### I.    THIS COURT DOES NOT HAVE JURISDICTION OVER GDA LIMITED

For a court to have personal jurisdiction over a party, the party must have minimum contacts with the forum such that "maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 923 (2011). To that end, a plaintiff bears the burden of alleging facts sufficient to make a prima facie showing of personal jurisdiction—either general or specific jurisdiction—over the defendant. *Dunn*, 2024 WL 667366, at *3; *FTX Recovery Trust v. Huobi Global Ltd., et al.*, No. 24-50219 (KBO) (Bankr. D. Del. Dec. 8, 2025) [Docket No. 63], Hr'g Tr. 54:7-17 (without support for conclusory alter ego allegations, an amended complaint "most likely will not pass muster") (Owens, J.). Here, GDA Limited has submitted an affidavit contradicting the Trust's jurisdictional allegations, so the Trust "bears the burden of establishing personal jurisdiction by a preponderance of the evidence." *Dunn*, 2024 WL 667366, at *3. The Trust cannot do so.

### A.    The Trust Fails to Plead General Jurisdiction Over GDA Limited

A court has general jurisdiction over a defendant when it is "at home" in the forum, in this case, the United States. *Goodyear*, 564 U.S. at 919. A corporation is "at home" where it is incorporated and has its principal place of business. *Daimler AG v. Bauman*, 571 U.S. 117, 118 (2014). A corporation's principal place of business is the location where its "officers direct, control, and coordinate the corporation's activities." *Hertz Corp. v. Friend*, 559 U.S. 77, 92-93 (2010). General jurisdiction is "evaluated at the time the complaint was filed." *See Round Rock Rsch. LLC v. ASUSTeK Computer Inc.*, 967 F. Supp. 2d 969, 974 (D. Del. 2013).

GDA Limited is not "at home" in the United States.  GDA Limited is incorporated in Cyprus, and its headquarters are in Dubai.  Decl. ¶ 5.[7]  Its officers direct and control GDA Limited's activities from Dubai, except for its Head of Legal, who is located in Cyprus.  *Id.* Accordingly, the Complaint fails to allege GDA Limited's place of incorporation or principal place of business is in the United States, and, as such, GDA Limited is not subject to the general jurisdiction of this Court.  *Daimler AG*, 571 U.S. at 118.

**B.**     **The Trust Fails to Plead Specific Jurisdiction Over GDA Limited**

To establish specific jurisdiction, "the plaintiff must establish with reasonable particularity" that (1) the defendant "purposefully directed its activities at the forum," (2) the claims "arise out of or relate to the defendant's activities," and (3) that "exercising personal jurisdiction will not offend traditional notions of fair play and substantial justice." *Danziger & De Llano, LLP v. Morgan Verkamp LLC*, 948 F.3d 124, 129-30 (3d Cir. 2020).  Specific jurisdiction is "claim specific," so "personal jurisdiction over one of the defendants as to a particular claim … does not necessarily mean that [the Court] has personal jurisdiction over that same defendant as to [plaintiff's] other claims."  *Remick v. Manfredy*, 238 F.3d 248, 255 (3d Cir. 2001).

1.     *There is no jurisdiction over GDA Limited with respect to Counts I-V*

The relevant contacts for Counts I-V are those arising from the Transfers, that is, the Transfers from Alameda to GDA Limited, not any alleged subsequent transfer from GDA Limited to the DDH Entities.  The Transfers arose from and were controlled by the First SPA and Second SPA, which were contracts for the purchase of stock from a *foreign* entity, contain *foreign* forum selection and choice of law clauses, and contain no contractual requirement for the use of funds

---

[7] The Trust used GDA's website as support for its allegation that GDA Limited's headquarters is in Houston, Texas, Compl. ¶ 16, but GDA Limited and its subsidiaries have one website, which lists both the Dubai office (GDA Limited's headquarters), and the Houston office, which is DDH (NA)'s headquarters.  Decl. ¶ 10.

from the Transfers for projects within the United States. *See generally* First SPA, Second SPA. That the Second SPA was with Alameda Research, a Delaware entity, does not suffice to establish that GDA Limited "directed" any activity at the United States. *See Walden v. Fiore*, 571 U.S. 277, 284-85 (2014) (the contacts must be "with the forum … itself, not the defendant's contacts with persons who reside there"); *Aldossari v. Ripp*, 49 F.4th 236, 259 (3d Cir. 2022) ("Merely entering into a contract with a resident of a state, absent any indication that the contract was executed or performed there, is insufficient to justify the exercise of personal jurisdiction in that state"); *Yankees Ent. and Sports Network, LLC v. Hartford Fire Ins. Co.*, 634 F.Supp.3d 203, 210-11 (D. Del. 2022) ), *aff'd*, No. 22-3121 (AJF), 2023 WL 6291784 (3d Cir. Sept. 27, 2023) (similar). That a Transfer originated from Alameda's US bank account, *see* Compl. ¶ 85, also does not establish that GDA Limited purposefully availed itself of the forum. *See Importers Serv. Corp. v. Aliotta*, No. 22-cv-4640 (EP), 2024 WL 2765620, at *7 (D.N.J. May 30, 2024) (declining to exercise jurisdiction over foreign holding company, stating that "the mere receipt of funds by a foreign entity is insufficient to confer personal jurisdiction over that entity").

The Trust's only attempt to plead that GDA Limited purposefully directed activities related to the Transfers to the United States is an allegation that "GDA also represented that it planned to expand its operations into the United States." Compl. ¶ 54. Alleging some possible future use of some unspecified funds does not establish a connection between the Transfers, GDA Limited, and the United States. *See Carvel v. Griffin*, No. 074-273-JJF, 2008 WL 4922432, at *6 (D. Del. Nov. 18, 2008) (no personal jurisdiction over the defendant in part because defendant's conduct was "merely random, fortuitous, or attenuated"). Moreover, even if the Complaint alleged US-directed activity with the requisite particularity, the "activity" would be a transfer from GDA Limited to

the DDH Entities, which fails as to GDA Limited for the reasons discussed below.  *See infra* §
I.B.2.

