**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*, | Case No. 22-11068 (KBO) |
| Debtors. | (Jointly Administered) |
| FTX RECOVERY TRUST, | |
| Plaintiff, | |
| -against- | |
| GENESIS DIGITAL ASSETS LIMITED, GDA US INC., DDH (NORTH AMERICA) INC., DDH-CHOLLA, LLC, DDH-OK-1, LLC, RASHIT MAKHAT and MARCO KROHN, | Adv. Pro. No. 25-52358 (KBO) |
| Defendants. | |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS
GENESIS DIGITAL ASSETS LTD., GDA US INC., DDH (NORTH AMERICA) INC.,
<u>DDH-CHOLLA, LLC AND DDH-OK-1, LLC'S MOTION TO DISMISS</u>**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................ 3

ARGUMENT .................................................................................................... 7

I.      GDA IS SUBJECT TO PERSONAL JURISDICTION .................................. 7

        A.      Legal Standard ................................................................................ 7

        B.      GDA Is Subject to Specific Jurisdiction Under Both the "Minimum Contacts"
                Test and the "More Flexible" Fifth Amendment Inquiry ...................... 8

                1.      GDA Targeted U.S. Investors, Including Debtor Alameda Research
                        LLC ............................................................................................ 9

                2.      GDA Induced the Investments by Promoting U.S. Operations That
                        GDA Then Funded with the Money It Raised ............................. 11

                3.      GDA Used a U.S. Agent To Secure Further Investments from
                        Alameda ................................................................................... 13

                4.      The Exercise of Specific Jurisdiction Is Reasonable Under *Fuld*............ 14

II.     THE COMPLAINT MORE THAN ADEQUATELY PLEADS ACTUAL AND
        CONSTRUCTIVE FRAUDULENT TRANSFER CLAIMS ......................... 16

        A.      Legal Standard .............................................................................. 16

        B.      Sections 544, 548 and 550 Apply Here, and This Case Involves a Domestic
                Application of Those Provisions ...................................................... 18

                1.      The Fraudulent Transfer Statutes Apply Extraterritorially ...................... 18

                2.      This Action Involves a Domestic Application of the Avoidance
                        Statutes ................................................................................... 20

        C.      The Complaint States a Claim for Actual Fraudulent Transfer ............................ 21

                1.      The Complaint Adequately Pleads Actual Fraudulent Intent .................. 22

                2.      The Complaint Adequately Alleges Badges of Fraud To Support an
                        Inference of Fraudulent Intent ................................................... 27

        D.      The Complaint States a Claim for Constructive Fraudulent Transfer ................. 29

       1.     The Complaint Adequately Pleads That Alameda Did Not Receive Reasonably Equivalent Value ................................................................. 30

       2.     The Complaint Adequately Pleads Insolvency at the Time of the Transfers ....................................................................................... 31

III.    DEFENDANTS' ADDITIONAL ARGUMENTS TO AVOID LIABILITY ARE WITHOUT MERIT ............................................................................................ 33

    A.     The Bankruptcy Code's Safe Harbor Provision Does Not Bar the Trust's Constructive Fraud Claims ................................................................. 33

    B.     The GDA U.S. Subsidiaries Are Liable As Subsequent Transferees .................. 36

    C.     The Complaint States a Claim for Recovery under Section 550(a)...................... 38

CONCLUSION ................................................................................................................. 38

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abitron Austria GmbH* v. *Hetronic Int'l, Inc.*,
600 U.S. 412 (2023)..........................................................................................18, 20

*In re Adams Golf, Inc. Sec. Litig.*,
381 F.3d 267 (3d Cir. 2004).........................................................................................3

*Am. Eagle Outfitters, Inc.* v. *Lyle & Scott Ltd.*,
2007 WL 1202760 (W.D. Pa. Apr. 12, 2007)..............................................................37

*ASARCO LLC v. Americas Mining Corp.*,
396 B.R. 278 (S.D. Tex. 2008) ..................................................................................26

*Ashcroft* v. *Iqbal*,
556 U.S. 662 (2009)...................................................................................................16

*In re Bayou Grp., LLC*,
439 B.R. 284 (S.D.N.Y. 2010)..............................................................................23, 24

*Begier* v. *I.R.S.*,
496 U.S. 53 (1990)................................................................................................19, 21

*Belden Techs., Inc.* v. *LS Corp.*,
626 F. Supp. 2d 448 (D. Del. 2009)............................................................................11

*In re Bell & Beckwith*,
64 B.R. 620 (Bankr. N.D. Ohio 1986) ........................................................................23

*In re Bernard L. Madoff*,
480 B.R. 501 (Bankr. S.D.N.Y. 2012)........................................................................21

*In re Bernard L. Madoff Inv. Sec., LLC*,
440 B.R. 243 (Bankr. S.D.N.Y. 2010) .......................................................................36

*Bilek* v. *Fed. Ins. Co.*,
8 F.4th 581 (7th Cir. 2021) ........................................................................................14

*bioMérieux, S.A.* v. *Hologic, Inc.*,
2018 WL 4647483 (D. Del. Sep. 26, 2018).................................................................16

*In re Black Elk Energy Offshore Operations, LLC*,
2019 Bankr. LEXIS 2561 (Bankr. S.D. Tex. Aug. 16, 2019)......................................36

*Black* v. *Montgomery Cnty.*,
   835 F.3d 358 (3d Cir. 2016)..................................................................................16

*Boyle* v. *City of Philadelphia*,
   2018 WL 994218 (E.D. Pa. Feb. 20, 2018) .........................................................17

*In re Bozel S.A.*,
   434 B.R. 86 (Bankr. S.D.N.Y. 2010) ...................................................................15

*Burger King Corp.* v. *Rudzewicz*,
   471 U.S. 462 (1985)..............................................................................................13

*In re Burlington Coat Factory Sec. Litig.*,
   114 F.3d 1410 (3d Cir. 1997)...............................................................................17

*In re Cal Dive Int'l, Inc.*,
   2018 WL 456156 (Bankr. D. Del. Jan. 16, 2018) ..................................................8

*In re Carrozzella & Richardson*,
   237 B.R. 536 (Bankr. D. Conn. 1999) .................................................................24

*Carvel* v. *Griffin*,
   2008 WL 4922432 (D. Del. Nov. 18, 2008) ........................................................13

*Cent. Am. Bank for Econ. Integration* v. *Mossi*,
   2025 WL 2732731 (D.D.C. Sep. 25, 2025) ...........................................................8

*In re Centaur, LLC,*
   2013 WL 4479074 (Bankr. D. Del. Aug. 19, 2013) .............................................32

*In re Charys Holding Co., Inc.*,
   443 B.R. 628 (Bankr. D. Del. 2011) ....................................................................30

*City of Cambridge Ret. Sys.* v. *Altisource Asset Mgmt. Corp.*,
   908 F.3d 872 (3d Cir. 2018).................................................................................28

*Compagnie des Bauxites de Guinee* v. *L'Union Atlantique S.A. d'Assurances*,
   723 F.2d 357 (3d Cir. 1983).................................................................................16

*Cromer Fin. Ltd.* v. *Berger*,
   137 F. Supp. 2d 452 (S.D.N.Y. 2001)..................................................................13

*In re DBSI, Inc.*,
   2011 WL 1810632 (Bankr. D. Del. May 5, 2011).................................................24

*In re DBSI, Inc.*,
   447 B.R. 243 (Bankr. D. Del. 2011) ....................................................................31

*In re DBSI, Inc.*,
    451 B.R. 373 (Bankr. D. Del. 2011) ........................................................15

*Deutsche Telekom, A.G.* v. *Republic of India*,
    155 F.4th 694 (D.C. Cir. 2025)..............................................................8

*In re Direct Response Media, Inc.*,
    466 B.R. 626 (Bankr. D. Del. 2012) ........................................................32

*In re DSI Renal Holdings, LLC*,
    574 B.R. 446 (Bankr. D. Del. 2017) ........................................................28

*In re DVI, Inc.*,
    2008 WL 4239120 (Bankr. D. Del. Sep. 16, 2008) ................................17

*In re Enron Corp.*,
    328 B.R. 58 (Bankr. S.D.N.Y. 2005)........................................................22

*In re FAH Liquidating Corp.*,
    572 B.R. 117 (Bankr. D. Del. 2017) ................................................. *passim*

*In re Fairfield Sentry Ltd.*,
    671 B.R. 5 (Bankr. S.D.N.Y. 2025)..........................................................8

*In re Fedders N. Am., Inc.*,
    405 B.R. 527 (Bankr. D. Del. 2009) ........................................................22

*Finjan LLC* v. *Trustwave Holdings, Inc.*,
    2021 WL 5051147 (D. Del. Oct. 29, 2021) ..............................................7

*In re Firestar Diamond, Inc.*,
    654 B.R. 836 (Bankr. S.D.N.Y. 2023)....................................................15

*In re First Conn. Consulting Grp. Inc.*,
    2023 Bankr. LEXIS 853 (Bankr. D. Conn. Mar. 31, 2023)....................37

*In re French*,
    440 F.3d 145 (4th Cir. 2006) ..........................................................20, 21

*In re FTX Trading Ltd.*,
    2023 WL 8814216 (Bankr. D. Del. Dec. 20, 2023)..............................7, 8

*In re FTX Trading Ltd.*,
    2024 Bankr. LEXIS 2584 (Bankr. D. Del. Oct. 23, 2024) .........35, 36, 38

*In re FTX Trading Ltd.*,
    2025 Bankr. LEXIS 2773 (Bankr. D. Del. Oct. 27, 2025) ................28, 29

*Fuld* v. *Palestine Liberation Org.*,
606 U.S. 1 (2025).................................................................................8, 14

*In re Glencoe Acquisition, Inc.*,
2015 WL 3777972 (Bankr. D. Del. June 16, 2015)...............................31

*Glob. Network Commc'ns, Inc.* v. *City of New York*,
458 F.3d 150 (2d Cir. 2006).................................................................17

*In re Golden Meditech Holdings Ltd.*,
2024 U.S. Dist. LEXIS 234430 (S.D.N.Y. Dec. 30, 2024) ...................12

*Goodyear Dunlop Tires Operations, S.A.* v. *Brown*,
564 U.S. 915 (2011).............................................................................12

*Grand Ent. Grp., Ltd.* v. *Star Media Sales, Inc.*,
988 F.2d 476 (3d Cir. 1993).............................................................14, 15

*King* v. *Bon Charge*,
2025 WL 3764039 (D. Del. Dec. 30, 2025) ......................................8, 9

*Ladd* v. *Boeing Co.*,
463 F. Supp. 2d 516 (E.D. Pa. 2006) ...................................................17

*Lang* v. *Morant*,
867 A.2d 182 (Del. 2005) ....................................................................35

*In re Live Well Fin., Inc.*,
2023 WL 3995900 (Bankr. D. Del. June 13, 2023).........................27, 28

*In re Live Well Fin., Inc.*,
652 B.R. 699 (Bankr. D. Del. 2023) ............................................22, 23, 24

*Loosier* v. *Unknown Med. Dr.*,
435 F. App'x 302 (5th Cir. 2010) .........................................................17

*Lord Abbett Mun., Income Fund, Inc., ex rel. Lord Abbett High Yield Mun. Bond
Fund* v. *Stone & Youngberg, LLC*,
2012 WL 13034286 (D.N.J. Nov. 19, 2012) ...........................................9

*In re Lyondell Chem. Co.*,
543 B.R. 127 (Bankr. S.D.N.Y. 2016).............................................7, 20

*Malek* v. *Chef's Roll, Inc.*,
2019 WL 3854303 (D.N.J. Aug. 16, 2019) .............................................9

*Manship* v. *Stein*,
  2022 WL 203247 (D.N.J. Jan. 24, 2022), *aff'd*, 2024 WL 4986936 (3d Cir.
  Dec. 5, 2024) ....................................................................................................................14