### 2.    *There is no jurisdiction over GDA Limited with respect to Count VI*

For Count VI, the relevant GDA Limited contacts are those that arise from GDA Limited's
alleged transfers to the DDH Entities.  The Trust does not allege specific facts, as required, that
funds from the Transfers were then transferred to the DDH Entities.  *See* Compl. ¶ 61 ("Upon
information and belief, these funds were further transferred to the GDA U.S. Subsidiaries.").[8]
Even if it did, payment to a US "resident, without more, does not show a deliberate targeting of
[the forum]."  *Jovanovic v. US Olympic & Paralympic Comm.*, No. 22-2098 (ZNQ), 2025 WL
1218155, at *4-5 (D.N.J. Apr. 28, 2025); *see also Walden*, 571 U.S. at 284-85 (the contacts must
be "with the forum … itself, not the defendant's contacts with persons who reside there.").  Even
knowledge that the funds would ultimately be used in the United States is insufficient to establish
specific jurisdiction absent the defendant's control over such funds.  *Jovanovic*, 2025 WL
1218155, at *5 ("even if [defendant] had knowledge that the grant money would be used [in the
forum], it was not [the defendant's] decision to build it, much less refine it, in [the forum].").[9]
Thus, the Complaint fails to establish specific jurisdiction because it does not allege with
"reasonable particularity" that GDA Limited "purposefully directed its activities" at the United
States.  *Danziger*, 948 F.3d at 129.

---

[8] The Trust alleges that GDA Limited made certain loans to the DDH Entities after the second
funding round, but it does not allege that the specific funds received by GDA Limited were the
same funds then allegedly loaned to the DDH Entities.  Money is fungible and at the time of these
alleged loans, GDA Limited had raised hundreds of millions of dollars from other third-party
investors and Alameda Ventures invested only 23% of that funding.  *See* Decl. ¶¶ 13-16.

[9] *See also*, *e.g.*, *Grainer v. Smallboard, Inc.*, No. 16-4866, 2017 WL 736718, at *2 (E.D. Pa. Feb.
24, 2017) ("The fact that Smallboard.com made payments to Plaintiff's bank account in
Pennsylvania, without more, does not establish specific jurisdiction."); *Traisman v. Khmelnitsky*,
19-cv-11045 (KSH) (CLW), 2020 WL 2847751, at *9 (D.N.J. June 1, 2020) (similar).

### C.    The Trust Fails to Plead Sufficiently that DDH Entities Were Alter Egos

The Trust's meager effort to allege an alter ego theory of personal jurisdiction over GDA Limited also fails.  To plead personal jurisdiction on an alter ego theory, a plaintiff must allege that the "contacts of an entity with sufficient ties to a particular forum can be attributed to another entity [because] the entity with the requisite forum contacts is the mere alter ego of the other; this requires a showing similar to piercing the corporate veil." *Sierra v. Trafigura Trading LLC*, No. 22-366 (CJB), 2024 WL 3823018, at *10 (D. Del. Aug. 14, 2024).  An "alter ego theory of personal jurisdiction" is "strictly applied" and only found in exceptional cases. *Fid. Nat'l Info. Servs, Inc. v. Plano Encryption Techs, LLC*, Civ. No. 15-777-LPS-CJB, 2016 WL 1650763, at *4 (D. Del. Apr. 25, 2016).  A plaintiff must "support alter-ego claims" with "facts that are alleged in the complaint." *FTX Recovery Trust (Huobi)*, No. 24-50219 (KBO) [Docket No. 63], Hr'g Tr. 54:14-15; *see also Sierra*, 2024 WL 3823018, at *13 (dismissing for lack of personal jurisdiction where alter-ego theory was only "vaguely suggest[ed]"); *Fid. Nat'l Info. Servs, Inc*., 2016 WL 1650763, at *5 (dismissing for lack of personal jurisdiction and declining to grant jurisdictional discovery where plaintiff "d[id] nothing more than simply recite the factors relevant" to alter-ego theory).

Here, the Trust's alter ego allegations are bare conclusory statements with no factual support.  The Trust alleges "upon information and belief" that the DDH Entities "operate as the alter egos of GDA," "are wholly controlled by GDA,"[10] "share overlapping employees and

---

[10] Merely being a holding company is not a basis for an alter ego claim.  Courts look at whether there is "interference in the day-to-day operations of the subsidiary" to determine whether there is "total control." *Sears, Roebuck & Co. v. Sears plc*, 744 F. Supp. 1297, 1305 (D. Del. 1990) (despite parent oversight of the subsidiary's major policy decisions, there was no pervasive interference with daily operations, and thus no total control).  The Trust does not—and cannot—allege that GDA Limited interfered in or controlled its subsidiaries' day-to-day operations. Decl. ¶ 26.

directors,"[11] "otherwise fail to keep adequate corporate records or separate books,"[12] "had no sources of funds other than those raised by GDA,"[13] and were "controlled" by the "same individuals that controlled GDA." Compl. ¶¶ 20, 16, 107-08. Such conclusory allegations are impermissible, and rebutted by the Declaration, and therefore do not support personal jurisdiction over GDA Limited under an alter ego theory.

*    *    *

Because neither general nor specific personal jurisdiction exists, the Court should dismiss all claims against GDA Limited for lack of personal jurisdiction under Rule 12(b)(2).

## II.    THE TRUST'S CLAIMS ARE BARRED BECAUSE SECTIONS 544, 548, AND 550 OF THE BANKRUPTCY CODE DO NOT APPLY EXTRATERRITORIALY

Extraterritorial application of federal law is barred "[a]bsent clearly expressed congressional intent to the contrary." *RJR Nabisco, Inc. v. European Cmty*, 579 U.S. 325, 325-26 (2016) (citing *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 255 (2010)). To determine whether a federal law may be applied extraterritorially, courts engage in a two-step analysis. First,

---

[11] Even if supported, it is insufficient to support an alter ego argument. *Action Mfg. Co., Inc. v. Simon Wrecking Co.*, 375 F. Supp. 2d 411, 424 (E.D. Pa. 2005) ("overlapping directors … is not sufficient to establish an alter ego relationship and it does not establish that the parent's supervision over the subsidiary is greater than that normally associated with parent-subsidiary relationships.").

[12] Each DDH Entity is validly incorporated, elects directors/officers, holds annual board meetings or has unanimous written consents for corporate actions, has bylaws or LLC agreements, enters into contracts in its own name, files or pays property and sales tax in its own name, maintains separate corporate records, and has its own corporate checking accounts. *Compare* Decl. ¶ 29, *with E.I. du Pont de Nemours and Co. v. Agfa-Gavaert NV*, 335 F.Supp.3d 657, 675-76 (D. Del. 2018) (personal jurisdiction was not established on similar facts).