*In re MarketXT Holdings Corp.*,
  376 B.R. 390 (Bankr. S.D.N.Y. 2007) ...........................................................................27

*In re Maxus Energy Corp.*,
  641 B.R. 467 (Bankr. D. Del. 2022) ..........................................................................18, 19

*Mellon Bank (E.) PSFS, Nat. Ass'n* v. *Farino*,
  960 F.2d 1217 (3d Cir. 1992) ..........................................................................................14

*Menard* v. *CSX Transp., Inc.*,
  698 F.3d 40 (1st Cir. 2012) ..............................................................................................17

*Merit Mgmt. Grp., LP* v. *FTI Consulting, Inc.*,
  583 U.S. 366 (2018) ......................................................................................................3, 34

*Metcalfe* v. *Renaissance Marine, Inc.*,
  566 F.3d 324 (3d Cir. 2009) .............................................................................................16

*In re Midway Games Inc.*,
  428 B.R. 303 (Bankr. D. Del. 2010) ................................................................................33

*In re Millennium Lab Holdings II, LLC*,
  2019 WL 1005657 (Bankr. D. Del. Feb. 28, 2019) .........................................................22

*Miller* v. *Mott*,
  2023 WL 6467368 (Bankr. D. Del. Oct. 4, 2023) ...........................................................31

*In re Nash Eng'g Co.*,
  2025 U.S. Dist. LEXIS 256499 (D. Conn. Dec. 11, 2025) ..............................................37

*In re Nat'l Audit Def. Network*,
  367 B.R. 207 (Bankr. D. Nev. 2007) ...............................................................................24

*In re Nine West LBO Sec. Litig.*,
  87 F.4th 130 (2d Cir. 2023) .........................................................................................34, 35

*In re Our Alchemy, LLC*,
  2019 WL 4447545 (Bankr. D. Del. Sep. 16, 2019) .........................................................31

*Philip A. Templeton, M.D., P.A.* v. *EmCare, Inc.*,
  868 F. Supp. 2d 333 (D. Del. June 15, 2012) ..................................................................17

*In re Picard*,
  917 F.3d 85 (2d Cir. 2019) ...............................................................................................21

*Pinker* v. *Roche Holdings Ltd.*,
  292 F.3d 361 (3d Cir. 2002)..................................................................................9

*Prestan Prods. LLC* v. *Innosonian Am., LLC*,
  2024 WL 278985 (D.N.J. Jan. 25, 2024) .............................................................16

*In re Qimonda Richmond, LLC*,
  467 B.R. 318 (Bankr. D. Del. 2012) .....................................................................30

*RJR Nabisco, Inc.* v. *Eur. Cmty.*,
  579 U.S. 325 (2016)..............................................................................................21

*Sec. Inv. Prot. Corp.* v. *Bernard L. Madoff Inv. Sec. LLC*,
  594 B.R. 167 (Bankr. S.D.N.Y. 2018)..................................................................37

*In re Sentinel Mgmt. Grp., Inc.*,
  728 F.3d 667-68 (7th Cir. 2013) ...........................................................................25

*Shapiro* v. *Wilgus*,
  287 U.S. 348 (1932)..............................................................................................27

*In re Simon*,
  153 F.3d 991 (9th Cir. 1998) ................................................................................20

*In re Student Fin. Corp.*,
  335 B.R. 539 (D. Del. 2005)..................................................................................17

*In re Syntax-Brillian Corp.*,
  2016 WL 1165634 (Bankr. D. Del. Feb. 8, 2016) ........................................ *passim*

*Time Share Vacation Club* v. *Atl. Resorts, Ltd.*,
  735 F.2d 61 (3d Cir. 1984).......................................................................................7

*Toys "R" Us, Inc.* v. *Step Two, S.A.*,
  318 F.3d 446 (3d Cir. 2003).....................................................................................7

*In re Tronox Inc.*,
  503 B.R. 239 (Bankr. S.D.N.Y. 2013)..................................................................26

*In re UD Dissolution Corp.*,
  629 B.R. 11 (Bankr. D. Del. 2021) .......................................................................15

*Walden* v. *Fiore*,
  571 U.S. 277 (2014)..............................................................................................11

*WesternGeco LLC* v. *ION Geophysical Corp.*,
  585 U.S. 407 (2018)..............................................................................................20

*Williams* v. *Netflix, Inc.*,
   2023 WL 3478568 (D. Del. May 16, 2023)............................................................14

*Yegiazaryan* v. *Smagin*,
   599 U.S. 533 (2023)...........................................................................................21

*Zazzali* v. *AFA Fin. Grp., LLC*,
   2012 WL 4903593 (Bankr. D. Del. Aug. 28, 2012) .............................................24

**Statutes**

11 U.S.C. § 101(22) ...............................................................................33, 34, 35

11 U.S.C. § 541(a) ......................................................................................19, 20

11 U.S.C. § 544...........................................................................................19, 38

11 U.S.C. 546(e) ............................................................................. *passim*

11 U.S.C. § 548......................................................................................18, 19, 38

11 U.S.C. § 550......................................................................................19, 37, 38

# INTRODUCTION

It is a matter of public record that the individuals who ran the FTX Group (referred to in the Complaint as "FTX Insiders") operated a scheme to defraud creditors for their own benefit.  To prop up that scheme, the FTX Insiders needed not only to maintain the appearance of a profitable business, but also to increase the scope of their fraudulent enterprise.  The acquisition of Genesis Digital Assets Ltd. ("GDA") served both of these purposes.

As the FTX Group spiraled toward collapse, Samuel Bankman-Fried diverted more than $1.15 billion in estate assets to GDA and its affiliates.[1]  GDA was a Bitcoin mining company whose business model depended on cheap power, permissive regulators, and aggressive financial projections.  Bankman-Fried caused Alameda to fund the transfers to GDA (the "Transfers") with misappropriated customer deposits and other improperly obtained funds.  The Transfers formed part of Bankman-Fried's broader scheme to perpetuate the illusion of growth, profitability, and stability at a time the FTX Group was hopelessly insolvent.  The Trust now seeks to recover the funds underlying the Transfers for the benefit of creditors.  To evade liability, GDA and its subsidiaries have moved this Court to dismiss the Complaint based on "facts" outside the complaint and inapposite arguments and defenses [Adv. D.I. 15] (the "Motion").  But these arguments and defenses fail for multiple reasons.

*First*, GDA contends that it is beyond the reach of this Court's jurisdiction.  But that argument ignores both the governing constitutional standard and GDA's own conduct.  GDA aggressively solicited U.S. investors and capital—including hundreds of millions of dollars from Delaware-formed Alameda Research LLC—all while touting plans to expand its operations in the United States.  It engaged U.S. advisors and bankers, and used the funds it raised to finance its

---

[1] Terms not defined herein shall have the same meaning used in the complaint [Adv. D.I. 1] (the "Complaint").

U.S.-based subsidiaries and develop U.S. data centers.  Having purposefully accessed U.S. capital markets and directed its activities toward the United States, GDA cannot now claim that it is unfair to defend itself here.

*Second*, GDA argues that the avoidance provisions of the Bankruptcy Code do not apply because certain aspects of the challenged transactions involved foreign entities or accounts.  But this Court has consistently held that the avoidance provisions *do* apply extraterritorially.  In any event, this case involves a domestic application of federal law.  The Transfers depleted property of a U.S. bankruptcy estate and were carried out in furtherance of a fraudulent scheme involving the United States.  The focus of the avoidance statutes is the protection of estate property and creditors.  Where, as here, estate assets were transferred from U.S. accounts in furtherance of that scheme, application of the Bankruptcy Code is domestic.

*Third*, GDA asks the Court to disregard the Complaint's detailed allegations that the Transfers were made with fraudulent intent.  However, the Complaint more than plausibly pleads that the Transfers were made with the intent to hinder, delay, or defraud creditors:  the Transfers were funded with commingled and misappropriated customer deposits; they were undertaken while Alameda was deeply insolvent; Bankman-Fried prioritized speed over diligence despite obvious red flags; valuations and projections underpinning the transactions were inflated and unreliable; and the Transfers furthered a Ponzi-like cycle in which new capital was used to prop up and prolong Bankman-Fried's fraudulent scheme.  These allegations support an inference that the Transfers were made with the actual intent to hinder, delay, or defraud creditors.

*Fourth*, GDA's arguments with respect to the Trust's constructive fraudulent transfer claims are equally misplaced.  At this stage, the Trust need only allege that Alameda did not receive reasonably equivalent value and was insolvent when the Transfers were made.  The

Complaint does both.  Whether GDA's shares were worth what Alameda paid, whether GDA's projections were realistic, and whether Alameda was insolvent are quintessential questions of fact that cannot be resolved on a motion to dismiss.

GDA and its subsidiaries' remaining arguments seek to rewrite the Complaint and rely on fact-intensive purported affirmative defenses, but it is well-settled that "affirmative defense[s] may not be used to dismiss a plaintiff's complaint under Rule 12(b)(6)." *In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 277 (3d Cir. 2004).  For example, GDA argues that the Complaint should be dismissed pursuant to the "securities safe harbor" contained in Section 546(e) of the Bankruptcy Code.  But that provision is an affirmative defense that the Supreme Court has held does not apply to the types of transfers the Trust seeks to avoid here, *see Merit Mgmt. Grp., LP* v. *FTI Consulting, Inc.*, 583 U.S. 366 (2018), and GDA's factual assertions do not support application of the defense even if it properly could be raised on a motion to dismiss.  Similarly, the GDA U.S. Subsidiaries' attempt to evade liability by imposing heightened tracing and pleading requirements finds no support in Rule 8 or Section 550 of the Bankruptcy Code.

The Motion should be denied in its entirety.

## BACKGROUND

The FTX Insiders perpetrated a massive fraud intended to defraud creditors for their own benefit, including by causing Alameda to misappropriate billions of dollars from FTX.com in order to finance speculative "investments."  Compl. ¶¶ 38-39.  These "investments" served the dual purpose of benefitting the FTX Insiders personally, while also maintaining the façade that the FTX Group was profitable and growing, which was necessary both to perpetuate the fraudulent scheme and to ensure it was not discovered.  *Id.*  The GDA Transfers, which totaled $1.15 billion, were among the most reckless investments designed to maintain this charade.

GDA is a Bitcoin mining company that rose to prominence in Kazakhstan in 2021, benefitting initially from low-cost electricity and political connections. *Id.* ¶¶ 49-50. However, Kazakhstan soon experienced a severe energy crisis driven in part by a surge in cryptocurrency mining, leading to rolling blackouts, electricity shortages, and rising prices. *Id.* ¶¶ 50-51. Thereafter, in June 2021, Kazakhstan announced a new tax on cryptocurrency miners, and by late 2021 had imposed additional energy caps and restrictions that materially threatened the viability of mining operations in the country. *Id.* ¶¶ 51, 63, 72. Despite these developments, GDA continued to present investors with financial projections and valuations that did not account for the deteriorating regulatory and operating environment in Kazakhstan. *Id.* ¶¶ 4-6, 64-66.

Against this backdrop, in July 2021, representatives of Alameda and GDA began discussions regarding a potential investment in GDA. *Id.* ¶ 52. GDA represented that its enterprise value was $3.25 billion based on a purported revenue "run rate," and provided unaudited financial projections showing exponentially increasing revenues and EBITDA. *Id.* ¶¶ 52-53. GDA represented that this strategic capital raise would be used to fund and expand GDA operations into the United States. *Id.* ¶ 54. Based on these representations, Bankman-Fried proceeded with the investment without obtaining audited financial statements or retaining an investment bank or other financial advisors, despite internal concerns that GDA's claimed cost advantages and valuation were inflated. *Id.* ¶ 55. On August 31, 2021, Alameda Research Ventures Ltd. committed to investing $100 million in GDA. On October 5, 2021, after issues processing a transfer from Alameda Research Ventures Ltd., Bankman-Fried caused Alameda Research Ltd. to transfer approximately $100 million to GDA. *Id.* ¶¶ 57, 59-60. Alameda invested in this round alongside four other U.S.-based investors.