[13] The DDH Entities are not "entirely capitalized by transfers from GDA." Compl. ¶ 16. Each DDH Entity has positive EBITDA and maintains enough capital to operate independently. Decl. ¶ 30. And that GDA US, Inc. is a 100% subsidiary of GDA Limited does not establish an alter ego relationship. *See, e.g., FTX Recovery Trust (Huobi)*, No. 24-50219 (KBO) [Docket No. 63], Hr'g Tr. 54:15-17 ("control and ownership is just one fact," and insufficient); *Baker v. LivaNova PLC*, 210 F.Supp.3d 642, 650 (M.D. Pa. 2016) (an alter-ego relationship is not established even when parent owns all stock in the subsidiaries and the companies operate under a united image).

the court must determine whether "the presumption against extraterritoriality has been rebutted—

that is, whether the statute gives a clear, affirmative indication that it applies extraterritorially."

*RJR Nabisco*, 579 U.S. at 337.  Second, if the presumption has not been rebutted, courts look to a

statute's "focus" to determine "whether the case involves a domestic application of the statute."

*Id.*  "[I]f the conduct relevant to the [statute's] focus occurred in a foreign country, then the case

involves an impermissible extraterritorial application regardless of any other conduct that occurred

in U.S. territory."  *Id.*  The "proper focus" of the second inquiry is the focus of the statute—in the

case of an avoidance action, the transfers themselves—"not the parties' relationship or locus."

*King v. Export Dev. Canada (In re Zetta Jet USA, Inc.)* 624 B.R. 461, 489 (Bankr. C.D. Cal. 2020).

Courts look to the "center of gravity" of the transfers, including where they originated, the location

of the transferor, where the funds were provided from, the law to be applied, forum selection, and

currency.  *Id.* at 490; *see also Sherwood Invs. Overseas Ltd., Inc. v. Royal Bank of Scotland (In re

Sherwood Invs. Overseas Ltd., Inc.)*, No. 10-00158 (KSJ), 2015 WL 4486470, at *19 (Bankr. M.D.

Fla. July 22, 2015), *aff'd*, No. 15-1469 (ORL), 2016 WL 5719450 (M.D. Fla. Sept. 30, 2016) ("it

is the transfer *not* the debtor's physical presence" that is determinative).

    *First*, the three sections of the Bankruptcy Code relied upon in the Complaint—sections

544, 548, and 550—contain no such "clear" or "affirmative" indications that they were created to

govern foreign transactions, as required under *RJR Nabisco* or *Morrison*.  Indeed, the "majority of

cases … hold that §§ 547 and 548 do not have extraterritorial application."  *Zetta Jet*, 624 B.R. at

476 (collecting cases); *see also LaMonica v. CEVA Grp. PLC (In re CIL Ltd.)*, 582 B.R. 46, 84-85

(Bankr. S.D.N.Y. 2018), *amended on reconsideration*, No. 13-11272 (JLG), 2018 WL 3031094

(Bankr. S.D.N.Y. June 15, 2018) ("Nothing in the language of sections 544, 548 and 550 of the

Bankruptcy Code suggests that Congress intended those provision[s] to apply to foreign

transfers."); *Barclay v. Swiss Fin. Corp. Ltd. (In re Bankr. Est. of Midland Euro Exch. Inc.)*, 347 B.R. 708, 718 (Bankr. C.D. Cal. 2006) ("[N]either the plain language of the statute nor its reading in conjunction with other parts of the Code establish congressional intent to apply § 548 extraterritorially …."). [14]   In line with these cases, the Court here should find the same: that the provisions of federal law underlying the Complaint were not specifically intended to apply extraterritorially.

*Second*, the "center of gravity" of the Trust's claims is extraterritorial and thus is not a domestic application of federal law.  The First SPA Transfer was allegedly a transfer by a foreign entity, Alameda Research Ltd., a British Virgin Islands Company, to another foreign entity's, GDA Limited's, Swiss bank account involving funds allegedly misappropriated from another foreign entity, FTX, and was done in connection with an agreement for the issuance of stock from a foreign entity, GDA Limited, to another foreign entity, Alameda Ventures Ltd., that contained forum selection and choice of law clauses providing for the application of English and Welsh law. Compl. ¶¶ 58-60; First SPA § 8.14; Decl. ¶ 19; D.I. 24 Nov. 17, 2022, *Decl. of John J. Ray III in Support of Ch. 11 Petitions and First Day Pleadings* ("Ray Decl.") ¶ 33. [15]   While the Complaint alleges the First SPA Transfer passed through Alameda Research Ltd.'s bank account, that does not make a transaction—where all other factors are foreign—domestic, and indeed, the Trust itself alleges that the transferred funds originated in accounts belonging to FTX, a foreign entity.  Compl.

---

[14] A minority of cases have taken a contrary position despite the statute's plain language and the Supreme Court's guidance that courts must presume that statutes do not apply extraterritoriality. *See, e.g.*, *Emerald Cap. Advisors Corp. v. BMW A.G.*, 572 B.R. 117, 125–26 (Bankr. D. Del. 2017) ("It would be inconsistent (such that Congress could not have intended) that property located anywhere in the world could be property of the estate once recovered under section 550, but that a trustee could not avoid the fraudulent transfer and recover that property if the center of gravity of the fraudulent transfer were outside of the United States.").

[15] The Complaint conveniently leaves out that the bank account to which the First SPA funds were transferred was also foreign.  Decl. ¶¶ 18-19.

¶ 59; Ray Decl. ¶ 33; *see Zetta Jet*, 624 B.R. at 495 (holding transfer utilizing a New York account was still foreign because the account was "merely a conduit" through which the funds flowed).

The Second SPA Transfer and Option Transfer were also foreign transactions.  They were transfers to a Swiss account of a foreign entity in connection with a share purchase agreement with a foreign entity that contained foreign forum and choice of law clauses.  Decl. ¶ 20; Second SPA. The Trust alleges that these transfers were from a Delaware entity and originated from a US bank account; however, even if true, these facts do not change the conclusion that the focus of the transactions—the shares being purchased, the transferee, and the controlling agreement—were all foreign.  *See Loginovskaya v. Batratchenko*, 764 F.3d 266, 275 (2d Cir. 2014) (the "transfer [of] money to the United States is insufficient to demonstrate a domestic transaction").