GDA subsequently made several "loans" to the GDA U.S. Subsidiaries (including Defendants GDA US and DDH-Cholla, LLC), and GDA US made an additional "loan" to Defendant DDH NA. *Id.* ¶ 61. GDA's Chinese supplier also sent DDH NA over $94 million in Bitcoin mining equipment for use in Texas. *Id.* ¶ 62.

Shortly after Alameda's fall 2021 investment, Kazakhstan began to ration electricity, which made GDA desperate for funding and to expedite its U.S. expansion. *Id.* ¶ 63. To court potential investors, GDA provided more misleading financials: for instance, even as Kazakhstan's political environment deteriorated, GDA increased its claimed valuation (which had already doubled from $3.25 billion to $6.5 billion in two months) to a range of $8.3 to $12.2 billion. *Id.* ¶¶ 52, 66. In part due to this "insane and off-market" valuation (as a GDA board member characterized it), GDA struggled to find even a single investor. *Id.* ¶¶ 67-68. Bankman-Fried, however, committed Alameda to a massive investment that ultimately included (1) a primary investment of $250 million for 77 GDA shares, (2) an option for GDA to sell an additional 77 shares for another $250 million, and (3) a secondary investment of $550.9 million for 177 ordinary shares from Defendants Makhat and Krohn. *Id.* ¶ 68.

In December 2021, while negotiations and diligence for Alameda's additional investment were pending, Bankman-Fried traveled with various GDA executives and directors to Kazakhstan to lobby President Kassym-Jomart Tokayev in support of cryptocurrency mining. *Id.* ¶ 69. These attempts to influence the Kazakh government failed, leading to what one GDA board member later described as "impaired (financially and reputationally) operations in that region which impact the overall firm." *Id.* ¶ 70. Then, in January 2022, Kazakhstan's energy crisis culminated in a wave of violent protests, and Kazakhstan imposed an increased tax on cryptocurrency miners that further impaired GDA. *Id.* ¶¶ 71-72.

Notwithstanding these warning signs, Alameda continued to negotiate with GDA and half-heartedly conduct due diligence. *Id.* ¶¶ 73-74.  These meager due diligence attempts uncovered additional red flags, including, *inter alia*, reports connecting a GDA co-founder to tax evasion and money laundering. *Id.* ¶¶ 75-77.  Although Alameda asked for additional information, GDA failed to cooperate, concluding that the requests for information were "unjustifiable" and "too much." *Id.* ¶ 74.  Nevertheless, to induce the investment, GDA gave Alameda manipulated financials and connected Bankman-Fried with its New York-based banker who provided additional financial information. *Id.* ¶¶ 78-80; Dunne Decl., Exs. 16-19.  Bankman-Fried subsequently executed an Agreement for the Sale and Purchase of Shares on January 19, 2022, committing Alameda Research LLC to paying Krohn and Makhat $550 million for 177 GDA shares. *Id.* ¶ 82.

GDA continued to struggle and again looked to Alameda, as well as U.S.-based investment firm Paradigm, for additional funding. *Id.* ¶¶ 83-84.  While Paradigm ultimately declined to participate, Bankman-Fried committed Alameda to additional investments in GDA. On February 24, 2022, before GDA had even completed its delivery of diligence documents, Alameda Research LLC executed a Stock Purchase Agreement that required Alameda to pay $250 million for 77 GDA shares and granted GDA an option to put another 77 shares to Alameda for an additional $250 million. *Id.* ¶¶ 84-85.  On April 7, 2022, GDA exercised this option, by which point Bankman-Fried had caused Alameda to transfer approximately $1.15 billion for GDA shares, including $601 million to GDA and $500.9 million to Krohn and Makhat. *Id.* ¶¶ 87, 89-90.

The Transfers included commingled and misappropriated FTX.com customer deposits that had passed through shell entities and multiple Alameda-controlled accounts. *Id.* ¶¶ 58-60.  Despite committing over $1 billion to acquiring GDA shares, Alameda received little (if any) value in exchange:  GDA had repeatedly overvalued itself, provided inaccurate financial

projections, made false representations about its business plans, and failed to meet its operational goals. *Id.* ¶¶ 91-97. For example, GDA only opened "a small fraction" of the data centers it had promised to open in the United States, prompting a board member to push for an independent forensic accounting investigation to determine where the investments had gone. *Id.* ¶¶ 93-94. GDA ultimately failed to meet even a single one of the revenue and EBITDA projections it had shared with Alameda. *Id.* ¶ 97.

**ARGUMENT**

**I.    GDA IS SUBJECT TO PERSONAL JURISDICTION.**

    **A.    Legal Standard**

"It is well established that in deciding a motion to dismiss for lack of [personal] jurisdiction" under Federal Rule of Civil Procedure 12(b)(2), "a court is required to accept the plaintiff's allegations as true, and is to construe disputed facts in favor of the plaintiff." *Toys "R" Us, Inc.* v. *Step Two, S.A.*, 318 F.3d 446, 457 (3d Cir. 2003). The plaintiff only has the burden of proof "[o]nce the defense has been raised," such that the Court's determination of the motion "inherently . . . requires [the] resolution of factual issues outside the pleadings." *Time Share Vacation Club* v. *Atl. Resorts, Ltd.*, 735 F.2d 61, 63, 66 n.9 (3d Cir. 1984); *see also In re FTX Trading Ltd.*, 2023 WL 8814216, at *1 (Bankr. D. Del. Dec. 20, 2023) ("Rule 8 does not require a plaintiff to set forth in the complaint the grounds upon which the court has personal jurisdiction over the defendant . . . ." (internal quotation marks omitted)).

At this stage, the plaintiff need only make a *prima facie* showing that personal jurisdiction exists, *Finjan LLC* v. *Trustwave Holdings, Inc.*, 2021 WL 5051147, at *4 (D. Del. Oct. 29, 2021), and "to determine whether a bankruptcy court's exercise of personal jurisdiction is constitutionally proper, only the requirements of the Fifth Amendment to the U.S. Constitution must be satisfied." *In re Lyondell Chem. Co.*, 543 B.R. 127, 138 (Bankr. S.D.N.Y. 2016); *see also*

*In re Cal Dive Int'l, Inc.*, 2018 WL 456156, at *2 (Bankr. D. Del. Jan. 16, 2018).  For purposes of this analysis, "the relevant forum . . . is the United States in general."  *In re FTX Trading Ltd.*, 2023 WL 8814216, at *1.

>    **B.    GDA Is Subject to Specific Jurisdiction Under Both the "Minimum Contacts" Test and the "More Flexible" Fifth Amendment Inquiry.**

GDA is subject to specific jurisdiction in the United States.  GDA argues that despite soliciting U.S. investors—including Alameda Research LLC, a Delaware company—by promising to expand its U.S. operations, it cannot be asked to defend itself in the United States for harms related to those investments.  In support of this argument, GDA incorrectly asserts that specific jurisdiction requires a showing of "minimum contacts" with the United States, which it alleges are absent here.  *See* [Adv. D.I. 16] ("Br.") at 8-10.  Although GDA is subject to specific jurisdiction under any applicable test, GDA overlooks the Supreme Court's recent holding that "the Due Process Clause of the Fifth Amendment does not incorporate the Fourteenth Amendment minimum contacts standard" and instead "necessarily permits a more flexible jurisdictional inquiry commensurate with the Federal Government's broader sovereign authority."  *Fuld* v. *Palestine Liberation Org.*, 606 U.S. 1, 16, 23 (2025); *see also, e.g.*, *King* v. *Bon Charge*, 2025 WL 3764039, at *4 (D. Del. Dec. 30, 2025) (Bibas, J.) (recognizing wide applicability of *Fuld* in Fifth Amendment context); *Cent. Am. Bank for Econ. Integration* v. *Mossi*, 2025 WL 2732731, at *8 (D.D.C. Sep. 25, 2025) ("*Fuld* lowers the constitutional floor when it comes to evaluating a federal court's exercise of personal jurisdiction under the Fifth Amendment Due Process Clause."); *Deutsche Telekom, A.G.* v. *Republic of India*, 155 F.4th 694, 700 n.2 (D.C. Cir. 2025) ("[T]he Fifth Amendment [does not] require[] a defendant to have minimum contacts with the United States."); *In re Fairfield Sentry Ltd.*, 671 B.R. 5, 19-20 (Bankr. S.D.N.Y. 2025) (recognizing *Fuld*'s relevance in bankruptcy cases).

Here, GDA's conduct easily satisfies both the "minimum contacts" test and *Fuld*'s "more flexible" inquiry.[2]  *See King*, 2025 WL 3764039, at *4 (minimum contacts satisfy *Fuld* standard).  *First*, GDA aggressively targeted U.S. investors for capital, including Delaware-formed Alameda Research LLC.  *Second*, GDA's pitch to these investors emphasized its plan to increase its U.S. business activities, which GDA projected would constitute a majority of its operations within nine months.  *Third*, after completing the fundraising round, GDA touted its intent to use the money it raised to increase its presence in the United States.  *Fourth*, to secure additional funding from Alameda Research LLC, GDA engaged a U.S. banker to provide financial projections.  These extensive contacts with the United States establish more than a *prima facie* case of specific jurisdiction under any relevant standard.[3]

### 1.    GDA Targeted U.S. Investors, Including Debtor Alameda Research LLC.

It is black-letter law that "personal jurisdiction [is] appropriate where a foreign corporation has directly solicited investment from the American market."  *Pinker* v. *Roche Holdings Ltd.*, 292 F.3d 361, 371 (3d Cir. 2002); *see also, e.g.*, *Lord Abbett Mun., Income Fund, Inc., ex rel. Lord Abbett High Yield Mun. Bond Fund* v. *Stone & Youngberg, LLC*, 2012 WL 13034286, at *2 n.1 (D.N.J. Nov. 19, 2012) (exercising personal jurisdiction over defendant who "directed efforts to sell investments towards New Jersey, sold such investments in New Jersey, and sold them to [plaintiff] in New Jersey"); *Malek* v. *Chef's Roll, Inc.*, 2019 WL 3854303, at *6 (D.N.J. Aug. 16, 2019) (defendant's "solicitations of Plaintiff and [plaintiff's company] to be

---

[2]     GDA argues specific jurisdiction is "claim specific," and that regardless of whether it is subject to jurisdiction for Counts One through Five, it is not subject to jurisdiction for Count Six.  *See* Br. at 8, 10.  Count Six, however, is not alleged against GDA.

[3]     The GDA U.S. Subsidiaries do not dispute that they are subject to personal jurisdiction.  GDA argues that this Court lacks jurisdiction over it because it is not the alter ego of its U.S. subsidiaries.  Br. at 11-12.  But GDA is subject to personal jurisdiction in the United States because of its own conduct.  The Trust does not contend that GDA is subject to personal jurisdiction under an alter ego theory.

business partners and investors" amounted to purposeful availment and established personal jurisdiction).

   The Agreement for the Sale and Purchase of Shares that Bankman-Fried executed on behalf of Alameda Research LLC on January 19, 2022, for example, lists five buyers and their principal places of business, four of which are in the United States (Alameda Research LLC, Paradigm Fund LP, Paradigm One LP, and Skybridge Multi-Adviser Hedge Fund Portfolios LLC — Series G). Dunne Decl., Ex. 1. The Second SPA executed between GDA and Alameda Research LLC on February 28, 2022 acknowledges that Alameda Research LLC is a Delaware company with a California address and calls for GDA to send all "[n]otices, demands and communications" to that address. [Adv. D.I. 17] ("Lvov Decl."), Ex. 2 at 1, 18-19. Moreover, every investor that participated in the February 28, 2022 fundraising is located in the United States. Indeed, GDA admits that "[t]he other entities that participated in this fundraising round . . . [are] Olshan Family 2016 Trust No. 1, Lime Partners, LLC (Belfer SPV), and Belfer Investment Partners, L.P. (Belfer SPV)." Lvov Decl. ¶ 21 n.2. All three entities are headquartered in New York, and Lime Partners, LLC and Belfer Investment Partners, L.P. are both organized under Delaware law. Dunne Decl., Exs. 2-4.