Thus, it is clear from the Complaint that "the conduct relevant to the [statute's] focus" "occurred in a foreign country." *RJR Nabisco, Inc*, 579 U.S. at 337.  As a matter of law, therefore, this "case involves an impermissible extraterritorial application regardless of any other conduct that occurred in U.S. territory." *Zetta Jet*, 624 B.R. at 487.

## III.    THE CLAIMS AGAINST DEFENDANTS SHOULD BE DISMISSED UNDER RULE 12(B)(6)

A motion to dismiss under Rule 12(b)(6) should be granted if the complaint does not contain sufficient factual matter to state a claim to relief that is plausible on its face.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Because the Court is not required to accept a plaintiff's legal conclusions as true, a plaintiff's bare and conclusory "recitals of a cause of action … will not suffice."  *Miller v. Black Diamond Cap. Mgmt., L.L.C. (In re Bayou Steel BD Holdings, L.L.C.)*, 642 B.R. 371, 381-382 (Bankr. D. Del. 2022).  On a motion to dismiss, the court may consider the complaint itself, as well as "documents attached to the complaint and matters of public record …." *McTernan v. City of York, Penn.*, 577 F.3d 521, 526 (3d Cir. 2009).  A plaintiff may plead facts

on information and belief "[w]here it can be shown that the requisite factual information is peculiarly within the defendant's knowledge or control," there are no "boilerplate and conclusory allegations," and plaintiffs provide "factual allegations that make their theoretically viable claim plausible." *In re Rockefeller Center Props., Inc. Sec. Litig.*, 311 F.3d 198, 216 (3d Cir. 2002). The Trust's Complaint against Defendants should be dismissed under Rule 12(b)(6) for failure to state a claim.

### A.    The Trust's Actual Fraudulent Transfer Claims (Counts I and II) Fail Under Rule 12(b)(6)

To plead an actual fraudulent transfer claim, a plaintiff must show the transfers were made by a debtor with actual intent to hinder, delay, or defraud any entity to which the transferor was or became, on or after the date that such transfer was made or obligation was incurred, indebted.  11 U.S.C. § 548(a)(1)(A).  The focus is on the intent of the transferors—here, Alameda Ventures and Alameda Research (not the other hundreds of entities in the FTX Group).  *See Phillips v. Josmic 2 LLC (In re ONH ACF CS Inv'rs, LLC)*, 671 B.R. 680, 696-97 (Bankr. D. Del. 2025) (noting focus is "unambiguously" on intent of transferor-debtor).[16]

Actual fraudulent transfer claims must satisfy the heightened pleading standard of Rule 9(b), which requires that the plaintiff "plead the who, what, where, when, how, and why of a

---

[16] Substantive consolidation of the entities in the FTX Group does not change this analysis as it did not "give rise to any defense … with respect to any Cause of Action vesting in the [the Trust]." *See* Findings of Fact, Conclusions of Law and Order Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of FTX Trading Ltd. and Its Debtor Affiliates [Docket No. 26404], ¶ 104 ("the substantive consolidation shall not: (i) affect the separate legal existence of the Consolidated Debtors for purposes other than implementation of the Plan pursuant to its terms; (ii) constitute or give rise to any defense, counterclaim or right of netting or setoff with respect to any Cause of Action vesting in the Consolidated Wind Down Trust that could not have been asserted against the Consolidated Debtors …."). Moreover, doing so would violate the maxim that "substantive consolidation should be used defensively … not offensively …, nor [as] a free pass to spare Debtors … from proving challenges, like fraudulent transfer claims, that are liberally brandished to scare yet are hard to show." *In re Owens Corning*, 419 F.3d 195, 215 (3d Cir. 2005).

fraudulent transfer claim." *Friedman v. Wellspring Capital Mgmt. (In re Sportco Holdings, Inc.), LLC*, Nos. 19-11299, 20-50554 (JKS), 2021 WL 4823513, at *4 (Bankr. D. Del. Oct. 14, 2021). A plaintiff must "do more than identify" the transfers and must "plead facts that allow the court to reasonably infer actual fraud." *Miller*, 642 B.R. at 397. To survive a motion to dismiss an actual fraudulent transfer claim a plaintiff must establish intent through direct evidence or circumstantial evidence by alleging "badges of fraud." *See Friedman*, 2021 WL 4823513, at *14. The Trust does neither.

            1.    *The Trust Does Not Adequately Allege Actual Fraudulent Intent*

The Trust fails to allege direct evidence of fraudulent intent with respect to the Transfers. The Trust does not allege with any specificity that Alameda Ventures or Alameda Research entered into the Transfers with the intent to defraud their creditors. The Trust instead alleges that Bankman-Fried engaged in fraud by "misappropriating" funds from *FTX trading platforms*, Compl. ¶¶ 38, 109-11, but that is a *step removed from Alameda's separate investment* in the indisputably legitimate business of GDA Limited. But again, Bankman-Fried's motives with respect to any potential *future* profits are irrelevant to assessing the propriety in the first place of Alameda's separate investment in GDA Limited. When assessing Alameda's investment in GDA Limited, the Court should pay heed to the Complaint's allegations that it was intended to "capture nearly all of the upside" of the "potential success (both of GDA [Limited] and Bitcoin generally)" using "misappropriated" funds from FTX trading platforms. *Id.* ¶¶ 109-10.

The Trust's allegations here fail for the same reasons set forth in *In re FTX Trading Ltd.*, where the court dismissed actual fraudulent transfer claims because they failed to connect the specific transfer at issue to the alleged scheme or explain how the transfer furthered that scheme, and even included allegations suggesting multiple "entirely different purposes" for the transfer, including a non-scheme purpose. *See Alameda Rsch. Ltd. v. Rocket Internet Cap. Partners II SCS*

*(In re FTX Trading Ltd.)*, 2024 WL 4562675, at \*8-9 (fraudulent intent was not pled adequately where plaintiff's allegations "suggest[ed] entirely different purposes" for the transfer, including legitimate belief in profitability of the acquisition).