   GDA disregards the many U.S. entities it solicited for investment, arguing instead that its decision to enter a contract with Alameda Research LLC "does not suffice to establish that GDA Limited 'directed' any activity at the United States." Br. at 9. However, none of the cases that GDA cites for this proposition involve any analogous pattern of soliciting forum residents. Moreover, as GDA acknowledges, its contract-based argument only applies where there is no "indication that the contract was executed or performed" in the forum. *Id.* (quoting *Aldossari ex rel. Aldossari* v. *Ripp*, 49 F.4th 236, 259 (3d Cir. 2022)); *see also Walden* v. *Fiore*, 571 U.S. 277,

285 (2014) ("[W]e have upheld the assertion of jurisdiction over defendants who have purposefully reached out beyond their State and into another by, for example, entering a contractual relationship that envisioned continuing and wide-reaching contacts in the forum State." (internal quotation marks omitted)). Here, as discussed *infra*, GDA represented that the investment's purpose was to develop its U.S. operations, used the investment to do precisely that, and directly involved its investors in these U.S. activities. GDA is therefore subject to personal jurisdiction under both the "minimum contacts" test and *Fuld*'s "more flexible" inquiry.

> **2.      GDA Induced the Investments by Promoting U.S. Operations That GDA Then Funded with the Money It Raised.**

GDA also is subject to personal jurisdiction because it advertised its plan to establish U.S. operations to obtain the investments, and it then used the funds in question to finance its U.S. business activities. GDA mischaracterizes these representations and expenditures as "some possible future use of some unspecified funds." Br. at 9. Of course, "the standard of review on a motion to dismiss for lack of personal jurisdiction requires the court to construe disputed facts in favor of the plaintiff." *Belden Techs., Inc.* v. *LS Corp.*, 626 F. Supp. 2d 448, 458 (D. Del. 2009). In any event, GDA's own promotional materials confirm that far from using "some unspecified funds," GDA not only intended to use the money it received from investors to fund its U.S. operations, but it made these U.S. activities a key component of its fundraising pitch.

In July 2021, for example, GDA shared with the FTX Group a "detailed slide with [its] international expansion in numbers" that emphasized that by April 2022, GDA would "have access to 410 [megawatts] of zero- and low-carbon energy across the U.S. and Sweden," 87.8 percent of which would be in the United States. Dunne Decl., Exs. 5, 6. GDA's CEO and co-founder, Marco Streng, added that he "hope[d] this info [would] help[] [Alameda] further" in deciding whether to invest. Dunne Decl., Ex. 5.

Upon completing that fundraising round in September 2021, GDA issued a press release from New York titled "Genesis Digital Assets Raises $431 Million to Fund Expansion of Industrial-Scale Bitcoin Mining Operations in the US and Nordics." Dunne Decl., Ex. 7.  In the press release, Streng noted, "[T]he capital raised from this round will be used to expand our bitcoin mining operations in locations where clean energy is easily accessible.  We're excited to have strategic investors on board and look forward to executing on our mission together." *Id.*  In other words, GDA foresaw a long-term relationship with its investors in which they would support GDA in its U.S. expansion.

The issuance of this press release from New York is consistent with a draft employment agreement located in the Trust's records in which GDA references its "headquarters in the New York, New York metropolitan area." Dunne Decl., Ex. 8.  It is likewise consistent with GDA's website during the relevant period, which only listed an office in New York and a forthcoming office in Houston.  Dunne Decl., Ex. 9.[4]

GDA followed through with its plan to utilize the funds raised to expand operations in the U.S.  After Alameda's investment, GDA made several multimillion-dollar "loans" to its U.S. subsidiaries, and purchased Bitcoin mining equipment for use in Texas.  Dunne Decl., Exs. 11, 12. On multiple occasions after the transfers, FTX Group employees also traveled with GDA personnel (including Streng) to a data center in Texas so GDA could "show[] [them] the progress on our site and spend[] some time together." *Id.*, Exs. 13-15.

---

[4]     GDA's website now lists two office locations—Houston and Dubai—with Houston listed first, Dunne Decl., Ex. 10, suggesting GDA may retain its headquarters in the United States and could be subject to general jurisdiction. *See Goodyear Dunlop Tires Operations, S.A.* v. *Brown*, 564 U.S. 915, 919, 924 (2011) (general jurisdiction exists in defendant's principal place of business); *see also In re Golden Meditech Holdings Ltd.*, 2024 U.S. Dist. LEXIS 234430, at *7-8 (S.D.N.Y. Dec. 30, 2024) (publicly available information showing defendants were headquartered in New York rendered them "at home").  These facts also call into doubt Mr. Lvov's statements that "[f]rom 2017 to 2022, GDA Limited was headquartered outside of the United States," "[s]ince September 2022, GDA Limited has been headquartered in Dubai," and "GDA Limited . . . has never had . . . offices . . . in the United States." *See* Lvov Decl. ¶¶ 5-6.

Particularly when considered alongside GDA's targeting of U.S. investors, these "prior negotiations and contemplated future consequences" provide further support for this Court's exercise of specific jurisdiction over GDA.  *See Burger King Corp.* v. *Rudzewicz*, 471 U.S. 462, 479 (1985); *see also Cromer Fin. Ltd.* v. *Berger*, 137 F. Supp. 2d 452, 476-77 (S.D.N.Y. 2001) (finding it "difficult to imagine how the [defendant] would lack the sufficient contacts with the United States" after soliciting U.S. investors for a fund that was largely managed from the United States and that invested the money it raised in U.S. securities).[5]

### 3.    GDA Used a U.S. Agent To Secure Further Investments from Alameda.

Though GDA's own contacts are more than sufficient to subject it to personal jurisdiction, GDA also enlisted the help of a U.S. agent to engage in the conduct underlying this Adversary Proceeding.  As alleged in the Complaint, in January 2022, GDA responded to Alameda Research LLC's "half-hearted" due diligence by engaging a U.S.-based investment banker to provide financial projections in order to induce Alameda Research LLC's investment.  *See* Compl. ¶¶ 74, 78; Dunne Decl., Exs. 16-19.  The banker even met with Streng—who internally remarked that he valued him for his "experience . . . in IPOs and generally in US public markets"—in New York shortly before GDA connected the banker with Bankman-Fried to persuade Bankman-Fried to invest.  Dunne Decl., Exs. 18-20.

It is well established that the "[a]ctivities of a party's agent may count toward the minimum contacts necessary to support jurisdiction."  *Grand Ent. Grp., Ltd.* v. *Star Media Sales,*

---

[5]    Although GDA's claim that the Trust has merely alleged "some possible future use of some unspecified funds" is patently false, Br. at 9, the sole case that GDA cites in support of its argument that this subsequent use cannot establish jurisdiction, *Carvel* v. *Griffin*, 2008 WL 4922432, at \*6 (D. Del. Nov. 18, 2008), does not stand for this proposition.  There, the individual defendant's only jurisdictional act consisted of "verifying a Petition [in the Delaware Court of Chancery], filed after th[e] [federal] case was commenced and not by him but by [another party]."  *Id.*

*Inc.*, 988 F.2d 476, 483 (3d Cir. 1993); *see also, e.g.*, *Bilek* v. *Fed. Ins. Co.*, 8 F.4th 581, 591 (7th Cir. 2021) ("[A]ttributing an agent's suit-related contacts to a principal to establish specific personal jurisdiction poses no due process bar."); *Manship* v. *Stein*, 2022 WL 203247, at *5 (D.N.J. Jan. 24, 2022) (use of in-forum counsel "to negotiate and finalize" contract established specific jurisdiction), *aff'd*, 2024 WL 4986936 (3d Cir. Dec. 5, 2024).  This alone is enough to subject GDA to jurisdiction in the United States.

### 4.    The Exercise of Specific Jurisdiction Is Reasonable Under *Fuld*.

Even if GDA could show that it lacks sufficient contacts with the United States (it cannot), the exercise of jurisdiction would be entirely reasonable under the Fifth Amendment framework articulated in *Fuld*.  In assessing reasonableness, courts consider "the burden on the defendant, the interests of the forum State, and the plaintiff's interest in obtaining relief." *Fuld*, 606 U.S. at 23-24.  The defendant bears a "heavy" burden to show that jurisdiction would be constitutionally unreasonable. *Grand Ent. Grp.*, 988 F.2d at 483.  GDA has not attempted to carry that burden and, by failing to analyze any of the factors that courts consider, has waived the argument entirely.  *See Williams* v. *Netflix, Inc.*, 2023 WL 3478568, at *2 (D. Del. May 16, 2023); *see also Mellon Bank (E.) PSFS, Nat. Ass'n* v. *Farino*, 960 F.2d 1217, 1226-27 (3d Cir. 1992) (inappropriate to engage in reasonableness analysis where defendants "limited their argument to whether they had sufficient minimum contacts" and "ma[de] no mention in their brief of the other factors that the Supreme Court has considered in determining whether a specific assertion of jurisdiction is unreasonable").

First, litigating in Delaware imposes no constitutionally significant burden on GDA.  GDA purposefully solicited hundreds of millions of dollars from U.S. investors, including a Delaware-formed entity, to fund what it promoted as a substantial U.S. expansion.  Having

deliberately accessed U.S. capital markets, GDA cannot now claim that defending itself in a U.S. court is unfair.  Moreover, GDA is already represented by sophisticated U.S. counsel in this proceeding and has actively litigated here.  *See In re UD Dissolution Corp.*, 629 B.R. 11, 28 (Bankr. D. Del. 2021).  It has offered no evidence that litigating in Delaware would impose any unusual financial or logistical hardship, much less the "compelling case" required to defeat jurisdiction.  *Grand Ent. Grp.*, 988 F.2d at 483; *In re DBSI, Inc.*, 451 B.R. 373, 377 (Bankr. D. Del. 2011).

Second, there is a strong federal interest in exercising jurisdiction.  This action arises under the Bankruptcy Code and seeks to recover property for a federally administered Chapter 11 estate.  The United States has a compelling interest in ensuring that estate assets are marshaled and distributed in accordance with federal law.  *See In re Firestar Diamond, Inc.*, 654 B.R. 836, 903 (Bankr. S.D.N.Y. 2023).  Permitting foreign defendants who solicited U.S. capital to evade avoidance actions would directly undermine that federal interest.

Third, considerations of judicial efficiency and orderly estate administration strongly favor adjudication here. This adversary proceeding is part of a centralized Chapter 11 case pending before this Court. Resolving avoidance claims in the same forum promotes uniformity, conserves judicial resources, and prevents fragmented litigation across jurisdictions.  *See In re Bozel S.A.*, 434 B.R. 86, 101 (Bankr. S.D.N.Y. 2010).  Requiring the Trust to pursue piecemeal foreign litigation on these facts would frustrate the core purposes of Chapter 11.

In short, exercising jurisdiction over GDA—an entity that deliberately targeted U.S. investors, accepted U.S. capital, and used that capital to expand U.S. operations—is entirely consistent with traditional notions of fair play and substantial justice.