Even taking the Trust's allegations of a fraudulent scheme within the FTX Group generally as true, these allegations, without more, do nothing to establish that ***the Transfers themselves*** were fraudulent—that is, undertaken with actual intent to hinder, delay, or defraud creditors—as is required to state a claim. "Transfers made in furtherance of a larger scheme to defraud may support an inference of fraudulent intent, but only where the allegations of the complaint connect the specific transfers to the scheme." *Id.* at \*8; *see also Kapila v. WLN Family Ltd. P'ship (In re Leneve)*, 341 B.R. 53, 62 (Bankr. S.D. Fla. 2006) (fraudulent intent was not pled adequately, despite transferor's "fraudulent scheme," because the "crucial issue is the intention of the transferor at the time of the transfer" and "[t]he fact that those payments were ultimately at the expense of others proves little more than that [transferors] ran out of money to fund [the] various schemes"). The Trust does not connect the Transfers to its alleged scheme within the FTX Group generally. *See* Compl. ¶¶ 109-11.[17]  The Trust here, as in *FTX Trading Ltd.*, offers "simply nothing" to explain how the Transfers at issue were intended by Alameda Research and Alameda Ventures Ltd. to hinder, delay, or defraud their creditors by "further[ing] the [alleged] fraudulent

---

[17] For example, the Trust alleges a purportedly "close relationship" between Bankman-Fried and certain founders of GDA Limited. Compl. ¶ 112(iv). However, the Trust does not tie the *Transfers* to any alleged fraud within the FTX Group or to otherwise demonstrate the transferors' actual fraudulent intent. Further, the court has recognized that legitimate, non-fraudulent transactions may naturally arise from existing relationships, even relationships closer than those alleged here— insider relationships. *See Miller*, 642 B.R. at 396-97 (dismissing actual fraudulent transfer claims despite allegations of insider status and financial distress, recognizing that "insiders are likely lender candidates" for an entity in need of financing).

scheme[,]" and has therefore failed to plead fraudulent intent.  *See FTX Trading Ltd.*, 2024 WL 4562675, at *8 (dismissing actual fraudulent transfer claims).

The Trust further pleads a purportedly fraudulent scheme wherein "FTX Insiders" provided "misleading financial statements to Alameda's lenders," misrepresented Alameda's "financial condition," and generally created a "recurring need to expand the FTX Group to perpetuate a myth of success and growth," including through unidentified investments in "relatively early-stage companies."  Compl. ¶¶ 105, 100, 39, 45.  However, the Court dismissed near identical allegations in *FTX Trading Ltd.*, where the plaintiff's general allegation that FTX Insiders "needed to continue projecting a false image of profitability, growth, and legitimacy…, and that the [] acquisition was part of that scheme," as "the specific allegations they cite[d] to sa[id] nothing of the kind."  *FTX Trading Ltd.*, 2024 WL 4562675, at *9.  Similarly, the Trust's allegations of a generalized fraudulent scheme contain no supporting allegations to explain "how exactly the allegedly fraudulent transfers further the fraudulent scheme" as is required to plead an actual fraudulent transfer claim.  *Id.* at *8.[18]  Indeed, the Complaint alleges that the Transfers were for alternative, non-fraudulent purposes: to invest in GDA Limited to "captur[e] [] the upside" of GDA Limited's and bitcoin's "potential success."  Compl. ¶ 110.  This alternative, non-fraudulent purpose—to invest and profit from GDA Limited's success—demonstrates that the Trust has not adequately alleged actual fraudulent intent in the Transfers.  *See FTX Trading Ltd.*, 2024 WL 4562675, at *9 (fraudulent intent was not pled adequately where plaintiffs' allegations suggested the "entirely

---

[18] In addition, the Complaint does not and cannot temporally tie this general scheme to the Transfers.  For example, the Trust alleges Ellison stated Alameda provided misleading financial statements starting in July 2022, three months after the last of the Transfers.  *See* Compl. ¶ 105.

different purpose" of legitimately profiting through the acquisition).[19]  The Trust therefore fails to plead fraudulent intent through direct evidence.

> 2.  *The Trust Fails to Allege Sufficiently Circumstantial Evidence of Fraudulent Intent Through "Badges of Fraud"*

Badges of fraud include:  "(i) the relationship between the debtor and the transferee; (ii) consideration for the conveyance; (iii) insolvency or indebtedness of the debtors; (iv) how much of the debtor's estate was transferred; (v) reservation of benefits; control or dominion by the debtor over the property transferred; and (vi) secrecy or concealment of the transaction."  *In re FTX Trading Ltd.*, 2024 WL 4562675, at *7.  Delaware law considers these badges, along with several others:  "(4) Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit; … (6) The debtor absconded; (7) The debtor removed or concealed assets; … (11) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor."  6 *Del. C.* § 1304(b).[20]  "Conclusory statements that the badges of fraud are present are insufficient; the plaintiff must allege facts demonstrating that badges of fraud exist."  *Friedman*, 2021 WL 4823513, at *14 (dismissing actual fraudulent transfer claims).  Further, a plaintiff must allege more than one badge of fraud to plead circumstantial evidence of fraudulent intent; alleging even two or three badges may still be insufficient to plead fraudulent intent.  *See Miller*, 642 B.R. at 396 (allegations of insider status and poor financial condition "fail[ed] to support even a speculation" of actual fraud).

---

[19] The Trust's allegation that Bankman-Fried was "largely indifferent to the per share price paid, and prioritized speed over diligence," Compl. ¶ 112(v), can be read instead to support Alameda's urgency to "capture … the upside" of the GDA Shares, *id.* ¶ 110, and therefore does nothing to establish Alameda's actual intent to defraud creditors through the Transfers.

[20] Delaware's Uniform Fraudulent Transfer Act mirrors the Bankruptcy Code with respect to both actual and constructive fraudulent transfer claims, and the Court routinely considers these claims together without distinction. *See Friedman*, 2021 WL 4823513, at *14.

***Relationship between the debtor and transferee:***  In evaluating this badge of fraud, courts consider whether the transferee was an insider and whether the transferee was able to exert control or influence over the debtor.  *See Off. Comm. of Unsecured Creditors of Pack Liquidating, LLC v. Vagenas (In re Pack Liquidating, LLC)*, No. 23-50590 (CTG), 2025 WL 2587577, at \*6-7 (Bankr. D. Del. Sept. 5, 2025).  While the Complaint is replete with allegations that the FTX Insiders, and particularly, Bankman-Fried, wholly controlled and influenced the Debtor, Compl. ¶¶ 2, 3, 10, 41, 58, the Trust fails to plead an "insider relationship" between *GDA Limited*, the transferee, and Alameda, the transferor.  The Trust does not allege that GDA Limited was a statutory insider:  a "(i) director of the debtor; (ii) officer of the debtor; (iii) person in control of the debtor; (iv) partnership in which the debtor is a general partner; (v) general partner of the debtor; or (v) relative of a general partner, director, officer, or person in control of the debtor."  11 U.S.C. § 101(31)(B).