*　　*　　*

If this Court finds that the Trust has not met its burden of establishing a *prima facie* showing of jurisdiction, the Court should permit the Trust to take jurisdictional discovery. *See bioMérieux, S.A.* v. *Hologic, Inc.,* 2018 WL 4647483, at *3 (D. Del. Sep. 26, 2018) ("Plaintiffs' request for jurisdictional discovery is ripe only if the Court finds a lack of a prima facie case."). If "the plaintiff's claim is not clearly frivolous, the [] court should ordinarily allow discovery on jurisdiction." *Compagnie des Bauxites de Guinee* v. *L'Union Atlantique S.A. d'Assurances*, 723 F.2d 357, 362 (3d Cir. 1983). "Moreover, there is, in some sense at least, a 'presumption' of jurisdictional discovery as to defendants that are corporations." *Prestan Prods. LLC* v. *Innosonian Am., LLC*, 2024 WL 278985, at *3 (D.N.J. Jan. 25, 2024); *see also Metcalfe* v. *Renaissance Marine, Inc.*, 566 F.3d 324, 336 (3d Cir. 2009) ("[J]urisdictional discovery [is] particularly appropriate where the defendant is a corporation."). Though the Trust maintains that it has made out a *prima facie* showing of personal jurisdiction over GDA, the Trust respectfully requests leave to serve jurisdictional discovery in the alternative, should the Court deem it necessary.

## II.    THE COMPLAINT MORE THAN ADEQUATELY PLEADS ACTUAL AND CONSTRUCTIVE FRAUDULENT TRANSFER CLAIMS.

### A.    Legal Standard

In deciding a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Black* v. *Montgomery Cnty.*, 835 F.3d 358, 364 (3d Cir. 2016) (quoting *Phillips* v. *Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008)); *see also Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) (plaintiff must only plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged"

(citing *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 556 (2007)).  "[W]hen a federal court reviews the sufficiency of a complaint . . . the issue is not whether [the] plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims."  *Boyle* v. *City of Philadelphia*, 2018 WL 994218, at *4 (E.D. Pa. Feb. 20, 2018) (alteration in original) (quoting *Ladd* v. *Boeing Co.*, 463 F. Supp. 2d 516, 523 (E.D. Pa. 2006)).

For purposes of Rule 12(b)(6), the Court "look[s] to the complaint and attached exhibits in ruling on a motion to dismiss."  *Philip A. Templeton, M.D., P.A.* v. *EmCare, Inc.*, 868 F. Supp. 2d 333, 338 (D. Del. June 15, 2012).  The Court may also consider a document outside of the pleadings if the document is "integral to or explicitly relied upon in the complaint."  *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (cleaned up).  Additionally, the Court may "allow limited discovery and, if justified, a final amendment of the complaint," particularly where "some of the information needed may be in the control of the defendants."  *Menard* v. *CSX Transp., Inc.*, 698 F.3d 40, 45 (1st Cir. 2012) (cleaned up); *see also Loosier* v. *Unknown Med. Dr.*, 435 F. App'x 302, 307 (5th Cir. 2010) ("[W]e do not require plaintiffs to plead facts peculiarly within the knowledge of defendants.").  It is not permissible on a Rule 12(b)(6) motion to rely on material outside the complaint to "make a finding of fact that controvert[s] the plaintiff's own factual assertions set out in its complaint."  *Glob. Network Commc'ns, Inc.* v. *City of New York*, 458 F.3d 150, 156 (2d Cir. 2006) (emphasis omitted); *see also In re Student Fin. Corp.*, 335 B.R. 539, 546 (D. Del. 2005) ("The purpose of a motion to dismiss is to test the sufficiency of a complaint, not to resolve disputed facts or decide the merits of the case.").  Nor should a Rule 12(b)(6) motion be granted based on an affirmative defense predicated on disputed facts.  *See In re DVI, Inc.*, 2008 WL 4239120, at *11 (Bankr. D. Del. Sep. 16, 2008).

**B.      Sections 544, 548 and 550 Apply Here, and This Case Involves a Domestic Application of Those Provisions.**

Courts use a two-step framework to determine if a statute applies extraterritorially. *See Abitron Austria GmbH* v. *Hetronic Int'l, Inc.*, 600 U.S. 412, 417-18 (2023). A court first must determine if "Congress has affirmatively and unmistakably instructed that the provision at issue should apply to foreign conduct." *Id.* (internal quotation marks omitted). If Congress has not done so, a court must determine whether the particular claims at issue seek a permissible domestic application of the provision by "identifying the focus of congressional concern underlying the provision at issue," looking to "the object of its solicitude, which can include the conduct it seeks to regulate, as well as the parties and interests it seeks to protect or vindicate," and asking "whether the conduct relevant to that focus occurred" in the United States. *Id.* at 418 (internal quotation marks and emphasis omitted).

GDA contends that the Trust's claims under 11 U.S.C. §§ 544, 548, and 550 fail because those provisions cannot be applied extraterritorially. Br. at 12-15. That is wrong. But even setting that aside, GDA's argument is beside the point, because this action involves a domestic application of federal law.

**1.      The Fraudulent Transfer Statutes Apply Extraterritorially.**

While GDA relies entirely on cases from outside this Circuit, cases from this Circuit addressing the extraterritorial application of the avoidance statutes have rejected the argument that the Bankruptcy Code's avoidance statutes do not apply extraterritorially. *See In re Maxus Energy Corp.*, 641 B.R. 467, 562 (Bankr. D. Del. 2022) ("The Trustee can seek recovery under § 548 extraterritorially to claw back" fraudulent transfers); *In re FAH Liquidating Corp.*, 572 B.R. 117, 125 (Bankr. D. Del. 2017) (same). The law in this Circuit is clear: "Congress' intent was to extend

the scope of section 548 to cover extraterritorial conduct." *In re FAH Liquidating Corp.*, 572 B.R. at 124.

With respect to Sections 544 and 548, the "surrounding provisions of the Bankruptcy Code" clearly evidence that Congress "intended that statute to apply extraterritorially." *See id.* at 125. Section 541(a)(3) provides that any interest in property that the trustee recovers under Section 550 "wherever located and by whomever held" becomes property of the estate. 11 U.S.C. § 541(a)(3); *see also In re FAH Liquidating Corp.*, 572 B.R. at 125-26. Section 550, in turn, "authorizes a trustee to recover transferred property to the extent that the transfer is avoided" under Sections 544 and 548, among others. *In re FAH Liquidating Corp.*, 572 B.R. at 125-26 (quoting *Lyondell*, 543 B.R. at 154). Thus, "[i]t would be inconsistent (such that Congress could not have intended) that property located anywhere in the world could be property of the estate once recovered under section 550, but that a trustee could not avoid the fraudulent transfer and recover that property if the center of gravity of the fraudulent transfer were outside of the United States." *Id.* (quoting *Lyondell*, 543 B.R. at 154-55). By incorporating Section 541's definition of "property" into Sections 544 and 548, "Congress made manifest its intent" that those provisions "apply to all property that, absent a prepetition transfer, would have been property of the estate, wherever that property is located."[6] *Id.* at 125 n.6 (quoting *In re French*, 440 F.3d 145, 151-52 (4th Cir. 2006)). Indeed, it is difficult to imagine a broader statutory definition of estate property than property "wherever located and by whomever held." 11 U.S.C. § 541(a).

The contrary holding that GDA asks this Court to adopt would undermine the *in rem* jurisdiction of the Bankruptcy Court by removing from its jurisdiction "assets that Congress

---

[6]     Section 541's broad definition of estate property is incorporated into both Sections 547 and 548 through Section 550, and the Supreme Court has held that section 547 "mirrors § 541's definition of 'property of the estate.'" *Begier* v. *I.R.S.*, 496 U.S. 53, 59 n.3 (1990). The argument in favor of extraterritoriality thus applies equally to both sections.

has declared become property of the estate when recovered under section 541(a)(3)," including fraudulently transferred assets. *In re FAH Liquidating Corp.*, 572 B.R. at 126; *see also In re Simon*, 153 F.3d 991, 996 (9th Cir. 1998) ("The court's exercise of 'custody' over the debtor's property, via its exercise of in rem jurisdiction, essentially creates a fiction that the property—regardless of actual location—is legally located within the jurisdictional boundaries of the district in which the court sits.") (emphasis omitted). There is simply no reason to think, as GDA argues, that "property not in the estate as of the commencement of the case cannot be brought into the estate because it is in a foreign locale." *Lyondell*, 543 B.R. at 154. This view is inconsistent with common sense, the plain text of Sections 541(a), and with "the purpose of the Bankruptcy Code's avoidance provisions, which is to prevent debtors from illegitimately disposing of property that should be available to their creditors." *In re French*, 440 F.3d at 152.

### 2.    This Action Involves a Domestic Application of the Avoidance Statutes.

GDA argues that the Transfers are "extraterritorial" because certain parties and bank accounts were located abroad, and the governing share purchase agreements contain foreign choice-of-law and forum-selection clauses. Br. at 14-15.   But that is not the relevant inquiry. Under the Supreme Court's framework, the question is not whether aspects of a transaction involved foreign entities or foreign accounts. Rather, a court must determine whether "the conduct relevant to the statute's focus occurred in the United States." *Abitron*, 600 U.S. at 418 (emphasis omitted). The "focus" of a statute is the "object of its solicitude"—that is, the conduct it regulates and the interests it seeks to protect or vindicate. *WesternGeco LLC* v. *ION Geophysical Corp.*, 585 U.S. 407, 413-14 (2018) (cleaned up).

For the avoidance provisions, that focus is clear. Sections 544, 548 and 550 exist to preserve property of the bankruptcy estate and protect creditors from illegitimate depletions of

that estate.  *See Begier*, 496 U.S. at 58 (avoidance provisions preserve estate property for distribution to creditors); *In re French*, 440 F.3d at 154 (statutes protect creditors by preventing depletion of the estate); *In re Maxus Energy Corp.*, 641 B.R. at 561 (avoidance provisions allow a trustee to recover transfers that deplete the estate).  Accordingly, the relevant inquiry is whether the conduct that depleted the estate occurred in the United States—even if other aspects of the transaction involved foreign participants.  *See RJR Nabisco, Inc.* v. *Eur. Cmty.*, 579 U.S. 325, 337 (2016).

Consistent with that approach, courts have held that where a domestic debtor transfers property from a U.S. bank account as part of a fraudulent scheme operated in the United States, application of the avoidance statutes is domestic.  *See In re Picard*, 917 F.3d 85, 100 (2d Cir. 2019); *In re Bernard L. Madoff*, 480 B.R. 501, 524-25 (Bankr. S.D.N.Y. 2012).  Courts likewise consider the "participants, acts, targets, and effects" of the transaction to determine whether it is primarily domestic.  *In re FAH Liquidating Corp.*, 572 B.R. at 124.  The inquiry is practical and case-specific—not formalistic.  *Cf. Yegiazaryan* v. *Smagin*, 599 U.S. 533, 544 (2023).

Reading the Complaint in the Trust's favor, the conduct relevant to the Transfers was domestic.  The Transfers were transmitted in U.S. currency from U.S. bank accounts and were made, in substantial part, pursuant to agreements with a Delaware-formed entity.  Compl. ¶¶ 11, 27, 60, 85, 87.  The alleged injury—the depletion of estate assets—occurred in the United States and arose from a U.S.-operated fraudulent scheme.  That is precisely the type of domestic conduct the avoidance provisions regulate.

### C.     The Complaint States a Claim for Actual Fraudulent Transfer.

To state a claim for an intentional fraudulent transfer, "a showing of any one of the three requisite states of mind—the intent to hinder, the intent to delay, or the intent to defraud—is sufficient."  *In re Syntax-Brillian Corp.*, 2016 WL 1165634, at *4 (Bankr. D. Del. Feb. 8, 2016).

Only the intent of the transferor, not the transferee, must be established.  *In re Live Well Fin., Inc.*, 652 B.R. 699, 704-05 (Bankr. D. Del. 2023).  Although Rule 9(b), made applicable here by Federal Rule of Bankruptcy Procedure 7009, requires a party to "state with particularity the circumstances constituting fraud or mistake," such as by pleading the factual circumstances of the transfers themselves, "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  Fed. R. Civ. P. 9(b); *see also In re Live Well Fin., Inc.*, 652 B.R. at 705; *In re Millennium Lab Holdings II, LLC*, 2019 WL 1005657, at *3 (Bankr. D. Del. Feb. 28, 2019).  This standard is relaxed where, as here, criminal investigations and the personnel departures force the new management of a debtor to operate from "second-hand knowledge."  *In re Enron Corp.*, 328 B.R. 58, 73 (Bankr. S.D.N.Y. 2005).  "Because direct evidence of fraudulent intent is often unavailable, courts usually rely on circumstantial evidence to infer fraudulent intent," including various "badges of fraud."  *In re Fedders N. Am., Inc.*, 405 B.R. 527, 545 (Bankr. D. Del. 2009).