Nor does the Trust allege that GDA Limited exerted control or influence over the Debtor. The Trust's conclusory reference to a "close relationship" between Bankman-Fried and GDA's founders, Compl. ¶ 112(iv), not only fails to provide the particularity to support this allegation required by Rule 9(b), but similarly fails to establish a non-statutory insider relationship between GDA Limited and the transferors.  *See Friedman*, 2021 WL 4823513, at \*14 ("conclusory statements that badges of fraud are present are insufficient"); *Wilen v. Pamrapo Sav. Bank, S.L.A. (In re Bayonne Medical Center)*, 429 B.R. 152, 183-85 (Bankr. D.N.J. 2010) ("the mere *potential* to deal at other than arm's length" is not enough to qualify a party as a non-statutory insider).  A non-statutory insider relationship requires not only "a showing [] of the existence of a close relationship between the debtor and the alleged insider," but also "that the transactions between the parties were not conducted at arm's length."  *Pack Liquidating*, 2025 WL 2587577, at \*12.  If anything, the Transfers occurred between sophisticated and unaffiliated parties in arm's-length

public financings. *See* Ray Decl. ¶ 24 (as of Sept. 30, 2022, the Alameda Silo had $3.98 billion in investments and $13.46 billion in total assets); Decl. ¶ 20 (discussing GDA Limited's "then current valuation of $5.75 billion" at the time of the Second SPA).

*Consideration for the Transfers and Insolvency, or Indebtedness of the Debtors:* As discussed below, the Trust fails to plead a lack of reasonably equivalent value in the Transfers at the time they were made, or that Alameda Research or Alameda Ventures Ltd. was insolvent at the time of or as a result of the Transfers. *See infra* § III.B. Further, allegations of insolvency and a lack of reasonably equivalent value, alone, do not suffice to create an inference of actual fraudulent intent. *See FTX Trading Ltd.*, 2024 WL 4562675, at *10 ("To hold otherwise would turn every constructive fraudulent conveyance claim into an actual fraudulent conveyance claim and thereby undermine the distinction between the two claims.").

*Portion of estate transferred:* The Trust does not allege that Alameda's investments in GDA Limited were a large portion of the overall Chapter 11 Debtors' estate at the time of the Transfers. The Transfers were, in fact, a small portion of the FTX Group's estate. *See* Ray Decl. ¶ 24 (as of Sept. 30, 2022, Alameda Silo balance sheets show $3.98 billion in investments and $13.46 billion in total assets).

*Control or dominion over transferred property:* The Trust does not allege any reservation of control, benefits or dominion by Alameda over the transferred funds or GDA Limited at large following the Transfers. In fact, the Trust alleges the opposite, that GDA Limited controlled the transferred funds, distributing them to third parties and subsidiaries. Compl. ¶¶ 61-62.

*Secrecy:* The issue here is whether the Transfers themselves were secret or concealed from the debtor's creditors at the time of the transfers—they were not. *See Hospitalists of Delaware, LLC v. Lutz*, No. 6221-VCP, 2012 WL 3679219, at *14 (Del. Ch. Aug. 28, 2012) (holding that

"the redemption was not concealed" where defendant, intertwined with debtor, transferred redemption to debtor's controlling stockholder, and granting defendant's motion to dismiss the fraudulent transfer claim).  As the Trust admits, the Transfers occurred in a multi-round financing involving third-party investors and therefore were far from concealed.  *See* Compl. ¶¶ 56, 84 (noting participation of third-party investors); Decl. ¶¶ 14-16.

The Trust's attempts to allege circumstantial fraudulent intent are similar to the failed allegations of badges of fraud in *Friedman*.  There, the court dismissed the plaintiff's actual fraudulent transfer claims because the plaintiff offered supporting factual allegations for only a single badge, lack of consideration, despite including "conclusory statements that [several] badges of fraud were present." *Friedman*, 2021 WL 4823513, at *15.  That single badge of fraud, without others, was inadequate to create an inference of fraudulent intent in the transfer, such that the actual fraud count was dismissed.  *Id*.  The Trust here, as in *Friedman*, offers conclusory statements to plead the existence of multiple badges of fraud, but does not support those badges with sufficient factual information to create an inference of fraudulent intent.  For this reason, the Trust's actual fraud claims here, as in *Friedman*, should be dismissed for failure to plead actual fraudulent intent.

## B.    The Trust's Constructive Fraudulent Transfer Claims (Counts III and IV) Fail Under Rule 12(b)(6)

To state a claim of constructive fraudulent transfer, a plaintiff must plead (1) a lack of reasonably equivalent value exchanged in the transaction and (2) insolvency at the time of or resulting from the transaction.  *See Cred Inc. v. Uphold HQ Inc. (In re Cred Inc.)*, 650 B.R. 803, 835 (Bankr. D. Del. 2023), *aff'd*, 658 B.R. 783 (D. Del. 2024); 11 U.S.C. § 548(a)(1)(B).  Here, the Trust fails to allege either sufficiently, such that its constructive fraudulent transfer claims must fail.

1.     *The Trust Does Not Allege Adequately That the Transfers Were of Less Than Reasonably Equivalent Value*

In assessing reasonably equivalent value, "the court should examine the totality of circumstances in order to determine whether [the Transfer] conferred realizable commercial value to [Alameda that was] reasonably equivalent to the realizable commercial value of the assets transferred." *Peltz v. Hatten*, 279 B.R. 710, 736 (D. Del. 2002) , *aff'd sub nom. In re USN Commc'ns, Inc.,* 60 F.App'x 401 (3d Cir. 2003). "In employing the totality of circumstances test, courts consider a host of factors, including the good faith of the parties, the difference between the amount paid and the fair market value, and whether the transaction was at arm's length," giving "significant deference to marketplace value." *Id.* at 736-38. "When sophisticated parties make reasoned judgments about the value of assets that are supported by then prevailing marketplace values and by the reasonable perceptions about growth, risks, and the market at the time, it is not the place of fraudulent transfer law to reevaluate or question those transactions with the benefit of hindsight." *Id.* at 738.