GDA argues that the Complaint fails to adequately allege actual fraudulent intent or to support the inference of fraudulent intent using "badges of fraud."  Br. at 17-22.  However, although GDA disclaims any connection between the FTX Insiders' criminal scheme and the Transfers, the Complaint's allegations clearly support the plausible inference that the Transfers were undertaken with an intent to hinder, delay, or defraud creditors.

### 1.    The Complaint Adequately Pleads Actual Fraudulent Intent.

The Complaint adequately alleges that the Transfers were in connection with and in furtherance of the larger fraud at the FTX Group.  The Transfers furthered the FTX Insiders' overarching fraud, were integral to a Ponzi-like scheme to prolong that fraud, knowingly exposed creditors to a concealed and substantial risk of loss, and—at a minimum—were made with intent to hinder or delay creditors by placing assets beyond their reach.

### (i)   The Transfers Were Accomplished By and In Furtherance of the Fraud at the FTX Group.

The Transfers were "accomplished by" and "the product of a deliberate fraud," and thus "any disposition of those funds must be considered to be part of a continuing course of conduct which was intended to defraud." *In re Bell & Beckwith*, 64 B.R. 620, 629 (Bankr. N.D. Ohio 1986). Here, the funds used in connection with the Transfers were only available as a result of the FTX Insiders' misappropriation of customer assets and fraudulent representations to lenders. Thus, the disposition of these misappropriated and fraudulently obtained funds, which was itself concealed from creditors (Compl. ¶¶ 7, 58-60, 100, 112), was part of the FTX Insiders' continuing fraud on their creditors. *See In re Bell & Beckwith*, 64 B.R. at 620 ("A general scheme or course of conduct that is designed to divert assets of a debtor without regard to the interests of creditors can constitute conduct from which intent to defraud can be found.").

Similarly, the Transfers were intended "to prevent exposure" of the scheme or "to continue perpetuating the fraud." *In re Live Well*, 652 B.R. at 706; *see also In re Bayou Grp., LLC*, 439 B.R. 284, 302 (S.D.N.Y. 2010) (finding actual fraudulent intent where transfers were made "[t]o avoid detection of the fraud, to retain existing investors and to lure new investors") (citation omitted); *Syntax*, 2016 WL 1165634, at *5 (fraudulent intent sufficiently pled where obligations were "incurred to prolong the [insiders'] fraudulent scheme and to continue an unsustainable enterprise that was inevitably doomed to fail."). The Complaint alleges that the FTX Insider's profligate spending "resulted in a recurring need to expand the FTX Group to perpetuate a myth of success and growth." Compl. ¶ 39 (Ellison testified that if customer funds were used to repay lenders, there would be no "source to repay the FTX customer money [they] had borrowed unless [they made] a lot of money or something."). Indeed, when Singh confronted Bankman-Fried about the growing hole caused by their unchecked misappropriation and spending, Bankman-

Fried replied that the "main line plan remains, making FTX successful and growing it." Compl. ¶ 47. The Transfers provided this opportunity by permitting Bankman-Fried to "capture nearly all of the upside from GDA's inflated valuation and potential success" "while at the same time externalizing the losses to the FTX Group's creditors and customers." Compl. ¶ 110.

**(ii)   The Transfers Were Part of a Ponzi-Like Scheme to Prolong the Larger Fraud at the FTX Group.**

Moreover, fraudulent intent may be presumed where, like here, (i) "the debtor runs a Ponzi scheme or a similar illegitimate enterprise," *In re Bayou Grp., LLC*, 439 B.R. at 305, and (ii) "the transfers at issue were related to or in furtherance of the fraudulent scheme," *Zazzali* v. *AFA Fin. Grp., LLC*, 2012 WL 4903593, at *7 (Bankr. D. Del. Aug. 28, 2012). The relevant scheme may also be a Ponzi-like scheme where, "[r]ather than passing on the new funds to old investors, [insiders] took or directed most of this money to themselves . . . or to the perpetuation of the scam." *In re Nat'l Audit Def. Network*, 367 B.R. 207, 222 (Bankr. D. Nev. 2007).[7] The Complaint sufficiently alleges a Ponzi-like arrangement that would by its very nature defraud creditors, and the Transfers were related to or in furtherance of that arrangement: The FTX Insiders "took advantage of the FTX Group's lack of controls and recordkeeping to perpetrate a massive fraud—lavishly spending the FTX Group's assets on . . . various reckless, illiquid investments," Compl. ¶ 38, and this "spending spree was funded through a Ponzi-like arrangement whereby the FTX Insiders caused Alameda to borrow significant amounts of funds from third-party lenders and to repay those funds as needed by 'borrowing'—*i.e.*, misappropriating—

---

[7]   *See also In re DBSI, Inc.*, 2011 WL 1810632, at *1 (Bankr. D. Del. May 5, 2011) (Ponzi presumption applied where insiders "directed that investor funds be used to meet pre-existing obligations and operating expenses by evading restrictions governing the use of investor funds."); *In re Live Well*, 652 B.R. at 706 (fraudulent intent sufficiently pled where complaint alleged that debtor's "bond trading business had turned into a de facto Ponzi scheme that required finding new victims to pay off the debts owed to earlier victims"); *In re Carrozzella & Richardson*, 237 B.R. 536, 539 (Bankr. D. Conn. 1999) (recognizing existence of Ponzi-like scheme where "funds placed with a debtor by later depositors are secretly and illicitly utilized to pay returns, and repay principal, to earlier depositors.").

customer funds," *id.* This "fraudulent misappropriation and misuse of customer and investor assets, and Alameda's overextended positions both to FTX.com and third-party investors and lenders, resulted in a recurring need to expand the FTX Group to perpetuate a myth of success and growth, using after-obtained capital to satisfy earlier-incurred liabilities in Ponzi-like fashion." Compl. ¶ 39; *see also* Compl. ¶ 40-48 (describing scheme that "facilitated the Transfers"); Compl. ¶ 52.

**(iii)    The FTX Insiders Acted with Fraudulent Intent by Exposing Creditors to a Substantial Risk of Loss of Which They Were Intentionally Kept Unaware.**

The Complaint further alleges that the FTX Insiders knew that the natural consequence of the Transfers would be to deprive FTX Group creditors of their assets—or at the very least, hinder or delay creditors in recovering them. A debtor or corporate insider acts with actual intent to defraud creditors where it "knowingly expose[s]" creditors "to a substantial risk of loss of which they were unaware." *In re Sentinel Mgmt. Grp., Inc.*, 728 F.3d 667-68 (7th Cir. 2013). That is exactly what the FTX Insiders did here when they used assets from Alameda (and in turn, misappropriated funds from customers and fraudulently obtained funds from lenders) to fund the Transfers. The FTX Insiders not only kept FTX Group creditors in the dark about their source of funding for the Transfers, but also actively concealed that the Transfers created a substantial risk that creditors would not be repaid.

Specifically, the Complaint alleges that the Transfers were funded from Alameda bank accounts, and Alameda had "[b]y this time" been used by the FTX Insiders to "'borrow[]' billions of dollars of customer funds" and "had taken out billions of dollars in loans from third party lenders" to whom false and misleading financial statements were provided and to misappropriate billions of dollars more from FTX.com customers." Compl. ¶¶ 43, 44, 105, 110; *see Syntax*, 2016 WL 1165634, at *6 ("The delay of payment to creditors was substantially certain

-25-

to occur when the Debtors incurred the Obligations at a time when they were purposefully concealing massive losses.").  The FTX Insiders knew that going forward with the Transfers meant spending customer funds, not for customer benefit, but nonetheless went through with it "to perpetuate a myth of success and growth, using after-obtained capital to satisfy earlier-incurred liabilities in Ponzi-like fashion."  Compl. ¶ 39.  FTX Group creditors were not just unaware that their funds were being used for the Transfers—the FTX Insiders went to lengths to actively (and illegally) conceal their use of misappropriated funds for the Transfers.  Compl. ¶¶ 45, 58-59, 100, 104-105.  The FTX Insiders papered over the source of funding in furtherance of their conspiracy to hide the true nature of the relationship between FTX.com and Alameda, and the FTX Group's true financial condition.  Compl. ¶¶ 58, 101-102, 110, 112.

        **(iv)**      **The FTX Insiders Acted, at a Minimum, with Intent To Hinder or Delay Creditors by Putting Over a Billion Dollars Beyond Their Reach.**

        Even if the FTX Insiders did not know that the funds used for the Transfers would become permanently unavailable to repay creditors, they at least knew that the Transfers would hinder or delay repayment to FTX Group creditors.  Put another way, under the totality of the circumstances, "the natural consequence" of these transfers "would, at a minimum, delay or hinder distributions to the creditor body."  *Syntax*, 2016 WL 1165634, at \*6; *see ASARCO LLC v. Americas Mining Corp.*, 396 B.R. 278, 388 (S.D. Tex. 2008) (finding intent to hinder or delay where insider "knew that payments to some creditors would be hindered and delayed as a result of the transaction, but it closed the transaction anyway").  Indeed, the Transfers necessarily hindered and delayed payment to creditors because assets that should have been instantly available to creditors were put even further beyond their reach.  *See, e.g.*, *In re Tronox Inc.*, 503 B.R. 239, 249 (Bankr. S.D.N.Y. 2013) (debtors acted with actual fraudulent intent when they "transferred out and then spun off" assets in face of liabilities).

GDA argues that Alameda's investments were for "alternative, non-fraudulent purposes" because they sought to "invest and profit from GDA Limited's success." Br. at 19. This fact-based argument is not only contrary to the Complaints' well-pleaded allegations, but is also beside the point. Even if the FTX Insiders did someday believe they would profit and intended to repay FTX.com customers and Alameda lenders (*e.g.*, with hypothetical future profits), a "genuine belief" that a debtor can "weather a financial storm, and pay his debts in full . . . does not clothe him with a privilege to build up obstructions that will hold his creditors at bay." *Shapiro* v. *Wilgus*, 287 U.S. 348, 354 (1932); *In re MarketXT Holdings Corp.*, 376 B.R. 390, 408 (Bankr. S.D.N.Y. 2007) (debtor's "intention to delay creditors is not immunized by the transferor's conviction that it is for the creditors' good").

### 2.    The Complaint Adequately Alleges Badges of Fraud To Support an Inference of Fraudulent Intent.

Even if it were necessary to look beyond direct evidence of intentional fraud to consider circumstantial evidence, Plaintiff's well-pled allegations contain several badges of fraud that this Court has found sufficient to plead intent to defraud. *See In re Live Well Fin., Inc.*, 2023 WL 3995900, at *15 (Bankr. D. Del. June 13, 2023) ("[T]he confluence of several [badges] in one transaction generally provides conclusive evidence of an intent to defraud."). Of course, "the presence or absence of any one badge of fraud is not dispositive and courts are free to consider additional factors as well as other allegations in the complaint." *Id.*

*First*, the Complaint alleges that the Debtors were insolvent and did not receive reasonably equivalent value in exchange for the Transfers—both recognized badges of fraud. *See id.* The circumstances surrounding the funding of the Transfers further support an inference of fraudulent intent. When GDA's bank refused to process the September 2021 Transfer without documentation showing that the funds originated from Alameda Ventures Ltd., Bankman-Fried

simply directed that the funds be wired instead from Alameda Research Ltd.'s U.S.-based account—even though Alameda Research Ltd. was not a party to the governing share purchase agreement.  Compl. ¶¶ 57-60.  Treating the source of funds as interchangeable—without ensuring that the funding entity received any value in return—supports the inference that the Transfers were designed to advance the FTX Group's broader scheme, not to benefit the transferor or safeguard its assets.