Alameda Ventures and Alameda Research Holdings acquired 202 Series A Preferred Shares in GDA Limited, which the Trust admits had "upside" (*i.e.*, value) given GDA Limited's "potential success." Compl. ¶¶ 7, 57, 110; Decl. ¶¶ 18, 20. The First SPA Transfer was part of a broader funding round by GDA Limited and in connection with this round, ***multiple other investors purchased shares of GDA Limited at the same price as Alameda Ventures***. Decl. ¶¶ 15, 19. Indeed, Alameda Ventures was only approximately 23% of the total funds raised in the summer and fall of 2021. *Id.* ¶ 19. The Trust acknowledges the participation of at least one other investor in this funding round, Paradigm, and critically, does not allege that other investors paid a different price from Alameda Ventures (because it cannot). *See* Compl. ¶¶ 56, 84. Under the Second SPA, there were also multiple other investors who purchased shares of GDA Limited at

the same price as Alameda Research and these other investors received *less* value than Alameda because they did not receive options to purchase additional shares.  Decl. ¶ 21.

Moreover, the Trust acknowledges a legitimate and valuable reason to invest in GDA Limited:  the opportunity for significant "upside" and "potential success (both of GDA [Limited] and Bitcoin generally)."  Compl. ¶ 110.  The Trust's claims that GDA Limited's "upside" was underrealized are immaterial to the reasonably equivalent value inquiry at the time of execution. *See Mellon Bank, N.A. v. Metro Commc'ns Inc.*, 945 F.2d 635, 646-47 (3d Cir. 1991), *as amended* (Oct. 28, 1991) (the expectation of "a strong synergy" and "more profitable" business were indirect benefits of a transaction to be considered in reasonably equivalent value, notwithstanding "unpredicted" circumstances causing that expectation to be underrealized); *VFB LLC v. Campbell Soup Co.*, No. 02-137 (KAJ), 2005 WL 2234606, at *26 (D. Del. Sept. 13, 2005), *aff'd*, 482 F.3d 624 (3d Cir. 2007) (finding reasonably equivalent value in spin-off transfer when the price was "fairly established in open and informed trading").

The Complaint fails to allege any facts to suggest the Transfers were negotiated at anything other than arm's-length by sophisticated parties, further demonstrating the reasonably equivalent value exchanged.  And the Complaint itself suggests that GDA Limited participated in each Transfer in good faith by acknowledging that in 2021 and 2022, GDA Limited was "trying to raise money to expand," through multiple rounds of financing with multiple investors for exactly this good-faith purpose:  to grow its already-leading bitcoin mining operation into new markets. Compl. ¶¶ 4, 84, 56.  Given these circumstances in totality, the Complaint fails to allege lack of reasonably equivalent value.

2.    *The Trust Does Not Allege Adequately That the Alameda Transferors*
*Were Insolvent at the Time of Each Transfer*

When assessing solvency for a constructive fraudulent transfer claim, the Bankruptcy Code uses a "balance sheet test," defining an "insolvent entity" as one for which "the sum of its debts is greater than all of such entity's property, at fair valuation."  11 U.S.C. § 101(32)(A).  Under Delaware law, for purposes of a constructive fraudulent transfer claim, a debtor is insolvent if after the transfer, (a) "the remaining assets of the debtor were unreasonably small in relation to the business or transaction" or (b) if the debtor "intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due," *i.e.*, the "inadequate capital" and "cash flow" tests.  6 *Del. C.* § 1304(a)(2).  Insolvency "is to be measured at the time the debtor transferred value or incurred an obligation."  *Mellon Bank, N.A.*, 945 F.2d at 648-650.  "[B]are-bone conclusory pleading" of insolvency is insufficient; rather "ample case law requires that … insolvency be plausibly supported by factual findings."  *Miller v. Wilson*, No. 21-51268, 2022 Bankr. LEXIS 2191, at *5 (Bankr. D. Del. Aug. 9, 2022).  There must be "financial data or analysis provided so that the court can infer the company's liabilities exceeded its assets at the time the transfers in question took place."  *Guiliano v. Ferdinand (In re Liquid Holdings Grp., Inc.)*, No. 17-50662 (KG), 2018 WL 2759301, at *19 (Bankr. D. Del. June 6, 2018).  Here, the Trust has not plead insolvency under any definition, such that its constructive fraudulent transfer claims must fail.

As a threshold matter, the Trust's references to the FTX Group's November 2022 Chapter 11 filing do nothing to plead Alameda's insolvency at the time of the Transfers in October 2021, February 2022, and April 2022, as each Transfer occurred 13 months, 9 months or 7 months, respectively, prior to Chapter 11 filing.  *See Shubert v. Foulkrod (In re Bentivegna)*, 597 B.R. 261, 267 (Bankr. E.D. Pa. 2019) (rejecting showing of insolvency 10 months after transfers at issue).

Moreover, the Trust's ambiguous, speculative, and conclusory allegations that the "FTX Group," "Alameda" or the "Debtors" were "rendered [] insolvent" fail to plead the insolvency of the transferors, Alameda Research Limited and Alameda Research, at the time of each Transfer. Compl. ¶¶ 98-104, 43-45, 12.  The Trust references several remarks by Caroline Ellison, an "FTX Insider," in February, March, and "the spring of 2022":  that the Alameda entities' net assets were negative $7.8 billion, FTX.com had a $10 billion cash deficit, and that the Alameda entities would be unable to satisfy lender obligations should a "market downturn" occur.  Compl. ¶¶ 43, 103, 44. But these allegations do not address Alameda Ventures' solvency at the time of the First SPA Transfer (October 2021) and also fail to offer more than speculative gestures at the elements of insolvency.  *See Liquid Holdings Grp., Inc.*, 2018 WL 2759301, at *19 (dismissing fraudulent transfer claim when plaintiff failed to include "financial data surrounding the Transfers that the Court can use to infer [the debtor's] insolvency").  The financial data, analysis, and particularity required to support an inference of insolvency are absent from the Trust's allegations.