*Second*, Alameda executed a series of hasty investments in GDA, and "Bankman-Fried was largely indifferent to the per share price paid, and prioritized speed over diligence." Compl. ¶¶ 68, 112.[8]  Indeed, Bankman-Fried "signed the Stock Purchase Agreement on behalf of Alameda Research LLC on February 24, 2022—before GDA even completed its delivery of [due diligence] documents."  Compl. ¶ 85; *In re FTX Trading Ltd.*, 2025 Bankr. LEXIS 2773, at *11 n.24 (Bankr. D. Del. Oct. 27, 2025) (fraudulent intent shown by "FTX's quick[] entry into agreements . . . without diligence"); *see In re DSI Renal Holdings, LLC*, 574 B.R. 446, 465 (Bankr. D. Del. 2017) ("hasty transfer not in the usual course of business" is a badge of fraud).  Executing nine-figure transactions without completing diligence is inconsistent with legitimate corporate decision-making and supports the inference that Bankman-Fried was motivated by the desire to perpetuate his fraudulent scheme.

*Third*, the Complaint alleges that in effectuating the Transfers, "Bankman-Fried concealed from FTX.com customers, creditors and investors that he was spending funds that had been misappropriated from FTX.com and commingled with other FTX Group funds."  Compl. ¶ 7; *id.* ¶ 58 ("The Trust's investigation into the source of funds used for the Transfers to GDA reveals

---

[8]       GDA argues that this allegation "can be read instead to support Alameda's urgency to 'capture . . . the upside' of the GDA Shares."  Br. at 20 n.19.  The Court should disregard this contra-textual reading of the Complaint.  *See City of Cambridge Ret. Sys.* v. *Altisource Asset Mgmt. Corp.*, 908 F.3d 872, 878 (3d Cir. 2018) (the Court must accept "all well-pleaded allegations as true and draw all reasonable inferences in favor of the plaintiff.").

that, in addition to drawing on its 'line of credit' at FTX.com, Bankman-Fried also used commingled, misappropriated funds from North Dimension Inc."); *id.* ¶¶ 85, 87; *id.* ¶ 111 ("Bankman-Fried pursued these investments with indifference to red flags and Defendants' flagrant misrepresentations precisely because he was gambling with commingled, misappropriated funds"). Meanwhile, "Alameda maintained negative balances in its own holdings of . . . cryptocurrencies." *Id.* ¶ 46. The Transfers were merely a facet of Bankman-Fried and Alameda's scheme to "regularly . . . 'borrow' (*i.e.*, loot) billions of dollars from the FTX.com exchange to fund . . . vanity investments—all while hiding the source of these funds from investors, creditors, and the general public." *Id.* ¶ 3. Such concealment, coupled with the use of misappropriated funds, is emblematic of transactions designed to perpetuate a fraud rather than preserve value for creditors.

*Fourth*, the Complaint alleges that the Transfers were facilitated by Bankman-Fried's close relationship with GDA and its employees. Compl. ¶ 112. The Complaint alleges that Bankman-Fried traveled with GDA personnel to Kazakhstan to meet with then-President Tokayev, Compl. ¶¶ 69-70, and that the FTX Group later hired "GDA's co-founder's son as an analyst." Compl. ¶ 88. These allegations place GDA squarely inside Bankman-Fried's inner circle—precisely the kind of close relationship that supports an inference of fraud.

Accordingly, the Trust has adequately alleged several badges of fraud.

### D.   The Complaint States a Claim for Constructive Fraudulent Transfer.

"[A]ll that is needed" to plead a constructive fraudulent transfer claim under federal and state law "is an allegation that there was a transfer for less than reasonably equivalent value at a time when the Debtors were insolvent." *In re FTX Trading Ltd.*, 2025 Bankr. LEXIS 2773, at *11-12 (internal quotation marks omitted). The Complaint satisfies this standard: the Complaint alleges that "Alameda received less than reasonably equivalent value for the Transfers," and

Alameda was insolvent at the time of the transfers.  *See* Compl. ¶¶ 90-97; 98-106, 108, 112.

Notwithstanding the Complaint's well-pled allegations, GDA disputes that Alameda did not

receive reasonably equivalent value in connection with the Transfers, and that Alameda was

insolvent at the time the Transfers were made.  Br. at 24-27.  Both arguments fail.

### 1.    The Complaint Adequately Pleads That Alameda Did Not Receive Reasonably Equivalent Value.

Assessing "reasonably equivalent value requires a factual determination that cannot

be made on a motion to dismiss."  *In re Qimonda Richmond, LLC*, 467 B.R. 318, 327 (Bankr. D.

Del. 2012) (internal quotation marks omitted); *see also, e.g.*, *In re Charys Holding Co., Inc.*, 443

B.R. 628, 638 (Bankr. D. Del. 2011) ("[R]easonably equivalent value is a fact intensive

determination that typically requires testing through the discovery process.").  The Complaint

explicitly pleads that Alameda did not receive reasonably equivalent value at the time of the

Transfers because:

- "The prices paid by Alameda were based on inflated valuations and projections."  Compl. ¶ 91;

- GDA's own projections "were untethered from reality" and "concealed the effects of the Kazakhstan energy crisis—including the tenfold increase in taxes on cryptocurrency miners and the energy restrictions that foreseeably resulted in serious electricity shortages for GDA and a material decline in its output."  *Id.*;

- "Even one of GDA's own board members described its valuation as 'insane and off-market.'  That GDA board member conceded that the revenue and production projections underpinning GDA's financial statements were 'wildly off, consistently.'"  *Id.* ¶ 92;

- Alameda's purchase price relied on GDA's aggressive U.S. expansion projections, which proved wildly overstated:  GDA projected hundreds of megawatts of U.S. Bitcoin mining capacity across multiple states by July 2022, but "GDA only succeeded in opening two data centers with just 75 Megawatts of capacity by July 2022, over 90% less than GDA projected just months earlier [in January 2022]."  *Id.* ¶¶ 93-94; and

- "By spring 2022, GDA's unaudited financials revealed that '2022 [was] not going that great' with 'major negative updates' on hash rates.  By summer 2022, financial updates showed GDA would need yet another funding round to cover its 'capital gap.'  By August 2023 the company was valued at a fraction of what it had been when Alameda invested."  *Id.* ¶ 96.

It is further undisputed that although the share purchase agreement underlying the October 2021 Transfer was between *Alameda Ventures Ltd.* and GDA, the funds for the investment were ultimately transferred from *Alameda Research Ltd.'s* U.S.-based bank account.  Compl. ¶¶ 57, 60.  Accordingly, Alameda Research Ltd. received *no* value whatsoever in exchange for the October 2021 Transfer.

### 2. The Complaint Adequately Pleads Insolvency at the Time of the Transfers.

Courts in this Circuit have held that "[w]hether a debtor was insolvent at a point in time is highly fact-specific and should be based on seasonable appraisals or expert testimony." *Miller* v. *Mott*, 2023 WL 6467368, at *6 (Bankr. D. Del. Oct. 4, 2023) (internal quotation marks omitted).  Therefore, "[s]pecific findings of insolvency are best determined following discovery and should not be generally decided on a motion to dismiss." *Id.*, 2023 WL 6467368, at *6; *see also In re DBSI, Inc.*, 447 B.R. 243, 248 (Bankr. D. Del. 2011) ("[I]nsolvency is generally a factual determination not appropriate for resolution in a motion to dismiss.").  Indeed, the Trust is "not required to include precise calculations evidencing balance sheet insolvency," *In re Glencoe Acquisition, Inc.*, 2015 WL 3777972, at *4 (Bankr. D. Del. June 16, 2015), and "a close analysis of insolvency is not necessary at this stage in the proceeding." *In re Our Alchemy, LLC*, 2019 WL 4447545, at *6 (Bankr. D. Del. Sep. 16, 2019).

Regardless, the Complaint more than adequately pleads insolvency at the time of the Transfers.  In addition to the allegation that the Debtors "were insolvent when, or became

insolvent shortly after, the transfers were made," Compl. ¶ 112, the Trust has alleged numerous

facts to support that the Debtors' obligations exceeded their assets, including:

- "[Gary] Wang admitted that in 2019 he made 'certain changes to [the FTX.com] code' to give Alameda and its affiliates 'special privileges on the FTX platform,' including to allow Alameda unfettered use of assets on the FTX.com exchange, even while *Alameda maintained negative balances* in its own holdings of fiat (*i.e.*, government-issued) currencies and cryptocurrencies." *Id.* ¶ 46 (emphasis added).

- "By 2021, Bankman-Fried had already caused *billions of dollars* of customer funds to be diverted from the FTX.com exchange to Alameda. Despite the ballooning debt Alameda owed FTX.com, Bankman-Fried caused Alameda to pay more than $1.15 billion for wildly overvalued GDA shares." *Id.* ¶ 110 (emphasis added).

- "Bankman-Fried also caused Alameda to maintain a negative balance on the exchange and utilize the exchange to trade and withdraw assets without limit, giving it a virtually unlimited 'line of credit' collateralized by the customer deposits on the exchange.  As a result of this tampering, the FTX.com exchange began running very large deficits, including during the time period in which Bankman-Fried caused approximately $1 billion to be transferred to the Defendants." *Id.* ¶ 102.

- "In February 2022, Ellison estimated that without 'Sam coins'—speculative, illiquid, and volatile cryptocurrencies peddled by Bankman-Fried—Alameda's net asset value was negative $7.8 billion.  By March 2022, Ellison privately estimated that FTX.com had a cash deficit alone of more than *$10 billion*." *Id.* ¶ 103 (emphasis in original).

Courts have routinely found plaintiffs to have adequately pled insolvency in

avoidance actions on the basis of similar allegations.  For example, in *In re Centaur, LLC*, the

plaintiffs alleged that (i) the debtor had "incurred massive debt prior to making the" allegedly

fraudulent transfers, (ii) the value of the debtor's assets was "grossly overestimated," and (iii) the

debtor incurred additional debt to execute an allegedly fraudulent transfer.  2013 WL 4479074, at

*4 (Bankr. D. Del. Aug. 19, 2013).  These "factual allegations, taken as true, provide enough detail

of insolvency upon which to base the avoidance claims."  *In re Direct Response Media, Inc.*, 466

B.R. 626, 655-56 (Bankr. D. Del. 2012) (plaintiffs adequately pleaded insolvency because of

allegations that the debtor "was unable to pay its obligations" and had sought a loan from the defendants to "pay its bills" because the debtor was "running out of cash"); *see also In re Midway Games Inc.*, 428 B.R. 303, 321 (Bankr. D. Del. 2010) (plaintiffs adequately pleaded insolvency because of allegations that the debtor was "not paying its debts," "had large trade debt," and had informed its board that it "was running out of cash").

## III.   DEFENDANTS' ADDITIONAL ARGUMENTS TO AVOID LIABILITY ARE WITHOUT MERIT.

Defendants' remaining arguments do not warrant dismissal. *First*, the Bankruptcy Code's securities safe harbor provision does not bar the Trust's constructive fraudulent transfer claims. *Second*, the GDA U.S. Subsidiaries' attempt to impose heightened tracing and pleading requirements finds no support in the governing law or the well-pled allegations of the Complaint. *Third*, because the Complaint adequately pleads avoidable Transfers under Sections 544 and 548, it necessarily states a claim for recovery under Section 550(a).