Additionally, documents from the Chapter 11 proceedings[21] undermine an inference of insolvency at the time of the Transfers.  On September 30, 2022—after the Transfers—the balance sheet for the "Alameda Silo" of the FTX Group reflected $13.46 billion in total assets, including $3.98 billion in investments.  A chart of the same date shows total liabilities of $5.09 billion.  D.I. 24, Ray Decl., ¶¶ 24-25.  Another declaration indicates that the FTX Group were later able to authenticate "substantially higher cash balances" than those substantiated as of November 16, 2022.  Nov. 21, 2022, *Supp. Decl. of Edgar W. Mosley II* [Docket No. 93], ¶ 4.  These declarations undermine any inference of Alameda's insolvency at the time of, or resulting from, the Transfers.

---

[21] These documents are incorporated by reference into the Trust's Complaint.  *See* Compl. ¶ 37.

### C.    Section 546(e) Bars the Constructive Fraudulent Transfer Claims

Section 546(e) provides a "safe harbor" against certain claims arising out of securities transactions where two requirements are met:  "(1) there is a *qualifying transaction* (*i.e.*, there is a settlement payment or a transfer payment ... made in connection with a securities contract) and (2) there is a *qualifying participant* (*i.e.*, the transfer was made by or to (or for the benefit of) a ... financial institution, [or financial participant'])."  *Opioid Master Disbursement Tr. II v. Covidien Unlimited Co. (In re Mallinckrodt PLC)*, No. 22-50433 (BLS), 2025 WL 2416807, at *6 (Bankr. D. Del. Aug. 20, 2025).

The Transfers the Trust seeks to avoid fall squarely within these requirements.  *First*, the Transfers were made in connection with the SPAs, which are "security contracts" because they are contracts for the purchase, sale, or repurchase of securities—here, GDA Limited's shares.  Compl. ¶ 85.  *Second*, GDA Limited was a "financial institution," so the transfers were "made by or to (or for the benefit of ) a … financial institution …."  11 U.S.C. § 546(e).  For purposes of the Code and section 546(e), financial institution is defined "to include a customer of a bank or other such entity when the bank or other such entity is acting as agent for the customer in connection with a securities contract."  *In re Nine West LBO Sec. Litig.*, 87 F.4th 130, 143 (2d Cir. 2023) (emphasis omitted) (quoting 11 U.S.C. § 101(22)(A)) (holding that customer of a bank acting as distributor of merger consideration was a "financial institution" for purposes of section 546(e)).  Here, GDA Limited was a customer of CBH Compagnie Bancaire Helvétique SA and Maerki Baumann & Co. AG, two Swiss banks that received the Transfers from Alameda Research Ltd.'s and Alameda Research's US bank accounts.  *See* Compl. ¶¶ 59-60, 87; Decl. ¶¶ 18, 20, 22.  Thus, the Trust's claims for constructive fraud are barred under section 546(e).

### D.    The Trust's "Claims" for Property Recovery Pursuant to 11 U.S.C. § 550(a)(2) (Counts V and VI) Fail Under Rule 12(b)(6)

"Section 550(a) is a recovery provision and gives rise to a secondary cause of action which applies *after* the trustee has prevailed under one (or more) of the avoidance provisions found in the Bankruptcy Code." *Williams v. Mortillaro (In re Resource, Recycling & Remediation, Inc.)*, 314 B.R. 62, 69 (Bankr. W.D. Pa. 2004) (emphasis added).  The Trust has not prevailed under any avoidance provisions under the Bankruptcy Code, and the Trust fails to state a claim for an avoidable transfer under the Bankruptcy Code, *see supra* § III.A-B, so Counts V and VI fail.  *See Burtch v. Huston (In re USDigital, Inc.)*, 443 B.R. 22, 40 (Bankr. D. Del. 2011) (dismissing "claims under section 550 … because the transfers at issue are unavoidable").

Further, Count VI (against the DDH Entities) fails because the Trust does not plead sufficiently that any of the DDH Entities was a subsequent transferee.  "A valid avoidance claim against a subsequent transferee, requires a plaintiff to plead and prove that … the initial transfer was later made to-or for the benefit of-the subsequent or mediate transferee." *Mervyn's LLC v. Lubert-Adler Grp. IV, LLC (In re Mervyn's Holdings, LLC)*, 426 B.R. 96, 102 (Bankr. D. Del. 2010).  Here, the Trust alleges that the First SPA Transfer funds were further transferred from GDA Limited to the DDH Entities on December 8, 2021, December 27, 2021, and January 25, 2022, and that approximately $93 million of mining equipment was ordered for DDH NA before February 13, 2022.  Compl. ¶¶ 61-62.  All of that predates the Second SPA Transfer (February 28, 2022) and the Option Transfer (April 13, 2022).  *Id.* ¶¶ 6-7.  As a result, because GDA Limited could not have had funds from those later transfers, the Trust does not—and cannot—allege a transfer of proceeds of the Second SPA Transfer or the Option Transfer to, or for the benefit of, any DDH Entity.

## CONCLUSION

For the above reasons, Defendants respectfully request that the Court enter the Proposed

Order attached as **Exhibit A** to the Motion dismissing the entire Complaint with prejudice.


Dated:  January 12, 2026

 */s/  Kara Hammond Coyle*

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
Michael R. Nestor (No. 3526)
Kara Hammond Coyle (No. 4410)
Kevin R. Guerke (No. 4096)
1000 North King Street
Rodney Square
Wilmington, Delaware 19801
Tel.: (302) 571-6600
Facsimile: (302) 571-1253
E-mail:    mnestor@ycst.com
   kcoyle@ycst.com
   kguerke@ycst.com

- and -

**LATHAM & WATKINS LLP**
Robert J. Malionek (pro hac vice forthcoming)
Caroline A. Reckler (pro hac vice forthcoming)
Elizabeth A. Morris (pro hac vice forthcoming)
Chase A. Chesser (pro hac vice forthcoming)
Joseph L. Teresi (pro hac vice forthcoming)
1271 Avenue of the Americas
New York, New York 10020
Telephone: (212) 906-1200
E-mail:    robert.malionek@lw.com
   caroline.reckler@lw.com
   elizabeth.morris@lw.com
   chase.chesser@lw.com
   joe.teresi@lw.com


*Counsel for Defendants Genesis Digital Assets Limited, GDA US Inc., DDH (North America) Inc., DDH-CHOLLA, LLC, DDH-OK-1, LLC*