### A.   The Bankruptcy Code's Safe Harbor Provision Does Not Bar the Trust's Constructive Fraud Claims.

GDA urges this Court to dismiss Plaintiff's constructive fraudulent transfer claims based on the affirmative defense of the securities safe harbor in Section 546(e) of the Bankruptcy Code. Br. at 28. That section provides, as relevant here, that a trustee may not avoid, except under section 548(a)(1)(A), a transfer that is (i) a "settlement payment . . . made by or to (or for the benefit of) a . . . financial institution," or (ii) "made by or to (or for the benefit of) a . . . financial institution . . . in connection with a securities contract." 11 U.S.C. § 546(e). Section 101(22) (cross referenced by Section 546(e)) defines "financial institution" to include the financial institution's "customer" when the financial institution is "acting as agent or custodian for" that customer "in connection with a securities contract." 11 U.S.C. § 101(22). Relying on out-of-circuit precedent, GDA argues that the safe harbor applies because it was a "financial institution"

as a result of it being "a customer of CBH Compagnie Bancaire Helvétique SA and Maerki Baumann & Co. AG, two Swiss banks that received the Transfers from Alameda Research Ltd.'s and Alameda Research's US bank accounts."  Br. at 28 (citing *In re Nine West LBO Sec. Litig.*, 87 F.4th 130, 143 (2d Cir. 2023)).

This argument is unavailing for at least two reasons.  *First*, the Supreme Court's decision in *Merit Mgmt. Grp., LP*, 583 U.S. at 384-86, makes clear that transfers through financial institution intermediaries as part of an overarching avoidable transfer do not bring that transfer within the protections of Section 546(e).  *Second*, GDA's out-of-circuit authority, *In re Nine West LBO Sec. Litig.*, 87 F.4th 130 (2d Cir. 2023), is irreconcilable with *Merit Management*, and would in any event require fact-intensive determinations not ripe for resolution at this stage.

As a threshold matter, *Nine West* directly conflicts with the Supreme Court's holding in *Merit Management*.  In *Merit Management*, the Supreme Court held that "the relevant transfer for purposes of the § 546(e) safe-harbor inquiry is the overarching transfer that the trustee seeks to avoid," and, accordingly, any role GDA's banks played in the transactions is "simply irrelevant to the analysis."  *Merit Mgmt.*, 583 U.S. at 378, 382.  Faced with similar circumstances, this Court has correctly followed *Merit Management* and rejected the Second Circuit's overbroad interpretation of "customer" in Section 101(22)(A), including in these Chapter 11 Cases.  *See In re FTX Trading Ltd.*, 2024 Bankr. LEXIS 2584, at *46 (Bankr. D. Del. Oct. 23, 2024) ("I am not persuaded that the Second Circuit's interpretation and application of the 'customer exception' in Section 101(22)(A) is correct"); *In re Live Well Fin., Inc.*, 2023 WL 3995900, at *14 (Bankr. D. Del. 2023).  Indeed, this Court previously observed that "[w]idespread application of the Second Circuit's interpretation would place nearly every transaction involving a security beyond the reach of the bankruptcy trustee" and "[s]uch an absurd result cannot be what Congress intended in

drafting Section 101(22)(A)." *See In re FTX Trading Ltd.*, 2024 Bankr. LEXIS 2584, at *46 n.31. GDA fails to explain why this Court should reach a different result here.

Even if *Nine West* applied, however, it would not avail GDA of the protections of Section 546(e). The court in *Nine West* determined that certain transfers through Wells Fargo were shielded by Section 546(e) because Wells Fargo acted as the defendant's agent in connection with the transfers. *In re Nine West LBO Sec. Litig.*, 87 F.4th at 143. In *Nine West*, the court defined "agent" in Section 101(22) based on its common-law meaning: "an agency relationship is created when a principal manifests assent to an agent that the agent will act on the principal's behalf and be subject to the principal's control, and the agent manifests assent to the same." *Id.* at 148 (citing RESTATEMENT (THIRD) OF AGENCY §1.01 ("Agency is the *fiduciary relationship* that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act." (emphasis added)). Indeed, the court in *Nine West* held that "the plain language of § 101(22)(A) indicates that courts must look to each transfer and determine 'when' a bank '*is acting as agent*' for its customer for a transfer, assuming, of course, the transfer is made in connection with a securities contract." *Id.* at 145 (emphasis in original). Acts by a financial institution on behalf of a customer that are "purely ministerial" do not cause a transaction to fall within the scope of Section 546(e). *Id.* at 148-49.

Whether an agency relationship exists "depends on the presence of factual elements," not the labels applied by the parties or any contract. *Lang* v. *Morant*, 867 A.2d 182, 186 (Del. 2005). As a result, agency "is thus a question usually reserved to the factfinder" and is not appropriate for resolution on a motion to dismiss. *Id.*; *In re FTX Trading Ltd.*, 2024 Bankr. LEXIS 2584, at *46 (Bankr. D. Del. Oct. 23, 2024) ("[T]he Motions still must be denied because

Defendants either have not established that Western was acting as an agent for either WRS or Defendants or, at the very least, its status as agent is a question of fact not amenable to resolution on a motion to dismiss"). GDA does not explain how, if at all, its banks operated as its agents with respect to the Transfers (or any securities contract) except to state in conclusory fashion that the Trust's constructive fraud claims are barred because "GDA Limited was a customer" of its banks. Br. at 28. Accordingly, consideration of this affirmative defense at this stage is, at best, premature. *In re FTX Trading Ltd.*, 2024 Bankr. LEXIS 2584, at *46-47.

### B.    The GDA U.S. Subsidiaries Are Liable As Subsequent Transferees.

The GDA U.S. Subsidiaries seek to limit their liability by arguing that the Trust may only recover against them only as subsequent transferees of the October 2021 Transfer. Br. at 29. They contend that because the Complaint alleges certain direct transfers from GDA to the GDA U.S. Subsidiaries immediately after the October 2021 Transfer, the GDA U.S. Subsidiaries "could not have had funds from [any] later transfers" and "the Trust does not—and cannot—allege a transfer of proceeds" to them from any post-October 2021 Transfer. Br. at 29. But that argument is contradicted both by the law and the well-plead allegations of the Complaint.

"In determining whether a claim to recover fraudulent transfers from a subsequent transferee is adequately pled, the Court need only apply a Rule 8 analysis." *In re Bernard L. Madoff Inv. Sec., LLC*, 440 B.R. 243, 269 (Bankr. S.D.N.Y. 2010); *In re Black Elk Energy Offshore Operations, LLC*, 2019 Bankr. LEXIS 2561, at *27 (Bankr. S.D. Tex. Aug. 16, 2019) (defendant's "involvement as a subsequent transferee need only satisfy Rule 8(a)'s 'short and plain statement of the claim showing that the pleader is entitled to relief.'").

The GDA U.S. Subsidiaries ask this Court to draw the negative inference that because the Complaint pleads that GDA made certain transfers from GDA to its subsidiaries, *no other* transfers were made to the GDA U.S. Subsidiaries. The Court may not draw such an

inference here. *Black*, 835 F.3d at 364 (all reasonable inferences must be drawn in Plaintiff's favor); *Am. Eagle Outfitters, Inc.* v. *Lyle & Scott Ltd.*, 2007 WL 1202760, at *3 n.4 (W.D. Pa. Apr. 12, 2007) ("Allowing the Defendants to reformulate [plaintiff]'s causes of action, however, would be inconsistent with both, (a) the rule that the Plaintiff is the master of its complaint, and (b) the court's obligation to take [plaintiff]'s allegations as true and construe facts in its favor.").

Moreover, the Complaint plainly alleges that "the Transfers"—including the February and April 2022 Transfers—"were intended for, and were in fact used for GDA's expansion into the United States" through its subsidiaries. Compl. ¶ 107. The Complaint alleges that the GDA U.S. Subsidiaries "are entirely capitalized by transfers from GDA." Compl. ¶ 16; *see also* Compl. ¶ 107 ("[T]hese U.S. entities had no sources of funds other than those raised by GDA, including the $600 million transferred to it by Alameda."). For example, "[i]n February 2022"—the same month as the February 2022 Transfer—"GDA represented that it would open 17 data centers in the United States by December 2022 with 875 Megawatts of Bitcoin mining capacity. Those data centers were supposed to be constructed for and operated by the GDA U.S. Subsidiaries." Compl. ¶ 94. These allegations are sufficient at this stage to plead that the GDA U.S. Subsidiaries received proceeds of initially avoidable transfers to GDA. *See Sec. Inv. Prot. Corp.* v. *Bernard L. Madoff Inv. Sec. LLC*, 594 B.R. 167, 195 (Bankr. S.D.N.Y. 2018) (the "plaintiff's burden at the pleading stage does not require dollar-for-dollar accounting of the exact funds at issue" to plead a Section 550 claim against a subsequent transferee (internal quotation marks omitted)); *In re First Conn. Consulting Grp. Inc.*, 2023 Bankr. LEXIS 853, at *23 (Bankr. D. Conn. Mar. 31, 2023) ("The Amended Complaint clearly traces the path of the Portland Funds to Jessica Licata by alleging, with sufficient particularity, that Cynthia Licata transferred some or all of the Portland Funds into the Jessica Licata Accounts"); *cf. In re Nash Eng'g Co.*, 2025 U.S.

Dist. LEXIS 256499, at *18 (D. Conn. Dec. 11, 2025) ("Trustees are <u>not</u> required to identify every subsequent transferee before discovery, a burden inconsistent with section 550(a) . . . .") (emphasis in original).

### C.     The Complaint States a Claim for Recovery under Section 550(a).

GDA argues that the Trust cannot state a claim under Section 550(a) seeking to recover any funds avoided pursuant to Section 544 and 548 because "the Trust has not prevailed under any avoidance provisions [and] the Trust fails to state a claim for an avoidable transfer."  Br. at 29.  But this Court has previously held in these Chapter 11 Cases that claims for recovery are "permitted to proceed" where avoidance claims survive a motion to dismiss.  *In re FTX Trading Ltd.*, 2024 Bankr. LEXIS 2584, at *56; *see also In re FTX Trading Ltd.*, 2025 Bankr. LEXIS 2773, at *20 (Bankr. D. Del. Oct. 27, 2025) ("Because Plaintiff's avoidance claims remain, Defendants' arguments with respect to [Sections 502(d) and 550] are moot.").  Because the Plaintiff's claims pursuant to Sections 544 and 548 are not subject to dismissal for the reasons discussed in Section II, *supra*, the Complaint states a claim for property recovery under Section 550(a).

## CONCLUSION

For the foregoing reasons, the Court should deny the Motion in its entirety.  If the Court grants the Motion in whole or in part, the Trust respectfully requests leave to replead.

Dated: February 20, 2026
Wilmington, Delaware

**LANDIS RATH & COBB LLP**

*/s/ Howard W. Robertson, IV*
Adam G. Landis (No. 3407)
Richard S. Cobb (No. 3157)
Matthew B. McGuire (No. 4366)
Howard W. Robertson, IV (No. 6903)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
E-mail: landis@lrclaw.com
           cobb@lrclaw.com
           mcguire@lrclaw.com
           robertson@lrclaw.com

-and-

**SULLIVAN & CROMWELL LLP**
Andrew G. Dietderich (admitted *pro hac vice*)
Stephen Ehrenberg (admitted *pro hac vice*)
Brian D. Glueckstein (admitted *pro hac vice*)
Christopher J. Dunne (admitted *pro hac vice*)
Daniel P. O'Hara (admitted *pro hac vice*)
125 Broad Street
New York, New York 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588
E-mail: dietdericha@sullcrom.com
           ehrenbergs@sullcrom.com
           gluecksteinb@sullcrom.com
           dunnec@sullcrom.com
           oharad@sullcrom.com

-and-

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
Sascha N. Rand (admitted *pro hac vice*)
Isaac Nesser (admitted *pro hac vice*)
Heather Christenson (admitted *pro hac vice*)
Andrew Kutscher (*pro hac vice* pending)
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: (212) 849-7000
E-mail: sascharand@quinnemanuel.com
           isaacnesser@quinnemanuel.com
           heatherchristenson@quinnemanuel.com
           andrewkutscher@quinnemanuel.com

*Counsel for Plaintiff FTX Recovery Trust*

-39-