# Exhibit 1

**RASHIT MAKHAT**

**MARCO KROHN**

as the Sellers

and

**ALAMEDA RESEARCH LLC**

**PARADIGM FUND LP**

**PARADIGM ONE LP**

**SKYBRIDGE MULTI-ADVISER HEDGE FUND PORTFOLIOS LLC – SERIES G**

**LEGION STRATEGIES, LTD**

as the Buyers

and

**GENESIS DIGITAL ASSETS LIMITED**

as the Company

---

**AGREEMENT FOR THE SALE AND PURCHASE OF SHARES IN THE CAPITAL OF
GENESIS DIGITAL ASSETS LIMITED**

---

## LATHAM&WATKINS

99 Bishopsgate
London EC2M 3XF
United Kingdom
Tel: +44.20.7710.1000
www.lw.com

EU-DOCS\35932375.6
EU-DOCS\35932375.12

**CONTENTS**

| Clause | | Page |
|---|---|---|
| 1. | DEFINITIONS AND INTERPRETATION | 1 |
| 2. | SALE AND PURCHASE | 4 |
| 3. | CONSIDERATION | 4 |
| 4. | COMPLETION | 5 |
| 5. | WARRANTIES | 6 |
| 6. | INDEMNIFICATION AND LIMITATIONS | 10 |
| 7. | FURTHER ASSURANCE | 11 |
| 8. | ANNOUNCEMENTS | 11 |
| 9. | NOTICES | 12 |
| 10. | COSTS AND EXPENSES | 12 |
| 11. | ASSIGNMENT | 12 |
| 12. | SEVERANCE | 12 |
| 13. | ENTIRE AGREEMENT | 13 |
| 14. | CONTRACTS (RIGHTS OF THIRD PARTIES) ACT 1999 | 13 |
| 15. | COUNTERPARTS; NO ORIGINALS | 13 |
| 16. | GOVERNING LAW AND JURISDICTION | 13 |

**THIS AGREEMENT** is dated [ 🖉 ] January 2022

**BETWEEN**

(1)    The persons whose names and addresses are set out in Part 1 of Schedule 1 to this agreement (each a "**Seller**" and together the "**Sellers**");

(2)    The persons whose names and addresses are set out in Part 2 of Schedule 1 to this agreement (each a "**Buyer**" and together the "**Buyers**"); and

(3)    **GENESIS DIGITAL ASSETS LIMITED**, incorporated and registered in Cyprus with company number HE 370590, with its registered office at Chrysanthou Mylona, 10, Magnum House, 3030, Limassol, Cyprus (the "**Company**").

**RECITALS**

The Sellers have agreed to sell and the Buyers have agreed to buy the Sale Shares subject to the terms and conditions of this agreement.

**AGREED TERMS**

1.    **DEFINITIONS AND INTERPRETATION**

1.1    In this agreement:

"**Alameda**" means Alameda Research LLC, a limited liability company registered under number 201733110369, of 2000 Center St 4th Floor, Berkeley CA 94704, the United States;

"**Alameda Sale Shares**" means a total of 177 Ordinary Shares registered in the names of the Sellers as set out against each Seller's name in column (3) of the table set out in Schedule 2 to be purchased by Alameda at a price of US$ 3,112,620.27 per share pursuant to Clause 2.1;

"**Articles**" means the articles of association of the Company as amended or superseded from time to time;

"**Business Day**" means a day other than a Saturday, Sunday or public holiday in London, England and Limassol, Cyprus;

"**Claim**" means a claim referred to in Clause 6.1;

"**Completion**" means completion of the sale and purchase of the relevant Sale Shares to the relevant Buyer under this agreement;

"**Completion Date**" means the date on which Completion occurs;

"**Consideration**" means the consideration for the sale of the Sale Shares as set out in Clause 3.1;

"**Encumbrance**" means any mortgage, charge, security interest, lien, pledge, assignment by way of security, equity, claim, right of pre-emption, option, covenant, restriction, reservation, lease, trust, order, decree, judgment, title defect (including retention of title claim), conflicting claim of ownership or any other encumbrance of any nature whatsoever (whether or not perfected other than liens arising by operation of law);

"**Exchange Rate**" means with respect to a particular currency for a particular day, the closing mid-point spot rate of exchange for that currency into US dollars on such date as published in the London edition of the Financial Times first published thereafter or, where no such rate is

published in respect of that currency for such date, at the rate quoted by HSBC Bank plc as at the close of business in London as at such date;

"**Fundamental Warranties**" means the Warranties made under paragraphs (a)-(f), (i), (j), (o)-(q), (s) of Clause 5.1;

"**Governmental Entity**" means:

(a)     any national, federal, state, county, municipal, local, or foreign government or any entity exercising executive, legislative, judicial, regulatory, taxing, or administrative functions of or pertaining to government;

(b)     any public international organisation;

(c)     any agency, division, bureau, department, or other political subdivision of any government, entity, or organisation described in the foregoing subparagraphs (a) or (b);

(d)     any company, business, enterprise, or other entity owned, in whole or in part, or controlled by any government, entity, organisation, or other person described in the foregoing subparagraphs (a), (b) or (c); or

(e)     any political party;

"**Legion**" means Legion Strategies, Ltd., a company incorporated under the laws of the Cayman Islands under registered number 3559391 with a principal place of business at PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands;

"**Legion Sale Shares**" means one Ordinary Share registered in the names of the Sellers as set out in against each Seller's name in column (3) of the table set out in Schedule 2 to be purchased by Legion at a price of US$ 3,112,620.27 per share pursuant to Clause 2.1;

"**Marco Krohn**" means the individual with German citizenship and Passport Number CH1HCTG0N residing in Flat 505, Building Easy 18, Warsan 4, Dubai, United Arab Emirates;

"**Ordinary Shares**" means the ordinary shares of 1.00 Euro par value each in the share capital of the Company which have the rights and restrictions set out in the Articles and the Shareholders' Agreement;

"**Paradigm Fund LP**" means a Cayman limited partnership with registration number 1514472 and with a principal place of business at 548 Market Street, San Francisco, CA 94104;

"**Paradigm One LP**" means a Delaware limited partnership with registration number 6228023 and with a principal place of business at 548 Market Street, San Francisco, CA 94104;

"**Paradigm**" means, collectively, Paradigm Fund LP and Paradigm One LP;

"**Paradigm Sale Shares**" means a total of 29 Ordinary Shares registered in the names of the Sellers as set out in against each Seller's name in column (3) of the table set out in Schedule 2 to be purchased by Paradigm at a price of US$ 3,112,620.27 per share pursuant to Clause 2.1;

"**Rashit Makhat**" means the individual with Kazakh citizenship and Passport Number 761129300190 residing in 507 Al dabas, Shoreline, Palm Jumeirah, Dubai, United Arab Emirates;

"**Regulatory Authority**" means (a) any government department or governmental, quasi-governmental, supranational, judicial, statutory, regulatory, supervisory or investigative body,

2

authority (including a taxation authority), agency, bureau, board commission, court or competent jurisdiction, stock exchange or similar listing authority, department, arbitrator, tribunal or instrumentality thereof (including, for the avoidance of doubt, any competition protection authority), or (b) any regulatory authority which regulates or supervises the Company or any member of its group, as the case may be;

"**Sale Shares**" means, together, the Alameda Sale Shares, the Paradigm Sale Shares, the Legion Sale Shares and the Skybridge Sale Shares, and namely 215 Ordinary Shares;

"**Shareholders' Agreement**" means shareholders' agreement relating to the Company dated 29 December 2020, as amended and restated on 20 January 2021, 30 March 2021, 29 June 2021 and 31 August 2021, and entered into between the Company and Abdumalik Mirakhmedov, Andrey Kim, Black Cloud Capital Limited, Rashit Makhat, Borderless Digital Brands Holding Limited, Vakha Goigov, Alan Dorjiyev, Evgeny Lvov, Ilia Glazyrin, Maxim Soulimov, Stone Ridge Ventures LLC, Byram River Investments LLC, Paradigm Fund L.P., Eighty-Seven Capital Predawn Fire L.P., Electric Capital Venture Fund II LP, Stable Genesis SP, Skybridge Genesis LP, Legion Strategies Ltd., SkyBridge Multi-Adviser Hedge Fund Portfolios LLC – Series G, GN-A Ribbit Blocker VII LLC, Alameda Ventures Ltd, JB-Growth GmbH, Marco Streng and Marco Krohn as shareholders;

"**Skybridge**" means Skybridge Multi-Adviser Hedge Fund Portfolios LLC – Series G, a company incorporated under the laws of the State of Delaware under registered number 3559391 with a principal place of business at Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801, USA; and

"**Skybridge Sale Shares**" means eight Ordinary Shares registered in the names of the Sellers as set out in against each Seller's name in column (3) of the table set out in Schedule 2 to be purchased by Skybridge at a price of US\$ 3,112,620.27 per share pursuant to Clause 2.1.

1.2    In this agreement:

(a)    unless otherwise defined in this agreement, capitalised terms used but not defined herein shall have the respective meanings given to them in the Shareholders' Agreement;

(b)    references to "this agreement" includes the Recitals and Schedules to it, which forms part of this agreement;

(c)    references to a "Clause" or "Schedule" is, unless the context specifically requires otherwise, to the corresponding clause of or schedule to this agreement, and reference to a "paragraph" is, unless the context specifically requires otherwise, a reference to the corresponding paragraph of the provision in which that reference occurs;

(d)    headings are for convenience only and do not affect the construction of this agreement;

(e)    words in the singular include the plural and vice versa and references to one gender include any other gender;

(f)    the expression "person" means any natural person, company, partnership, joint venture or association or any other entity, whether or not it has a legal personality;

(g)    reference to a "party" or "parties" is to a party or parties of the agreement, and their respective successors and permitted assigns;

(h)    references to the "Sellers" or the "Buyers" shall be interpreted as references to each of the Sellers or each of the Buyers as the context of this agreement may require;

(i)    for the purposes of applying a reference to a monetary sum expressed in United States Dollar, an amount in a different currency shall be deemed to be an amount in United States Dollar translated at the Exchange Rate at the relevant date;

(j)    a reference to any statute or statutory provision is a reference to that statute or statutory provision as amended, modified or re-enacted from time to time;

(k)    references to the word "include" or "including" (or any similar term) are not to be construed as implying any limitation and general words introduced by the word "other" (or any similar term) shall not be given a restrictive meaning by reason of the fact that they are preceded or followed by words indicating a particular class of acts, matters or things;

(l)    where any Warranty is qualified by the expression "so far as the Seller is aware" or words having similar effect, such Warranty shall be deemed to include a statement that such awareness means both the actual knowledge of such Seller and also such knowledge which such Seller would have had if he had made reasonable enquiry of all relevant persons and matters; and

(m)    a reference to a document "in the agreed form" means in the form agreed by the parties and initialled by them for the purposes of identification.

1.3    In this agreement the liability and obligations of each party shall be several and not joint and several in respect only of itself and/or those Sale Shares set out against its name in column (3) of the table set out in Schedule 2 (as applicable).

## 2.    SALE AND PURCHASE

2.1    On the terms set out in this agreement, each Seller shall sell, and the relevant Buyer shall purchase, with effect from the Completion Date, the Sale Shares as set out in Schedule 2:

(a)    with full title guarantee; and

(b)    free from all Encumbrances,

together with all rights that attach (or may in the future attach) to the Sale Shares, including the right to receive dividends and distributions declared, made or paid in respect of the Sale Shares on or after the Completion Date.

2.2    Each Seller severally undertakes to waive, and/or to procure the waiver and/or consent (as applicable) of, all transfer restrictions, pre-emption and similar rights over the relevant Sale Shares or any of them to which it or any person may be entitled under and in accordance with the provisions of the Articles of the Company, the Shareholder's Agreement and/or otherwise in connection with the sale or transfer of the relevant Sale Shares from the Sellers to the Buyers and the provisions set out in this agreement, in accordance with Clause 4.2(b)(i) below.

## 3.    CONSIDERATION

3.1    The aggregate purchase price for the Sale Shares shall be US$ 669,213,358.05 payable in cash in accordance with Clauses 4.2(d), and comprising of the amounts and in the accounts set out against each Buyer's name in column (4) of the table set out in Schedule 2.

3.2    The Sellers acknowledge that where a Seller has requested that the Consideration to which they are entitled is paid to their respective nominated account in a currency other than United States Dollar in accordance with Clause 4.2(d), all and any currency-exchange fees or commissions resulting from the required currency conversion incurred by the Buyers shall be deducted by

4

DocuSign Envelope ID: 95226645-9BA5-47ED-9E3D-PEB85AF9B4C2

the Buyers from the payment of their respective proportion of Consideration set out in column (4) of the table in Schedule 2 and therefore shall be borne by the relevant Seller.

**4.    COMPLETION**

4.1    Completion shall take place on the Completion Date at the offices of the Company (or at any other place as may be agreed by the parties).

4.2    The following events shall occur on the Completion Date:

(a)    the Sellers shall deliver to the Company, with a copy to each of the Buyers (as applicable):

(i)    one original of the duly executed and witnessed instrument of transfer of the Alameda Sale Shares owned by Rashit Makhat in favour of Alameda;

(ii)    one original of the duly executed and witnessed instrument of transfer of the Alameda Sale Shares owned by Marco Krohn in favour of Alameda;

(iii)    one original of the duly executed and witnessed instrument of transfer of the Paradigm Sale Shares owned by Marco Krohn in favour of Paradigm Fund LP;

(iv)    one original of the duly executed and witnessed instrument of transfer of the Paradigm Sale Shares owned by Marco Krohn in favour of Paradigm One LP;

(v)    one original of the duly executed and witnessed instrument of transfer of the Skybridge Sale Shares owned by Marco Krohn in favour of Skybridge;

(vi)    one original of the duly executed and witnessed instrument of transfer of the Legion Sale Shares owned by Marco Krohn in favour of Legion;

(vii)    each existing share certificate for the relevant Sale Shares, for cancellation;

(b)    the Sellers shall procure that the Company delivers to each of the Buyers, copies of the following documents:

(i)    a unanimous written resolution duly executed by the Company's shareholders approving the sale of the Sale Shares and waiving pre-emption rights, transfer restrictions and similar rights, in respect of such sale in accordance with the provisions of the Articles of the Company, the Shareholder's Agreement and/or otherwise, and incorporating certain confirmations to be provided by the shareholders of the Company to the reasonable satisfaction of the Buyers; and

(ii)    a unanimous written resolution of the Company's board of directors approving:

(A)    the sale and transfer of the Sale Shares to the Buyers; and

(B)    the registration of the Buyers (or as the Buyers shall direct) in the Company's registers as the holders of the Sale Shares;

(C)    the submission of the relevant filings to the Companies Registrar in Cyprus;

(D)    the issuance of share certificates for the Sale Shares in favour of each Buyer, subject to confirmation of the receipt of the Consideration from each Seller in accordance with Clause 4.2(d) (as applicable);

5

(c)     the Sellers shall procure that the Company, subject to confirmation of the receipt of the Consideration from each Seller in accordance with Clause 4.2(d) (as applicable):

(i)     enters the relevant Buyer as a member in the Register of Members of the Company with respect to the relevant Sale Shares;

(ii)    issues new share certificates in relation to the Sale Shares in the name of the relevant Buyer and deliver the original share certificate to such Buyer, accordingly;

(d)     (subject to the Sellers and the Company complying with their obligations under this Clause 4.2) each Buyer shall pay the Consideration on the Completion Date in the proportions set out next to their respective names in column (4) of the table set out in Schedule 2 to the account of each Seller set out in column (5) of the table set out in Schedule 2 and payment made in accordance with this Clause 4.2(d) shall constitute a good discharge for such Buyer of its obligations under this Clause 4.2(d).

4.3     The Company shall on or prior to the Completion Date provide the Buyers with a report, in a form satisfactory to the Buyers, setting out the assets and liabilities of the Company as at 31 December 2020.

4.4     Failure by any of the Sellers or the Buyers to proceed with the Completion on the Completion Date as per this Clause 4 shall give the right to any of the Parties to terminate this agreement with respect to the relevant Sale Shares by giving notice of such termination to the other parties (at their sole discretion and without prejudice to any other rights or remedies it has, including the right to claim damages for breach of this agreement). Termination shall take effect immediately upon the giving of such notice, at which point the agreement will immediately cease to have any further force and effect as regards the relevant Sale Shares except for any provisions of this agreement that survive termination and any rights, remedies, obligations or liabilities of the parties that have accrued before termination.

## 5.     WARRANTIES

5.1     Each Seller severally warrants to each of the Buyers (and as regards those warranties that relate to itself and the Sale Shares, in respect only of itself and/or those Sale Shares set out against its name in column (3) of the table set out in Schedule 2 (where applicable)) that each of the following warranties (together the "**Warranties**" and each a "**Warranty**") is true, accurate and not misleading as at the date of this agreement and on the Completion Date:

(a)     the authorised and issued share capital of the Company consists of €1,767 divided into 1,200 ordinary shares of nominal value €1.00 each, 360 preferred ordinary shares of nominal value €1.00 each and 207 series A preferred shares of nominal value €1.00 each;

(b)     his Sale Shares are fully paid up;

(c)     the Seller is the sole legal and beneficial owner of his Sale Shares;

(d)     the Seller has the right to transfer the legal title to, and beneficial ownership of, his Sale Shares to the relevant Buyers;

(e)     there is no Encumbrance on, over or affecting any of such Seller's Sale Shares, there is no agreement or commitment to give or create such an Encumbrance, and no person has claimed to be entitled to such an Encumbrance;

6

DocuSign Envelope ID: 95220645-9BAC-4F2D-856D-8E76FAF934C2

(f)     the Seller and the Company has taken all necessary actions and has all requisite power and authority to enter into and perform this agreement and the other documents referred to in it (to which it is a party) in accordance with their respective terms;

(g)     the Seller, the Company and, so far as the Seller is aware,  the Subsidiaries, have all licences, consents, approvals, authorisations, clearances and permissions and have made all notifications, in each case necessary in any relevant jurisdiction in connection with the entry into and performance of the transactions and matters contemplated in this agreement (as applicable) to the extent such licences, consents, approvals and permissions are required by any Regulatory Authority or pursuant to any agreement or instrument to which the Seller and/or the Company and/or any of the Subsidiaries is a party or by which they are bound;

(h)     this agreement and the documents referred to in it constitute (or shall constitute when executed) valid, legal and binding obligations on the Seller and the Company in accordance with their respective terms;

(i)     the execution and delivery by the Seller and the Company of this agreement and the documents referred to in it, and compliance with their respective terms shall, and to the extent it refers to the Subsidiaries below, as far as the Seller is aware, not breach or constitute a default under:

    (i)     the constitutional documents of the Company and/or any Subsidiary;

    (ii)    any agreement or instrument to which the Seller and/or the Company and/or any Subsidiary is a party, or by which the Seller and/or the Company and/or any Subsidiary is bound; or

    (iii)   of any order, judgement, decree or other restriction applicable to the Seller and/or the Company and/or any Subsidiary;

(j)     no person has any right to call for the transfer of or otherwise acquire the relevant Sale Shares and, so far as the Seller is aware, no claims of any kind have been made by any person to be entitled to any such Sale Shares;

(k)     each Seller:

    (i)     is a sophisticated individual familiar with transactions similar to those contemplated by this agreement;

    (ii)    has adequate information concerning the business and financial condition of the Company to make an informed decision regarding the sale of his Sale Shares and to make the warranties set out in this agreement;

    (iii)   has independently and without reliance upon the Buyers or the Company, and based on such information and the advice (and in particular tax advice) of such advisers as the Seller has deemed appropriate, made his own analysis and decision to enter into this agreement;

(l)     subject to Clause 5.5 below, to the extent a Seller has received any investment advice or deal arrangement services regarding the sale of his Sale Shares, or has been invited or induced to sell his Sale Shares by a party, any such investment advice or deal arrangement services has been received from a person authorised by the Financial Conduct Authority to provide investment advice or to arrange deals in investments (respectively) and any such invitation or inducement has been issued by a person authorised by the Financial Conduct Authority;

EU-DOCS\35932375.6
EU-DOCS\35932375.12

(m)    there are no:

    (i)    outstanding judgments applicable to such Seller and/or the Sale Shares and/or the Company and/or the Subsidiaries;

    (ii)    proceedings pending or threatened against him and/or the Sale Shares and/or the Company and/or the Subsidiaries, as far as the Seller is aware; or

    (iii)    investigations or inquiries by any Governmental Entity or Regulatory Authority that are pending or threatened against him and/or the Sale Shares and/or the Company and/or the Subsidiaries, as far as the Seller is aware,

    that, in each case, would be reasonably expected to:

        (A)    materially impair the ability of that Seller to perform his obligations under this agreement, or

        (B)    have any adverse effect on the consummation by that Seller of the transactions contemplated by this agreement, or

        (C)    have any adverse effect on the validity and/or value of the Sale Shares; or

        (D)    have any material adverse effect on the assets of the Company and/or the Subsidiaries, and/or the financial projections and forecasts of the Company;

(n)    as far as the Seller is aware, the Company and the Subsidiaries at all times conduct their business in compliance with all applicable laws, rules and regulations in any applicable jurisdiction, including, without limitation, as regards data protection, anti-corruption, sanctions and anti-money laundering;

(o)    no Insolvency Event (save for such events which are instigated by third parties or competent authorities and for which no notice is required by applicable law to be given to the relevant entity (and/or its affiliates and/or officers) subject to such event)) has occurred or, as far as the Seller is aware, has been threatened, in relation to the Company and the Subsidiaries or other member of their group;

(p)    each of the Company and each Subsidiary (i) is a limited liability corporation, duly incorporated and validly existing under the law of its jurisdiction of incorporation, and (ii) has the power to own its assets and carry on its business as it is being conducted;

(q)    the Company and each Subsidiary has a good, valid and marketable title to, or valid leases or licenses or rights of use of, and all appropriate authorisations to use, the assets necessary to carry on its business as it is being conducted;

(r)    there are no liabilities or indebtedness (actual or contingent) outstanding by the Company and/or the Subsidiaries (including, without limitation, any tax liabilities), with an aggregate value equal to or exceeding USD 100 million;

(s)    the financial statements of the Company for the year ended 31 December 2020 fairly present the financial condition of the Company in respect of the financial period ended on such date;

(t)    any factual information, financial information, financial modelling and financial projections and forecasts with respect to the Company and its Subsidiaries included in

EU-DOCS\35932375.6
EU-DOCS\35932375.12

the virtual data room with URL: https://www8.idealsvdr.com/v3/Genesis_Digital_Assets/#/documents?path=973889:973892:976733 as of 6 January 2022 (the "**Data Room**") and accessed by the Buyers were prepared by the Company in good faith and after careful consideration; and

(u)     so far as the Seller is aware, any factual information with respect to the Company and its Subsidiaries included within the Data Room and the financial model update disclosed to the Buyers on 14 January 2022 is true and accurate as of 3 January 2022 in all material respects and nothing has occurred, and no information has been given or has been withheld that results in any such information being untrue or misleading in any material respect or which results to a material adverse change in the assets, business or financial condition of the Company and the Subsidiaries.

5.2     Each of the Warranties is separate and, unless otherwise specifically provided, is not limited by reference to any other Warranty or any other provision in this agreement.

5.3     Each Seller acknowledges that (i) neither the Buyers nor any of their affiliates, nor any of their respective officers, directors, employees, consultants or professional advisers, nor (ii) the Company, its Subsidiaries nor any of its affiliates, any of their respective officers, directors, employees, consultants or professional advisers ((i) and (ii) together, the "**Company Parties**") are acting as a fiduciary or financial adviser or investment adviser to such Seller, or has offered deal arrangement services, and has not given such Seller any investment advice, opinion, recommendation or other information on whether the sale of his Sale Shares is prudent.

5.4     Each Seller acknowledges that if it wishes to be advised on the terms of the sale or purchase of his Sale Shares or otherwise then it must seek its own advice, and in particular tax advice, from a suitably qualified professional.

5.5     Each Seller acknowledges that:

(a)     the Company and/or the Buyers currently may have, and later may come into possession of, information with respect to the Company that is not known to such Seller and that may be material to a decision to sell his Sale Shares ("**Excluded Information**");

(b)     each Seller has determined to sell its Sale Shares notwithstanding its lack of knowledge of the Excluded Information; and

(c)     none of the Company Parties shall have any liability to any Seller, and each Seller hereby irrevocably waives and releases any and all claims that he might have against any of the Company Parties, respectively, whether under applicable securities laws or otherwise, with respect to the non-disclosure of such Excluded Information in connection with the sale of his Sale Shares and the transactions contemplated by this agreement.

5.6     Each Seller acknowledges that:

(a)     the price for the Sale Shares may increase in the future and the Seller is not entitled to and will not receive any further consideration, proceeds or otherwise, other than the Consideration;

(b)     the Company Parties have not made any representations or warranties in connection with the sale of the Sale Shares and the Seller is not relying on any Company Party in making his decision to sell; and

(c)     he has received all the information he considers necessary or appropriate for deciding whether to enter into this agreement and has had an opportunity to ask questions and

9

receive full answers from the Company concerning, among other things, its financial condition, its management, its prior activities and any other information which he considers relevant or appropriate.

5.7 Each Buyer severally warrants to the Company in respect only of itself that, with respect to the sale and purchase of the Sales Shares contemplated pursuant to this agreement:

(a) it has duly and carefully considered whether any notifications or clearance applications are required to be submitted to any applicable competition authority (including, without limitation, the Commission for the Protection of Competition of Cyprus); and

(b) in its opinion, no such notification or clearance (including, for the avoidance of doubt, deemed clearance) is required to or from any relevant competition authority or authorities, as the case may be.

## 6.    INDEMNIFICATION AND LIMITATIONS

6.1 Without limiting any other rights or remedies the Buyers may have but always subject to the remaining sub-clauses of this clause 6, each Seller shall promptly indemnify and hold harmless each of the Buyers, jointly and severally, from any claims for breach of, or default in connection with, any of the warranties, covenants, or agreements given or made by the Sellers in this agreement (each a "**Claim**"), including, for damages or loss (but excluding indirect, unforeseeable or consequential losses and/or loss of profit), and costs and expenses reasonably incurred by the Buyers as a result of such claims.

6.2 For the avoidance of doubt, each Buyer may independently commence a Claim notwithstanding that the claim of a Buyer has arisen from the same facts, events or circumstances that resulted to the same claim by another Buyer.

6.3 Each Buyer shall be under a duty to take all reasonable steps to mitigate their loss in respect of any Claim.

6.4 The maximum aggregate liability of each Seller in respect of any and all Claims shall not exceed 50 per cent of the Consideration actually received (or deemed to be received) by that Seller (the "**Liability Cap**") save in circumstances where the liability in excess of the Liability Cap is solely in respect of a Claim for breach of the Fundamental Warranties, in which case a Seller's maximum aggregate liability may exceed the Liability Cap by the amount of such excess but shall not exceed the total Consideration actually received (or deemed to be received) by that Seller. It is provided that no limitation shall apply to any Claim that arises as a result of fraud, gross negligence or wilful misconduct of the relevant Seller.

6.5 No Seller will be liable in respect of any Claim unless the amount of such Claim when aggregated with the amounts of any other Claim made by the relevant Buyer against such Seller equals to or exceeds US$1,000,000, in which case the relevant Seller will be liable for the aggregate amount of all such Claims and not just the excess.

6.6 No Seller will be liable in respect of any Claim unless written notice of that Claim has been served on the relevant Seller on or before the date falling on the third anniversary of the Completion Date. Where written notice of a Claim has been served on a Seller it shall be deemed withdrawn within six months of such service unless proceedings have been commenced with respect to that Claim.

6.7 A Seller's liability in respect of a Claim shall be proportionately reduced to the extent that such liability arises directly, or is materially increased, by an act or omission of a Buyer.

10

DocuSign Envelope ID: 95226645-9BA6-4F2D-9E6D-8B76FAF934C2

6.8    Without prejudice to the other rights and remedies of a Buyer pursuant to applicable law and this agreement, each Buyer waives any remedy that it might but for this clause 6.8 have to terminate or rescind this Agreement as a result of a Claim or otherwise (including a claim under the Misrepresentation Act 1967), save in the case of fraud, gross negligence or wilful misconduct of the relevant Seller.

6.9    No failure or delay on the part of any party in exercising any right, power or privilege under this agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any such right, power or privilege preclude any other or further exercise thereof or the exercise of any other right, power or privilege.

7.    **FURTHER ASSURANCE**

Each Seller severally agrees and undertakes, for no additional consideration or payment and at his own expense, to (and shall use reasonable endeavours to procure that any relevant third party shall) do, execute and deliver any such further acts, documents and/or things as the Buyers or the Company may reasonably require to vest in the Buyers (or as he shall direct) the legal and beneficial ownership of the Sale Shares free from all Encumbrances and to give full effect to the terms of this agreement.

8.    **ANNOUNCEMENTS**

8.1    Each party hereto shall keep confidential the terms of this agreement, **provided that** any party may disclose any information that it is otherwise required to keep confidential under this Clause 8:

(a)    to such professional advisers, consultants and employees or officers of its group as are reasonably necessary to advise on this agreement, or to facilitate the transactions contemplated by this agreement, **provided that** the disclosing party procures that the people to whom the information is disclosed keep it confidential as if they were that party; and

(b)    to the extent that the disclosure is required (i) by law, (ii) by any applicable regulatory body, tax authority or securities exchange to which such party is subject to or bound by, (iii) to make any required filing with, or obtain any authorisation from, any applicable regulatory body, tax authority or securities exchange to which such party is subject to or bound by, or (iv) to protect the disclosing party's interest in any legal proceedings.

8.2    Nothing in this Clause 8 shall in any way limit any Buyer or its affiliates from disclosing confidential information relating to the transactions contemplated hereby:

(a)    to its directors, officers, partners, members, employees, agents, consultants, advisers or other representative who need to know such confidential information to assist such Buyer or its affiliates;

(b)    in connection with financial or operating reports made available to the limited partners, investors, managers, members, representatives and advisers of such Buyer;

(c)    in compliance with the terms of the limited partnership or other organisational documents of such Buyer; or

(d)    to any governmental authority or self-regulatory organisation that has jurisdiction over such Buyer or its affiliates or in any filings or applications made by such Buyer or its affiliates to such governmental authority or self-regulatory organisation.

11

8.3     It is provided that the disclosure permitted pursuant to clauses 8.1 and 8.2 above will be limited to such disclosure and information that is strictly necessary for the purposes of these clauses, and, to the extent possible, the Sellers and the Buyers will disclose solely the information relating to the Sale Shares acquired by the relevant Buyer for whom the disclosure is required or relates. In addition, following any such disclosure, the disclosed information shall continue to be deemed confidential under this Clause 8.

## 9.      NOTICES

9.1     Any communication and/or information to be given to a party in connection with this agreement shall be in writing in English and shall either be delivered to that party by hand or sent by first class post or email or other electronic form:

   (a)     to any company which is a party at its registered office;

   (b)     to any individual who is a party at the address of that individual as set out in this agreement; or

   (c)     to any such other address as the recipient may notify to the other parties for such purpose.

9.2     A communication sent according to Clause 9.1 shall be deemed to have been received:

   (a)     if delivered by hand, at the time of delivery;

   (b)     if sent by pre-paid first class post, on the second day after posting; or

   (c)     if sent by email or other electronic form, at the time of completion of transmission by the sender, provided such sender does not receive an automated response regarding non-delivery of the communication to its intended recipient;

except that if a communication is received between 5.30 pm on a Business Day and 9.30 am on the next Business Day, it shall be deemed to have been received at 9:30 am on the second of such Business Days.

## 10.     COSTS AND EXPENSES

Each of the parties shall bear their own costs and disbursements incurred in the negotiations leading up to and in the preparation of this agreement and of matters incidental to this agreement.

## 11.     ASSIGNMENT

Neither party shall assign, grant any security interest over, hold on trust or otherwise transfer the benefit of, or any of its rights or interests in, under or arising from, this agreement in whole or in part, without the prior written consent of the other party. Notwithstanding the preceding sentence, each of the Buyers shall be permitted to assign its rights under this agreement as regards the Sale Shares acquired or to be acquired by them to any of its affiliates without the prior consent of any other party hereto or as otherwise permitted under the Shareholders' Agreement.

## 12.     SEVERANCE

12.1    If any provision of this agreement is held to be invalid or unenforceable by any judicial or other competent authority, all other provisions of this agreement will remain in full force and effect and will not in any way be impaired.

EU-DOCS\35932375.6
EU-DOCS\35932375.12

12.2    If any provision of this agreement is held to be invalid or unenforceable but would be valid or enforceable if some part of the provision were deleted, the provision in question will apply with the minimum modifications necessary to make it valid and enforceable.

## 13.    ENTIRE AGREEMENT

13.1    This agreement and the documents referred to or incorporated in it constitute the entire agreement between the parties relating to the subject matter of this agreement and supersede and extinguish any prior drafts, agreements, undertakings, representations, warranties and arrangements of any nature whatsoever, whether or not in writing, between the parties in relation to the subject matter of this agreement.

13.2    Each of the parties acknowledges and agrees that it has not entered into this agreement in reliance on any statement or representation of any person (whether a party to this agreement or not) other than as expressly incorporated in this agreement and the documents referred to or incorporated in this agreement.

13.3    Nothing contained in this agreement or in any other document referred to or incorporated in it shall be read or construed as excluding any liability or remedy as a result of fraud.

## 14.    CONTRACTS (RIGHTS OF THIRD PARTIES) ACT 1999

This agreement does not confer any rights on any person or party (other than the parties to this agreement) pursuant to the Contracts (Rights of Third Parties) Act 1999.

## 15.    COUNTERPARTS; NO ORIGINALS

This agreement may be executed in any number of counterparts, each of which shall constitute an original, and all the counterparts shall together constitute one and the same agreement. The exchange of a fully executed version of this agreement (in counterparts or otherwise) by electronic transmission in PDF format or electronic means using Docusign or otherwise shall be sufficient to bind the parties to the terms and conditions of this agreement and no exchange of originals is necessary, other than the documents set out in clause 4.2 which need to be executed in originals.

## 16.    GOVERNING LAW AND JURISDICTION

16.1    This agreement and any dispute or claim (including non-contractual disputes or claims) arising out of or in connection with it or its subject matter or formation shall be governed by and construed in accordance with the laws of England and Wales.

16.2    Each party irrevocably agrees that the courts of England and Wales shall have exclusive jurisdiction to settle any dispute or claim (including non-contractual disputes or claims) arising out of or in connection with this agreement or its subject matter or formation.

16.3    Nothing in this clause shall limit the right of any of the Buyers to take proceedings against any Seller in any other court of competent jurisdiction, nor shall the taking of proceedings in any one or more jurisdictions preclude the taking of proceedings in any other jurisdictions, whether concurrently or not, to the extent permitted by the law of such other jurisdiction, provided that the provisions of this Clause 16.3 shall not apply to any proceedings against or directly involving the Company.

## Schedule 1

## THE SELLERS AND THE BUYERS

Part 1
## THE SELLERS

| Name | Address |
|---|---|
| Marco Krohn | Flat 505, Building Easy 18, Warsan 4, Dubai, United Arab Emirates |
| Rashit Makhat | 507 Al dabas, Shoreline, Palm Jumeirah, Dubai, United Arab Emirates |

EU-DOCS\35932375.6
EU-DOCS\35932375.12

Part 2
**THE BUYERS**

| Name | Address |
|---|---|
| Alameda Research LLC | 2000 Center St 4th Floor, Berkeley CA 94704<br><br>Email: sam@alameda-research.com<br><br>Attention: Sam Bankman-Fried |
| Paradigm Fund LP | 548 Market Street, San Francisco, CA 94104<br><br>Email: legal@paradigm.xyz<br><br>Attention: General Counsel |
| Paradigm One LP | 548 Market Street, San Francisco, CA 94104<br><br>Email: legal@paradigm.xyz<br><br>Attention: General Counsel |
| Skybridge Multi-Adviser Hedge Fund Portfolios LLC – Series G | Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801, USA<br><br>Email: mnoble@skybridge.com<br><br>Attention: General Counsel, SkyBridge Capital |
| Legion Strategies, Ltd. | PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands<br><br>Email: mnoble@skybridge.com<br><br>Attention: General Counsel, SkyBridge Capital |

EU-DOCS\35932375.6
EU-DOCS\35932375.12

**Schedule 2**

**PROPORTIONS IN WHICH THE SALE SHARES ARE TO BE PURCHASED**

| (1)<br>Name of Buyer | (2)<br>Name of Seller | (3)<br>Number and class of Sale Shares | (4)<br>Consideration (US$) | (5)<br>Seller's bank account | |
|---|---|---|---|---|---|
| Alameda Research LLC | Rashit Makhat | 151 Ordinary Shares | 470,005,660.77 | Account Name | : Makhat, Rashit |
| | | | | Bank | : CBH Compagnie Bancaire Helvétique SA |
| | | | | Principle Account Nr | : 9025107 |
| | | | | Current Account (in USD) | : 9025107/001.000.840 |
| | | | | Swift Code | : BSSACHGGXXX |
| | | | | IBAN (in USD) | : CH27087629025107B000C |
| Alameda Research LLC | Marco Krohn | 26 Ordinary Shares | 80,928,127.02 | Account Name | : Krohn, Marco Alexander |
| | | | | Bank | : CBH Compagnie Bancaire Helvétique SA |
| | | | | Principle Account Nr | : 9025370 |
| | | | | Current Account (in USD) | : 9025370/001.000.840 |

EU-DOCS\35932375.6
EU-DOCS\35932375.12

| (1) | (2) | (3) | (4) | (5) |
|-----|-----|-----|-----|-----|
| Name of Buyer | Name of Seller | Number and class of Sale Shares | Consideration (US$) | Seller's bank account |
| | | | | Swift Code : BSSACHGGXXX<br>IBAN (in USD) : CH59087629025370B000C |
| Paradigm Fund LP | Marco Krohn | 9 Ordinary Shares | 28,013,582.43 | Account Name : Krohn, Marco Alexander<br>Bank : CBH Compagnie Bancaire Helvétique SA<br>Principle Account Nr : 9025370<br>Current Account (in USD) : 9025370/001.000.840<br>Swift Code : BSSACHGGXXX<br>IBAN (in USD) : CH59087629025370B000C |
| Paradigm One LP | Marco Krohn | 20 Ordinary Shares | 62,252,405.40 | Account Name : Krohn, Marco Alexander<br>Bank : CBH Compagnie Bancaire Helvétique SA<br>Principle Account Nr : 9025370 |

EU-DOCS\35932375.6
EU-DOCS\35932375.12

| (1) | (2) | (3) | (4) | (5) | | |
|---|---|---|---|---|---|---|
| **Name of Buyer** | **Name of Seller** | **Number and class of Sale Shares** | **Consideration (US$)** | **Seller's bank account** | | |
| | | | | Current Account (in USD) | : | 9025370/001.000.840 |
| | | | | Swift Code | : | BSSACHGGXXX |
| | | | | IBAN (in USD) | : | CH59087629025370B000C |
| Skybridge Multi-Adviser Hedge Fund Portfolios LLC – Series G | Marco Krohn | 8 Ordinary Shares | 24,900,962.16 | Account Name | : | Krohn, Marco Alexander |
| | | | | Bank | : | CBH Compagnie Bancaire Helvétique SA |
| | | | | Principle Account Nr | : | 9025370 |
| | | | | Current Account (in USD) | : | 9025370/001.000.840 |
| | | | | Swift Code | : | BSSACHGGXXX |
| | | | | IBAN (in USD) | : | CH59087629025370B000C |
| Legion Strategies, Ltd. | Marco Krohn | 1 Ordinary Share | 3,112,620.27 | Account Name | : | Krohn, Marco Alexander |
| | | | | Bank | : | CBH Compagnie Bancaire Helvétique SA |

18

| (1) | (2) | (3) | (4) | (5) |
|---|---|---|---|---|
| Name of Buyer | Name of Seller | Number and class of Sale Shares | Consideration (US$) | Seller's bank account |
|  |  |  |  | Principle Account Nr  :  9025370<br><br>Current Account (in USD)  :  9025370/001.000.840<br><br>Swift Code  :  BSSACHGGXXX<br><br>IBAN (in USD)  :  CH59087629025370B000C |

19

This agreement has been executed on the date shown on the first page.

Signed by
RASHIT MAKHAT

_____

Signed by
MARCO KROHN

_____

Signed by ALAMEDA RESEARCH LLC in
accordance with the laws of the territory in which
Alameda Research LLC is incorporated

*Sam Bankman-Fried*
DocuSigned by:
672DA88132804B9...
_____
Name:  Samuel Bankman-Fried
Title:    CEO

Signed by PARADIGM FUND LP, acting by its
general partner PARADIGM FUND GP LLC who, in
accordance with the laws of the territory in which
Paradigm Fund LP is incorporated, is acting under the
authority of Paradigm Fund LP

_____
Name: Fred Ehrsam III
Title: Managing Member

_____
Name: Matt Huang
Title: Managing Member

EU-DOCS\35932375.6
EU-DOCS\35932375.12

Signed by PARADIGM ONE LP, acting by its general
partner PARADIGM ONE GP LLC who, in
accordance with the laws of the territory in which
Paradigm One LP is incorporated, is acting under the
authority of Paradigm One LP.

_____
Name: Fred Ehrsam III
Title: Managing Member


_____
Name: Matt Huang
Title: Managing Member


Signed by SKYBRIDGE CAPITAL II, LLC acting on
behalf of SKYBRIDGE MULTI-ADVISER HEDGE
FUND PORTFOLIOS LLC – SERIES G in
accordance with the laws of the territory in which
Skybridge Multi-Adviser Hedge Fund Portfolios LLC
– Series G is incorporated

_____
Name:  Brett Messing
Title:    Authorized Signatory

Signed by SKYBRIDGE CAPITAL II, LLC acting on
behalf of LEGION STRATEGIES, LTD. in
accordance with the laws of the territory in which
Legion Strategies, Ltd. is incorporated

_____
Name:  Brett Messing
Title:    Authorized Signatory

2

Signed by GENESIS DIGITAL ASSETS LIMITED
acting by its director, Natalia Evripidou in accordance
with the laws of the territory in which Genesis Digital
Assets Limited is incorporated

_____

3

# Exhibit 2

## Legal Entity Identifier (LEI)

# Olshan Family 2016 Trust No. 1
## LEI: 894500328WTH1EQGZW66

| Entity |
| --- |

**Legal Name**

Olshan Family 2016 Trust No. 1

**Legal Name Language Code**

en

**Legal Address**

600 Madison Avenue, 14 Fl

New York, 10022

UNITED STATES

**Headquarters Address**

600 Madison Avenue, 14 Fl

New York, 10022

UNITED STATES

**Legal Jurisdiction Country**

UNITED STATES (US)

**Legal Jurisdiction Region**

New York (US-NY)

**Registration Authority**

   **Registration Authority ID**

   No registration authority for this entity (RA999999)

**Entity Legal Form Code**

Other (8888)

**Other Legal Form**

Trust

**Entity Category**

GENERAL

**Entity Status**

ACTIVE

**Entity Creation Date**

2016-11-02 22:00:00

**Legal Entity Events**

   **Legal Entity Event 1**

      **Event Type**

      CHANGE_HQ_ADDRESS

      **Effective Date**

      2024-08-26 21:00:00

1/3

Recorded Date

2024-08-28 07:12:23

Validation Documents

SUPPORTING_DOCUMENTS

Event Status

COMPLETED

Legal Entity Event 2

Event Type

CHANGE_LEGAL_ADDRESS

Effective Date

2024-08-26 21:00:00

Recorded Date

2024-08-28 07:12:23

Validation Documents

SUPPORTING_DOCUMENTS

Event Status

COMPLETED

## Relationships

Direct Parent

Parent Information Not Provided

Non-Disclosure Reason 1

Reason

NATURAL_PERSONS

Ultimate Parent

Parent Information Not Provided

Non-Disclosure Reason 1

Reason

NATURAL_PERSONS

## Registration

Initial Registration Date

2023-10-17 13:02:41

Last Update Date

2025-09-03 05:12:32

Next Renewal Date

2026-10-17 13:02:31

Registration Status

ISSUED

Managing LOU

529900F6BNUR3RJ2WH29

Validation Sources

ENTITY_SUPPLIED_ONLY

**Validation Authority**

**Validation Authority ID**

No registration authority for this entity (RA999999)

# Exhibit 3

# Legal Entity Identifier (LEI)

## LIME PARTNERS, LLC
### LEI: 549300GZZPFTJIJ0WL25

---

**Entity**

---

**Legal Name**

LIME PARTNERS, LLC

**Language Code**

en

**Legal Address (English)**

C/O THE CORPORATION TRUST COMPANY
CORPORATION TRUST CENTER 1209 ORANGE ST
WILMINGTON, Delaware (US-DE), 19801
UNITED STATES

**Headquarters Address (English)**

767 Fifth Avenue
Suite 4602
New York, New York (US-NY), 10153
UNITED STATES

**Legal Jurisdiction Country**

UNITED STATES (US)

**Legal Jurisdiction Region**

Delaware (US-DE)

**Registration Authority**

  **Registration Authority ID**

  (US-DE): Division of Corporations, Department of State (RA000602)

  **Registration Authority Entity ID**

  3651125

**Entity Legal Form Code**

Limited Liability Company (HZEH)

**Entity Category**

GENERAL

**Entity Status**

ACTIVE

**Entity Creation Date**

2003-04-24 00:00:00

---

**Relationships**

---

  **Direct Parent**

Parent Information Not Provided

Non-Disclosure Reason 1

Reason

NON_PUBLIC

Ultimate Parent

Parent Information Not Provided

Non-Disclosure Reason 1

Reason

NON_PUBLIC

## Registration

**Initial Registration Date**

2012-12-13 01:41:00

**Last Update Date**

2023-10-21 13:30:03

**Next Renewal Date**

2023-10-20 18:06:00

**Registration Status**

LAPSED

**Managing LOU**

5493001KJTIIGC8Y1R12

**Validation Sources**

FULLY_CORROBORATED

**Validation Authority**

Validation Authority ID

(US-DE): Division of Corporations, Department of State (RA000602)

Validation Authority Entity ID

3651125

## Contact

# Exhibit 4

# Legal Entity Identifier (LEI)

## BELFER INVESTMENT PARTNERS L.P.

### LEI: 4Q2T1DEW9NYUHCE8DN58

### Entity

**Legal Name**

BELFER INVESTMENT PARTNERS L.P.

**Language Code**

en

**Legal Address (English)**

C/O THE CORPORATION TRUST COMPANY
CORPORATION TRUST CENTER 1209 ORANGE ST
WILMINGTON, Delaware (US-DE), 19801
UNITED STATES

**Headquarters Address (English)**

767 Fifth Avenue
Suite 4602
New York, New York (US-NY), 10153
UNITED STATES

**Legal Jurisdiction Country**

UNITED STATES (US)

**Legal Jurisdiction Region**

Delaware (US-DE)

**Registration Authority**

  **Registration Authority ID**

  (US-DE): Division of Corporations, Department of State (RA000602)

  **Registration Authority Entity ID**

  3782700

**Entity Legal Form Code**

Limited Partnership (T91T)

**Entity Category**

GENERAL

**Entity Status**

ACTIVE

**Entity Creation Date**

2004-03-26 00:00:00

### Relationships

  **Direct Parent**

1/2

Parent Information Not Provided

Non-Disclosure Reason 1

Reason

NON_PUBLIC

Ultimate Parent

Parent Information Not Provided

Non-Disclosure Reason 1

Reason

NON_PUBLIC

## Registration

Initial Registration Date

2012-06-06 15:57:00

Last Update Date

2023-10-21 13:30:03

Next Renewal Date

2023-10-20 18:06:00

Registration Status

LAPSED

Managing LOU

5493001KJTIIGC8Y1R12

Validation Sources

FULLY_CORROBORATED

Validation Authority

Validation Authority ID

(US-DE): Division of Corporations, Department of State (RA000602)

Validation Authority Entity ID

3782700

## Contact

# Exhibit 5

| | |
|---|---|
| **From:** | Marco Streng[marco.streng@genesisda.com] |
| **Sent:** | Fri 7/16/2021 1:23:35 PM (UTC) |
| **To:** | Adam Jin[adam.jin@ftx.com] |
| **Cc:** | Evgeny Lvov[evgeny.lvov@genesisda.com]; Ramnik Arora[ramnik@ftx.com]; Manuel Stotz[ms@kingswaycap.com]; Katharina Haid[katharina.haid@genesis-group.com]; Afonso Campos[ac@kingswaycap.com]; David Ma[david.ma@ftx.com]; Olivia Whelan[ow@kingswaycap.com]; Ilya Glazyrin[ilya.glazyrin@genesisda.com] |
| **Subject:** | Re: Connecting FTX <> GDA - Zoom next Monday? |
| **Attachment:** | hashrate_growth_GDA.jpg |
| **Attachment:** | daily_coin_production_GDA.jpg |
| **Attachment:** | international_expansion_GDA.png |
| **Attachment:** | Genesis Digital Assets_Management Presentation_July 2021 (2).pdf |

Hey Ramnik, Adam, David,
Hope you are all fine! Since this is a very exciting time for us during hyper expansion I wanted to take this moment to send you our daily coin production for this month. (You can clearly also see the China impact on the numbers.)

Furthermore I am sending you our updated deck that also includes a detailed path to grow above 35 EHs as well as a detailed slide with our international expansion in numbers!

It's truly an amazing time for us and hope this info helps you further!

Thank you all! We would love to have FTX on board joining our journey going forward!

Greetings,
Marco

On Fri, Jul 16, 2021 at 10:25 AM Adam Jin <adam.jin@ftx.com> wrote:

Hi Evgeny,
We will let you know if we need more Fireblocks reports.

Thanks,
Adam

On Fri, Jul 16, 2021 at 2:24 AM Evgeny Lvov <evgeny.lvov@genesisda.com> wrote:

Hi Adam,
Usually we do not share a Fireblocks viewer rights to persons outside GDA group. We may provide you an update Fireblocks report upon your request.

Regards,

Evgeny

On Wed, Jul 14, 2021 at 5:24 PM Adam Jin <adam.jin@ftx.com> wrote:

 Hi Evgeny,
 Thanks for the financial files. We will review and get back to you.
 Regarding the Fireblocks transactions, is there a share link we could review the transaction?

 Best,

 On Wed, Jul 14, 2021 at 8:24 PM Evgeny Lvov <evgeny.lvov@genesisda.com> wrote:

  Please find enclosed legal documents related to the investment rounds closing.

  Regards,
  Evgeny


  On Wed, Jul 14, 2021 at 2:53 PM Evgeny Lvov <evgeny.lvov@genesisda.com> wrote:

   Hi Adam,
   Thank you for the NDA. Please find attached:
   1. Our monthly reports (consolidated P&L and BS) with the actual data for the first 4
   months of 2021;
   2. Updated financial model;
   3. Pre-final draft of 2020-2019 IFRS consolidated statements (some minor changes may
   occur);
   4. Fireblocks reports from our companies responsible for mining, i.e. DDH Switzerland
   and DDH Digital Data Hub GmbH

   Definitive docs from the first closing will be sent by separate emails.

   Regards,
   Evgeny

   On Tue, Jul 13, 2021 at 9:20 PM Adam Jin <adam.jin@ftx.com> wrote:

    Hi Evgeny,
    Please find the signed NDA attached. Looking forward to the information tomorrow.

    Thanks,

    On Tue, Jul 13, 2021 at 11:51 PM Evgeny Lvov <evgeny.lvov@genesisda.com> wrote:

     Hi Ramnik,

We are gathering all the information and will provide it to you tomorrow. Meanwhile, could you please fill in and sign an NDA attached.

Regards,
Evgeny

On Tue, Jul 13, 2021 at 6:24 PM Ramnik Arora <ramnik@ftx.com> wrote:

Hey Ilya and Evgeny - Mind sharing the following?

1.  Financial Statements for 2019, 2020 and whatever you have for 2021. Understand none of this will be audited.
2.  FireBlocks transactions.
3.  Definitive Docs from first close. Plus any meaningful side letters.

Ramnik

On Mon, Jul 12, 2021 at 8:53 PM, Marco Streng <marco.streng@genesisda.com> wrote:

Hey Ramnik,
Was a great call earlier today. I am adding Evgeny and Ilya here who will also take care of answering your questions.

In the meantime I will open the Signal group and add everybody so that we can communicate most efficiently!

Thank you very much everyone!

Greetings,
Marco

On Mon, Jul 12, 2021 at 1:09 PM Ramnik Arora <ramnik@ftx.com> wrote:

Thanks Marco, Ilya and Evgeny (who're not a part of the thread) and Manny.

A few follow-ups.

1.  Financial Statements for 2019, 2020 and whatever you have for 2021. Understand none of this will be audited.
2.  FireBlocks transactions
3.  Definitive Docs from first close. Plus any meaningful side letters.
4.  [Maybe, will confirm later] Conversation with Morgan Stanley
5.  Want to share your numbers for Signal? Will create a small group (we're

at: Ramnik: +1-201-724-8725, Adam - +1 (312) 216-7395, David Ma - +852 6586 8833)

Regards,

Ramnik

On Sat, Jul 10, 2021 at 6:03 PM, Manuel Stotz <ms@kingswaycap.com> wrote:

Looking forward to it & looping in Olivia who'd be delighted to help arrange.

Have a great weekend

Manny

**From:** Adam Jin <adam.jin@ftx.com>
**Sent:** 09 July 2021 11:23
**To:** Marco Streng <marco.streng@genesisda.com>
**Cc:** Katharina Haid <katharina.haid@genesis-group.com>; Afonso Campos <ac@kingswaycap.com>; David Ma <david.ma@ftx.com>; Manuel Stotz <ms@kingswaycap.com>; Ramnik Arora <ramnik@ftx.com>
**Subject:** Re: Connecting FTX <> GDA - Zoom next Monday?

[External to Kingsway Capital]

Hi Marco,

Likewise, looking forward to the call on Monday.

Best,

Adam

On Fri, Jul 9, 2021 at 6:06 PM Marco Streng <marco.streng@genesisda.com>
wrote:

 Hey Adam,


 No problem regarding the changes.


 Looking forward to the call together on Monday!


 Greetings,

 Marco


 On Wed 7. Jul 2021 at 17:09, Katharina Haid <katharina.haid@genesis-group.com> wrote:

 Great! Thank you very much and I'll send over a calendar invite shortly!


 Best,

 Katharina


 On Wed, 7 Jul 2021 at 15:06, Adam Jin <adam.jin@ftx.com> wrote:

 Hi Katharina,


 Sounds good, please send over the calendar invite.


 Best,

 Adam

On Wed, Jul 7, 2021 at 21:04 Katharina Haid <katharina.haid@genesis-group.com> wrote:

Dear Adam,


I hope you are doing well! I jump in here on Marco's behalf to help coordinate.

Monday, July 12th at 1pm Dubai time works well for Marco. Should I send over a calendar invite or would you like to do so?


Kind regards,

Katharina




On Wed, 7 Jul 2021 at 13:41, Adam Jin <adam.jin@ftx.com> wrote:

Hi Marco, Manny


Apologies, there is a schedule conflict on this Friday, is it possible we do the same time on next Monday?


Tentative schedule:

1pm Dubai / 10am London / 5pm HKT on Monday (7/12)?


Please let me know.


Thanks,

Adam

On Wed, Jul 7, 2021 at 6:28 PM Adam Jin <adam.jin@ftx.com> wrote:

Hi Marco,

Sounds good. We can definitely discuss more details about it. Would 1pm Dubai/10am London/5pm Hong Kong time on Friday (7/9) work for you?

Thanks,

Adam

On Wed, Jul 7, 2021 at 6:13 PM Marco Streng <marco.streng@genesisda.com> wrote:

Hey Adam,

Nice to hear from you!

Those are all very good points that we should discuss! We are currently doing 2 full days on strategy internally and I will discuss this with the team!

Can we do a follow up call to discuss those points on Friday?

We are all very excited to make this a strategic partnership with you and looking forward to our next call!

Exciting times ahead!

Greetings,

Marco

On Tue 6. Jul 2021 at 14:39, Adam Jin <adam.jin@ftx.com> wrote:

Hi Manny,

Thanks for the time yesterday. It's great meeting both Marco and yourself. We are working on the due diligence on our end, Afonso Campos, please let us know when we have access to the full VDR.

In terms of the strategic partnership, FTX and Alameda have various setups for GDA to look into, I included three potential collaborations below for your review:
1. Borrow/Lending

i) FTX has facilitated over $1b notional open interest, currently the borrow rate is around 1% per year with a collateral over 125% of BTC, details here.

ii) Alameda does OTC borrow/lending as well.

2. Pre-IPO listing

FTX partnered with CM-Equity AG to list Pre-IPO and listed stocks as tokenized stocks (explainer), if GDA has any interest, we can list Pre-IPO GDA stocks, as we listed Robinhood Pre-IPO.

3. Mining Pool

As we discussed, GDA is also interested in looking into mining pool in the future. If there is any interest, we'd be interested in organizing a mining pool on FTX for GDA.

Please let us know your thoughts.

Best,

Adm

On Tue, Jul 6, 2021 at 2:56 AM Manuel Stotz <ms@kingswaycap.com> wrote:

Dear Team FTX,

Thanks again for being so generous with your time earlier today, and also for getting Sam to join. I would be an honour to have a strategic partnership with FTX beyond the capital, and we'd love to find a way of making this happen over the course of this month.

In case you have any concrete questions on the scope of such strategic, and what's important to you in this respect, please let us know. GDA has no preferential terms with NYDIG and as long as your offering is competitive, we'd love to work with you on the balance sheet management (BTC options, collateralized loans, hash-rate syndication etc).

In terms of capacity in this round, the max available would be $100M if we extended the round, which will be a decision by the Founders. Kingsway would certainly be very supportive.

@Afonso Campos will open up the full VDR for you tomorrow, we're updating some slides to adequately reflect the tremendously positive impact from the China mining ban.

All the best from London

Manny

---

**From:** Manuel Stotz
**Sent:** 05 July 2021 08:56
**To:** Adam Jin <adam.jin@ftx.com>; Olivia Whelan

<ow@kingswaycap.com>
**Cc:** David Ma <david.ma@ftx.com>; Katharina Haid
<katharina.haid@genesis-group.com>; Marco Streng
<marco.strengda@genesisda.com>; Ramnik Arora <ramnik@ftx.com>
**Subject:** RE: Connecting FTX <> GDA - Zoom next Monday?


Adam – @Olivia Whelan will do this right away. Thanks, Manny


**From:** Adam Jin <adam.jin@ftx.com>
**Sent:** 05 July 2021 08:26
**To:** Olivia Whelan <ow@kingswaycap.com>
**Cc:** David Ma <david.ma@ftx.com>; Katharina Haid
<katharina.haid@genesis-group.com>; Marco Streng
<marco.streng@genesisda.com>; Manuel Stotz <ms@kingswaycap.com>;
Ramnik Arora <ramnik@ftx.com>
**Subject:** Re: Connecting FTX <> GDA - Zoom next Monday?


**[External to Kingsway Capital]**

Hi Olivia,


It seems Sam wasn't added to the calendar invite. Can you make sure he's
on the list before our call today?


Thanks,


On Fri, Jul 2, 2021 at 10:22 PM Ramnik Arora <ramnik@ftx.com> wrote:

 Thanks Olivia!



 On Fri, Jul 02, 2021 at 10:21 PM, Olivia Whelan

<ow@kingswaycap.com> wrote:

Dear Ramnik,

Thank you for your email. I've added Sam to the meeting invite for Monday's call.

Kind regards,

**Olivia Whelan | Executive Assistant| Kingsway Capital**

O: +44 (0) 207 6594 130  | M: +44 (0) 7772 646501

Email: ow@kingswaycap.com

Address: 9th Floor, Smithson Tower, 25 St James's Street, London SW1A 1HA, U.K.

---

**From:** Ramnik Arora [mailto:ramnik@ftx.com]
**Sent:** 02 July 2021 15:19
**To:** Marco Streng <marco.streng@genesisda.com>; Manuel Stotz <ms@kingswaycap.com>
**Cc:** David Ma <david.ma@ftx.com>; Katharina Haid <katharina.haid@genesis-group.com>; Olivia Whelan <ow@kingswaycap.com>; Adam Jin <adam.jin@ftx.com>
**Subject:** Re: Connecting FTX <> GDA - Zoom next Monday?

**[External to Kingsway Capital]**

---

Great to meet you Marco. Congrats on all the successes!

Manny - Can we add Sam (sam@ftx.com) to the meeting invite?

Ramnik

On Fri, Jul 02, 2021 at 6:32 PM, Marco Streng
<marco.streng@genesisda.com> wrote:

Hello Adam,

It is great to meet you, too!

The proposed time on Monday 5.30 pm HKT works well for me.

Thank you and I'm looking forward to the call!

Greetings,

Marco

On Fri, Jul 2, 2021 at 3:46 AM Adam Jin <adam.jin@ftx.com> wrote:

Hi Manuel, Marco,

Thanks for the introduction Manuel. Great to meet you Marco!

10:30 UK/ 17:30 HKT on Monday (7/5) sounds good if it works for
both of you. Look forward to chatting with you soon.

Best,

Adam


On Fri, Jul 2, 2021 at 05:45 Manuel Stotz <ms@kingswaycap.com>
wrote:

Hey Ramnik, Adam & David,


It's a pleasure to connect you with Marco, Co-Founder and CEO of
GDA. Debriefed him on our conversation, like me Marco is a huge fan
of SBF and we've also had very positive feedback from NYDIG on
you guys.


Let's get a Zoom into the diary for Monday between 10.30-14.00 UK
time, which should be early afternoon in Dubai and evening in HK, if
that works for everyone?


All the best from London


Manny


Manuel Stotz | CEO | Kingsway Capital Partners Ltd

O: +44 (0) 207 659 4131  | M: +44 (0) 7722 065 537

Email: ms@kingswaycap.com

9th Floor, Smithson Tower, 25 St James's Street, London SW1A 1HA, UK

Kingsway Capital Partners Limited (Registration No. 10644372) is authorised
and regulated by the Financial Conduct Authority of the United Kingdom
(FCA Reference Number: 782595) . Registered Office can be found here .

This email contains confidential information and is intended only for the individual or entity named. If you are not the named addressee you should not disseminate, distribute or copy this email. Please notify the sender immediately by email if you have received this email by mistake and delete this email from your system

--

Marco Streng
CEO & Founder

marco.streng@genesisda.com

**Genesis Digital Assets**
GenesisDigitalAssets.com

Kingsway Capital Advisors LLP (Registration No. OC416750) is an appointed representative of Kingsway Capital Partners Limited (Registration No. 10644372) which is authorised and regulated by the Financial Conduct Authority of the United Kingdom. (FCA Reference Number: 790149) Registered Office (not place of business) can be found here .
This email contains confidential information and is intended only for the individual or entity named. If you are not the named addressee you should not disseminate, distribute or copy this email. Please notify the sender immediately by email if you have received this email by mistake and delete this email from your system

Kingsway Capital Partners Limited (Registration No. 10644372) is authorised and regulated by the Financial Conduct Authority of the United Kingdom (FCA Reference Number: 782595) . Registered Office can be found here .

This email contains confidential information and is intended only for the individual or entity named. If you are not the named addressee you should not disseminate, distribute or copy this email. Please notify the sender immediately by email if you have received this email by mistake and delete this email from your system

--

Marco Streng
CEO & Founder

marco.streng@genesisda.com

**Genesis Digital Assets**
GenesisDigitalAssets.com

--

**Katharina Haid**

Executive Assistant for Management

Email: katharina.haid@genesis-group.com

www.genesis-group.com

Follow us on: LinkedIn

.

Confidentiality Note:

This email is intended only for the person or entity to which it is addressed and may contain information that is privileged, confidential or otherwise protected from disclosure. Unauthorized use, dissemination, distribution or copying of this email or the information herein or taking any action in reliance on the contents of this email or the information herein, by anyone other than the intended recipient, or an employee or agent responsible for delivering the message to the intended recipient, is strictly prohibited. If you have received this email in error, please notify the sender immediately and destroy the original message, any attachments thereto and all copies. Please refer to the firm's privacy policy for important information on this policy.

--

**Katharina Haid**

Executive Assistant for Management

Email: katharina.haid@genesis-group.com

www.genesis-group.com

Follow us on: LinkedIn

.

Confidentiality Note:

This email is intended only for the person or entity to which it is addressed and may contain information that is privileged, confidential or otherwise protected from disclosure. Unauthorized use, dissemination, distribution or copying of this email or the information herein or taking any action in reliance on the contents of this email or the information herein, by anyone other than the intended recipient, or an employee or agent responsible for delivering the message to the intended recipient, is strictly prohibited. If you have received this email in error, please notify the sender immediately and destroy the original message, any attachments thereto and all copies. Please refer to the firm's privacy policy for important information on this policy.

--

Marco Streng
CEO & Founder

marco.streng@genesisda.com

Genesis Digital Assets
GenesisDigitalAssets.com

Kingsway Capital Partners Limited (Registration No. 10644372) is authorised and regulated by the Financial Conduct Authority of the United Kingdom (FCA Reference Number: 782595) . Registered Office can be found here .
This email contains confidential information and is intended only for the individual or entity named. If you are not the named addressee you should not disseminate, distribute or copy this email. Please notify the sender immediately by email if you have received this email by mistake and delete this email from your system

--
Marco Streng
CEO & Founder

marco.streng@genesisda.com

Genesis Digital Assets
GenesisDigitalAssets.com



--
Evgeny Lvov
Head of Finance

evgeny.lvov@genesisda.com

**Genesis Digital Assets**
GenesisDigitalAssets.com



--
Evgeny Lvov
Head of Finance

evgeny.lvov@genesisda.com

**Genesis Digital Assets**
GenesisDigitalAssets.com



--
Evgeny Lvov
Head of Finance

evgeny.lvov@genesisda.com

**Genesis Digital Assets**
GenesisDigitalAssets.com



--
Evgeny Lvov
Head of Finance

evgeny.lvov@genesisda.com

**Genesis Digital Assets**
GenesisDigitalAssets.com



--
Marco Streng
CEO & Founder

marco.streng@genesisda.com

**Genesis Digital Assets**
GenesisDigitalAssets.com

# Exhibit 6

# GDA INTERNATIONAL DEVELOPMENT PIPELINE

STRICTLY CONFIDENTIAL

## By April 2022, GDA will have access to 410 MW of zero- and low-carbon energy across the U.S. and Sweden (in addition to existing capacity in Kazakhstan)

Sweden already launched, scaling to 50 MW by Jan–Apr 2022

| Item | Norrbotten | Västerbotten | South Carolina | North Carolina | Ohio |
|---|---|---|---|---|---|
| Country | Sweden | Sweden | USA | USA | USA |
| Available capacity | 12 MW (Aug'21) 20 MW (Nov'21) | 8 MW (Sep'21) 30 MW (Jan'21) | 20 MW (Oct'21) 60 MW (Dec'21) | 80 MW (Mar'22) | 20 MW (Sep'21) 220 MW (Apr'22) |
| Energy supply | Grid – hydro | Grid – hydro | Grid with renewable energy certificates option | Grid with renewable energy certificates option | Power plant – natural gas + green hydrogen |
| Launch time | Operations commenced | Sep'21 | Oct–Nov'21 | Aug–Sep'21 | Sep–Oct'21 |
| Agreement type | Hosting now, full acquisition in Sep | Land lease & power provision | Land & facilities lease + power provision | Land & facilities lease + power provision | Land lease & power provision |
| Agreement term | Until acquired | 5 years | 3+2 years | 3+2 years | 3+2 years |
| Current status | Mining started; deal closure is expected in Aug'21 | Mining to start in Sep'21 when power is provided | Lease agreement is anticipated to be signed within the next few weeks | Lease agreement is anticipated to be signed within the next few weeks | Term sheet is signed |



### GDA data center capacity – April 2022

**602 MW\***
Total data center capacity

**192 MW / 32%**
Kazakhstan, Coal

**360 MW / 60%**
USA, Low-carbon energy

**50 MW / 8%**
Sweden, Zero-carbon energy (100% hydropower)

Note:
Data centers with access to 602 MW of power capacity; mining machines installed therein will amount to 393 MW by April 2022

Genesis Digital Assets

# Exhibit 7

 (https://genesisdigitalassets.com/)



PRESS RELEASE (HTTPS://GENESISDIGITALASSETS.COM/CATEGORY/PRESS-RELEASE/)

# Genesis Digital Assets Raises $431 Million to Fund Expansion of Industrial-Scale Bitcoin Mining Operations in the US and Nordics

September 21, 2021  •  4 years ago



Source (https://www.globenewswire.com/news-release/2021/09/21/2300881/0/en/Genesis-Digital-Assets-Raises-431-Million-to-Fund-Expansion-of-Industrial-Scale-Bitcoin-Mining-Operations-in-the-US-and-Nordics.html)

NEW YORK, Sept. 21, 2021 (GLOBE NEWSWIRE) — Genesis Digital Assets, one of the largest industrial-scale Bitcoin mining companies in the world, has announced a strategic raise of $431 million, the largest known funding round announced by a bitcoin mining company.

The funding round was led by Paradigm and also included, NYDIG, Stoneridge, FTX, Ribbit, Electric Capital, Skybridge, and Kingsway Capital, who invested $125 million in a previous round earlier this year. Investors in Kingsway Capital include the family offices of Paul Tudor Jones, Paul Marshall, and Winter Capital.

As part of the round, Matt Huang, Co-Founder and Managing Partner of Paradigm, has joined the Genesis Digital Assets Board of Directors. Commenting on the announcement, Huang said: "Over nearly a decade, GDA's team have built what we regard as the most impressive bitcoin mining operation in the world. They have everything it takes to continue to scale their operations and make bitcoin mining even more efficient, and we're thrilled to support their mission."

Marco Streng, CEO and Co-Founder of Genesis Digital Assets, said: "As we work towards our goal of bringing 1.4 gigawatts online by 2023, the capital raised from this round will be used to expand our bitcoin mining operations in locations where clean energy is easily accessible. We're excited to have strategic investors on board and look forward to executing on our mission together."

As of September 2021, Genesis Digital Assets data center capacity is at over 170 megawatts, translating into a total hashrate exceeding 3.3 Exahashes (EH/s), which is more than 2.4% of the global bitcoin mining hashrate. Another 8.6 Exahashes (EH/s) will go online during the next 12 months, and by the end of 2023, Genesis Digital Assets expects to reach a capacity of over 1.4 gigawatts.

## About Genesis Digital Assets

Genesis Digital Assets is one of the world's largest and most experienced Bitcoin mining companies. Since 2013, founders of the company have built over 20 industrial-scale mining farms, brought over 300,000 miners online, and mined over $1 billion in Bitcoin. Learn more at genesisdigitalassets.com.

The company was founded by five founders, Marco Streng and Marco Krohn from Genesis Mining and three former mining industry executives, Abdumalik Mirakhmedov, Andrey Kim, and Rashit Makhat.

Share this

   



PRESS RELEASE (HTTPS://GENESISDIGITALASSETS.COM/CATEGORY/PRESS-RELEASE/)
(https://genesisdigitalassets.com/)

← Back to News & Insights
(https://genesisdigitalassets.com/news-insights/)

View all news & insights →
(https://genesisdigitalassets.com/news-insights/)

February
26, 2025
,
PRESS
RELEASE

BLOG



(https://genesisdigitalassets.com/gda-adds-50-mw-of-new-power-capacity-in-texas/)



(https://genesisdigitalassets.com/)

≡ Menu

December
20, 2024
,
PRESS
RELEASE



(https://genesisdigitalassets.com/gda-
named-to-fast-companys-fourth-
annual-list-of-the-next-big-things-in-
tech/)

April
29,
2024
,
MEDIA
PRESS
RELEASE



(https://genesisdigitalassets.com/leading-
bitcoin-miner-gda-unveils-60-mw-wind-
energy-powered-texas-data-center-
plans-site-expansion-to-400-mw/)


(https://genesisdigitalassets.com/)

BLOG
JUL
23,
2025
PRESS
RELEASE



(https://genesisdigitalassets.com/gda-
purchases-1000-advanced-auradine-
miners-to-expand-mining-capacity/)

BLOG
APR
10,
2025
PRESS
RELEASE



(https://genesisdigitalassets.com/gda-
selected-as-winner-of-the-esg-
solution-of-the-year-award-by-
cleantech-breakthrough/)

1/26/26, 11:51 AM $431 Million to Fund GDA's Expansion of the Digital World...

Case 25-52358-KBO    Doc 24-1    Filed 02/20/26    Page 63 of 150



(https://genesisdigitalassets.com/)

≡

BLOG

July 26, 2025 , PRESS RELEASE



(https://genesisdigitalassets.com/gda-adds-50-mw-of-new-power-capacity-in-texas/)

MEDIA

November 20, 2024 , PRESS RELEASE

GDA Named to Fast Company's Fourth Annual List of the Next Big Things in Tech

(https://genesisdigitalassets.com/gda-named-to-fast-companys-fourth-annual-list-of-the-next-big-things-in-tech/)



(https://genesisdigitalassets.com/)

MEDIA
29,
2024

PRESS RELEASE



(https://genesisdigitalassets.com/leading-
bitcoin-miner-gda-unveils-60-mw-wind-
energy-powered-texas-data-center-
plans-site-expansion-to-400-mw/)

BLOG
23,
2025

PRESS RELEASE



(https://genesisdigitalassets.com/gda-
purchases-1000-advanced-auradine-
miners-to-expand-mining-capacity/)



(https://genesisdigitalassets.com/)

☰

April
10,
2025

BLOG
,
PRESS
RELEASE



(https://genesisdigitalassets.com/gda-
selected-as-winner-of-the-esg-
solution-of-the-year-award-by-
cleantech-breakthrough/)

February
26, 2025

BLOG
,
PRESS
RELEASE



(https://genesisdigitalassets.com/gda-
adds-50-mw-of-new-power-capacity-
in-texas/)

1/26/26, 11:51 AM    $431 Million to Fund GDA's Expansion of the Digital Model...

Case 25-52358-KBO    Doc 24-1    Filed 02/20/26    Page 66 of 150


(https://genesisdigitalassets.com/)

MEDIA, PRESS RELEASE
December 20, 2024



(https://genesisdigitalassets.com/gda-named-to-fast-companys-fourth-annual-list-of-the-next-big-things-in-tech/)

MEDIA, PRESS RELEASE
April 29, 2024

(https://genesisdigitalassets.com/leading-bitcoin-miner-gda-unveils-60-mw-wind-energy-powered-texas-data-center-plans-site-expansion-to-400-mw/)

      

1/26/26, 11:51 AM    $431 Million to Fund Expansion of the Largest World...

Case 25-52358-KBO    Doc 24-1    Filed 02/20/26    Page 67 of 150

 **GDA**
(https://genesisdigitalassets.com/)

≡

GET IN TOUCH

Contact us 
(https://genesisdigitalassets.com/contact-us/)

CONNECT

Linkedin →
(https://www.linkedin.com/company/genesis-digital-assets)

PRESS

press@genesisda.com →
(mailto:press@genesisda.com)



About Us

News & insights

Careers

Privacy Policy

© 2026 Genesis Digital Assets

The information on this website does not convey an offer of any type and is not intended to be, and should not be construed as, an offer to sell, or the solicitation of an offer to buy, any securities, commodities, or other financial products. In addition, the information on this website does not constitute the provision of investment advice. No assurances can be made that any aims,

GDA

assumptions, expectations, strategies, and/or goals expressed or implied herein were or will be realized or that the activities or performance described did or will continue at all or in the same manner as is described on this website.

(Community Warning: Beware of Scammers) Please be aware of scams that impersonate GDA or GDA employees, whether through spoofing the GDA domain (genesisdigitalassets.com), phishing, or other means. Always (1) take a close look at the domain URL and make sure there's an SSL certificate, and (2) check email domains from suspicious mail against those from trusted contacts. GDA shall not be liable or responsible for any claims, losses, damages, expenses or other inconvenience resulting from or in any way connected to the actions of scammers. GDA does not accept investment from the public and does not sell any product or service to the public.

# Exhibit 8

**Company draft**
**March 14, 2022**

## EMPLOYMENT AGREEMENT

**THIS EMPLOYMENT AGREEMENT** (this "<u>Agreement</u>") is entered into on March __, 2022 by and between Genesis Digital Assets Limited (together with its successors and assigns, the "<u>Company</u>"), and Christian Anderson, an individual ("<u>Executive</u>").

## W I T N E S S E T H:

**WHEREAS:**

(1)     The Company and Executive (each, a "<u>Party</u>") desire for Executive to be employed by the Company as President and Chief Financial Officer upon and subject to the terms and conditions set forth in this Agreement;

(2)     Executive is willing and desires to be employed by the Company upon and subject to the terms of this Agreement; and

(3)     Executive's agreement to the terms and conditions of Sections 4 and 5 are a material condition of Executive's employment with the Company under the terms of this Agreement;

**NOW, THEREFORE**, in consideration of the premises, and the promises and agreements set forth below, the Parties, intending to be legally bound, agree as follows:

1.     **Employment Terms and Duties**

**1.1     Employment.** The Company hereby agrees to employ Executive in an executive capacity as its President and Chief Financial Officer, and Executive hereby accepts such employment upon the terms and conditions set forth in this Agreement.

**1.2     Term; Option to Extend.** Executive's employment under this Agreement (the "<u>Term</u>") shall commence on April 1, 2022 or such earlier date as mutually agreed by Executive and the Company (the "<u>Effective Date</u>") and shall continue until terminated pursuant to Section 3.

**1.3     Position and Duties**. During the Term, Executive shall serve as the President and Chief Financial Officer of the Company; shall (i) have all authorities, duties and responsibilities customarily exercised by an individual serving in those positions at an entity of the size and nature of the Company (including having responsibility for financial reporting, capital markets and treasury and investor and banking relationships and playing a key role in mergers and acquisitions strategy) as may from time to time reasonably be assigned to him by the Executive Chairman (the "<u>Chairman</u>") of the Board of Directors of the Company (the "<u>Board</u>"), (ii) be assigned no duties or responsibilities that are materially inconsistent with, or that materially impair Executive's ability to discharge, the foregoing duties and responsibilities; and (iii), in his capacity as President and Chief Financial Officer of the Company, report solely and directly to the Chairman.

**1.4     Outside Activities.** During the Term, Executive shall devote substantially all of his business time and efforts to the business and affairs of the Company. However, nothing in this Agreement shall preclude Executive from: (a) serving on the boards of the entities listed on

Annex A attached hereto (the "Permitted Entities"), (b) serving on the boards of up to two public companies, (c) engaging in religious, educational, non-profit, charitable and civic matters, and (d) managing his (and his family's) personal investments and affairs; provided that in the case of clauses (b), (c) and (d) of this Section 1.4, such activities do not either individually or in the aggregate: interfere with the proper performance of his duties and responsibilities hereunder; create a conflict of interest; or violate any provision of this Agreement; and provided further that service on the board of any public company under clause (b) of this Section 1.4 must be approved in advance by the Chairman, which approval will not be unreasonably withheld.

       **1.5    Location**. During the Term, Executive's principal office and principal place of employment shall be at the Company's headquarters in the New York, New York metropolitan area or such remote or other location of Executive's choosing; provided that services shall be performed in the Company's offices in the New York, New York metropolitan area when directed by the Chairman.

       **2.    Compensation and Benefits.**

       **2.1    Salary**. Beginning as of the Effective Date, Executive shall be paid a base salary (the "Salary") in respect of his services hereunder during the Term. The Salary shall be at an annual rate of $500,000. The Salary shall be paid in equal periodic installments according to the Company's customary payroll practices, but no less frequently than semi-monthly. During the Term, the Salary may be increased, but shall not be reduced below the applicable amount set forth in the preceding sentence at any time, or for any purpose (including for the purpose of determining benefits under Section 3 below), without Executive's prior written consent.

       **2.2    Performance Bonus.** Executive shall be paid an annual cash performance bonus (an "Annual Bonus") in respect of each calendar year that ends during the Term, to the extent earned based on performance against objective performance criteria. The performance criteria for any particular calendar year shall be established by the Chairman, in consultation with Executive, no later than 90 days after the commencement of each such calendar year. Beginning with calendar year 2022, Executive's Annual Bonus shall equal 100% of his actual Salary earned for that year (the "Target Bonus") if target levels of performance for that year (as established by the Chairman, in consultation with Executive, when the performance criteria for that year are established) are achieved as determined in reasonable good faith by the Chairman, with greater or lesser amounts paid for performance above and below target (such greater and lesser amounts to be determined by a formula established by the Chairman, in consultation with Executive for that year when they established the targets and performance criteria for that year). Executive's Annual Bonus for a calendar year shall be determined by the Chairman in his reasonable good faith, after the end of the calendar year and shall be paid to Executive when annual bonuses for that year are paid to other senior executives of the Company generally, but in no event later than March 15 of the following calendar year, subject to Executive's continued employment with the Company through the payment date except as otherwise provided in Section 3.  For 2022, the earned Annual Bonus (if any) shall be prorated based on the number of days Executive is employed by the Company during such year.

### 2.3    Long-Term Incentive Compensation.

**(a)**    <u>Initial Grants</u>. On the Effective Date, Executive will be issued (a) an option to purchase 0.675% of the Company's common stock, determined on a fully diluted basis as of the grant date and in accordance with the Option Agreement entered into by and between the Company and Executive (the "<u>Option Agreement</u>") attached hereto as <u>Exhibit B</u> and the Genesis Digital Assets Limited 2021 Incentive Award Plan (as amended from time to time, the "<u>Plan</u>"), and (b) restricted share units representing 0.295% of the Company's common stock, determined on a fully diluted basis as of the grant date and in accordance with the Restricted Stock Unit Agreement entered into by and between the Company and Executive (the "<u>RSU Agreement</u>") attached hereto as <u>Exhibit C</u> and the Plan.

**(b)**    <u>Anti-Dilution Grants</u>. If the Company issues equity in connection with a financing with bona fide institutional investors undertaken primarily to raise working capital (as opposed to a Change in Control (as defined in the Plan) or equity issued in connection with vendor financing or bank debt, or strategic transactions, licenses or collaborations) that results in the dilution of Executive's percentage ownership of the Company (treating all outstanding equity awards held by Executive as if they were vested and, as applicable, exercised for this purpose), then the Company shall, within 30 days of the closing of such transaction, issue an additional option to Executive (the "<u>Additional Option</u>") to purchase a number of shares of common stock such that Executive's share of the outstanding equity of the Company following such issuance will constitute 1.075% of the Company's common stock, determined on a fully diluted basis as of the date of issuance of the Additional Option (treating all outstanding equity awards held by Executive as if they were vested and, as applicable, exercised for this purpose).  The Additional Option will have a per share exercise price equal to the then current Fair Market Value (as defined in the Plan) of one share of the Company's common stock, but which shall not give effect to any control premiums or discounts, restrictions on the shares of common stock or that such shares of common stock would represent a minority interest in the Company.

### 2.4    **Employee Benefits.** During the Term, Executive and his eligible dependents and beneficiaries, shall be entitled to participate in all retirement, profit sharing, savings, 401(k), income deferral, life insurance, disability insurance, accidental death and dismemberment protection, travel accident insurance, hospitalization, medical, dental, vision and other employee benefit plans, programs and arrangements that are from time to time made available to other senior executives of the Company, all to the extent Executive is eligible under the terms of such plans, programs and arrangements. Executive's participation in all such plans, programs and arrangements shall be at a level, and on terms and conditions, that are commensurate with his positions and responsibilities at the Company and that are no less favorable to him than to other senior executives of the Company generally. Nothing in this Section 2.4 shall be construed to require the Company to establish or maintain any particular employee benefit plan, program or arrangement.

### 2.5    **Expenses and Perquisites**.

(a)    **Expenses**. The Company shall promptly reimburse Executive for all expenses reasonably incurred by him in connection with the performance of his duties hereunder (including appropriate business entertainment activities, expenses appropriately incurred by Executive in attending conventions, seminars, and other business meetings, and promotional activities), subject to Executive's furnishing the Company documentation substantiating the expenses in accordance with any reasonable policies concerning substantiation previously communicated to him in writing. When traveling on Company business on commercial airlines, Executive shall be entitled to fly business class when available for flights in excess of three hours.

(b)    **Additional Fringe Benefits and Perquisites.** During the Term, Executive shall, in addition to the foregoing, also be entitled to participate in all fringe benefits and perquisites made available to senior executives of the Company, such participation to be at levels, and on terms and conditions, that are commensurate with his positions and responsibilities at the Company and no less favorable to him than those applying to other senior executives of the Company.

**2.6    Vacations and Holidays.** Executive shall be entitled to paid vacation of twenty-five (25) days per calendar year (prorated for partial years of employment) during the Term, which vacation days to be taken in accordance with Company policy. Executive shall also be entitled to paid holidays as and to the extent set forth in the Company's policies as the same may change from time to time for senior executives of the Company.

**2.7    Attorneys' Fees.** The Company shall pay, directly to Executive's attorneys within ten (10) days following Executive's execution of this Agreement and his submission of appropriate supporting documentation, for all reasonable attorneys' fees and expenses up to $20,000 incurred in connection with the review, negotiation, drafting and execution of this Agreement and related agreements and arrangements, including the Option Agreement attached as Exhibit B and the RSU Agreement attached as Exhibit C.

**3.    Termination of Employment.**

**3.1    Termination Due to Death or Disability.**

(a)    In the event that Executive's employment hereunder is terminated during the Term due to his death or "Disability" (as determined pursuant to Section 3.1(b) below), the Term shall expire and he or his estate or beneficiaries (as the case may be) shall be entitled to (i) any unpaid Annual Bonus for a prior year, payable at the time specified in Section 2.2 and (ii) the benefits described in Section 3.4.

(b)    For purposes of this Agreement, Executive shall be deemed to have a "<u>Disability</u>" if, due to illness, injury or a physical or medically recognized mental condition, he is unable to perform his duties under this Agreement with reasonable accommodation for one hundred and twenty (120) consecutive days, or one hundred eighty (180) days during any twelve (12) month period, as determined in accordance with this Section 3.1(b). Whether a Disability exists shall be determined by a medical doctor selected by agreement of the Parties upon the request of either Party by notice to the other. If the Parties cannot agree on the selection of a medical doctor, each of them shall select a medical doctor and the two medical doctors shall select

4

a third medical doctor who shall determine whether a Disability exists. The determination of the medical doctor selected under this Section 3.1(b) shall be binding on both Parties. Executive must submit to no more than three (3) examinations by the medical doctor making the determination of Disability under this Section 3.1(b), and to no more than two (2) examinations by other specialists designated by such medical doctor, and Executive hereby authorizes the disclosure and release to the Company, in confidence, of such determination and all supporting medical records relating thereto. No termination for Disability shall be effective until fifteen (15) days after either Party gives written notice of such termination to the other Party.

> **3.2    Termination for Cause; Voluntary Quit.**

> > **(a)**    For purposes of this Agreement, the term "<u>Cause</u>" shall mean:

> > > **(i)**    Executive's material misconduct in connection with the performance of his duties;

> > > **(ii)**    Executive's commission of any felony or a misdemeanor involving moral turpitude, or any conduct by Anderson that would reasonably be expected to result in material injury or harm to the reputation of the Company;

> > > **(iii)**    Executive's continued material non-performance of his duties to the Company;

> > > **(iv)**    Executive's material breach of this Agreement; or

> > > **(v)**    Executive's material violation of the Company's written employment policies previously provided to him;

so long as, in each case (x) the Board has provided notice to Executive setting forth in reasonable detail the specific conduct of Executive that constitutes Cause within thirty (30) days of the date the Board first becomes aware of its existence, (y) Executive has failed to cure such conduct, if curable, within ten (10) days following the date of receipt of such notice and (z) the Board has terminated Executive's employment within thirty (30) days following such failure to cure.

> > **(b)**    In the event that Executive's employment hereunder is terminated by the Company for Cause in accordance with Section 3.2(b), the Term shall expire and he shall be entitled only to the benefits described in Section 3.4.

> > **(c)**    In the event that Executive's employment hereunder is terminated by Executive on his own initiative, other than by death, for Disability, or in a Good Reason Termination (as defined below), the Term shall expire and he shall be entitled only to the benefits described in Section 3.4.

> **3.3    Termination Without Cause or With Good Reason**.

> > **(a)**    In the event that Executive's employment hereunder terminates during the Term in a Good Reason Termination, or is terminated by the Company (<u>other than</u> (x)

5

for Disability in accordance with Section 3.1, or (y) for Cause in accordance with Section 3.2) the Term shall expire and Executive shall be entitled to:

    **(i)** A payment equal to the sum of (a) the Salary and (b) the Target Bonus, paid in a lump sum on the next regularly scheduled payroll date following the 30th day following the Termination Date; and

    **(ii)** the benefits described in Section 3.4.

    **(b)** For purposes of this Agreement, the term "<u>Good Reason Termination</u>" shall mean a termination by Executive of his employment hereunder following the occurrence of any of the following events without his express written consent:

    **(i)** any reduction in the Salary or the Target Bonus;

    **(ii)** any diminution in Executive's title or a material diminution in Executive's authorities, duties or responsibilities;

    **(iii)** any requirement that Executive report to any person other than the Chairman;

    **(iv)** any requirement that Executive's place of employment be other than a location (remote or otherwise) of his choosing except as otherwise provided in Section 1.5;

    **(v)** the Company's material breach of this Agreement or any other material written agreement between the Company and Executive; or

    **(vi)** any failure of the Company to timely obtain the assumption in writing of its obligations under this Agreement by any successor to all or substantially all of its business or assets upon any reconstruction, amalgamation, combination, merger, consolidation, sale, liquidation, dissolution or similar transaction.

No Good Reason Termination shall exist unless (i) Executive notifies the Company in writing of the grounds for the Good Reason Termination within 30 days of becoming aware of them, (ii) the Company fails to cure such grounds within 30 days following the receipt of such notice, and (iii) Executive actually resigns within 30 days following the end of such cure period.

    **(c)** Prior to receiving the payment described in Sections 3.3(a)(i), (ii), and (iii), Executive must first execute and deliver to the Company, within thirty (30) days following the Termination Date, a release of claims in substantially the form attached to this Agreement as <u>Exhibit A</u> (the "<u>Release</u>"), which shall not have been revoked by Executive by the close of business on the seventh day following its execution (the "<u>Release Condition</u>"). Notwithstanding the foregoing, the Release will become null and void if not countersigned by the Company, and returned to Executive, within fifteen (15) days after it is received by the Company, although the Release Condition will nevertheless be deemed to have been satisfied by Executive.

6

**3.4** **Benefits On Any Termination.** On any termination of Executive's employment hereunder, he shall be entitled to:

(a) Salary through the Termination Date;

(b) To the extent provided by Company policy, a lump-sum payment in respect of accrued but unused vacation days at his per-business-day Salary in effect as of the date his employment terminates;

(c) a lump-sum payment in respect of any unreimbursed expenses under Sections 2.5(a) and (b), in each case, accrued or incurred through the Termination Date; and

(d) other or additional benefits in accordance with the terms of applicable plans, programs, corporate governance documents, agreements and arrangements of the Company and its affiliates (collectively, "Company Arrangements").

Amounts due under clauses (a), (b), (c) and (d) of this Section 3.4 shall be paid on the next regularly scheduled payroll date following the Termination Date and include payment of any amounts that would otherwise be due prior thereto, and the benefits to be provided under clause (e) of this Section 3.4 shall be provided in accordance with the terms of the applicable Company Arrangement.

**3.5** **Notice of Termination**. Any termination of this Agreement and Executive's employment hereunder, other than by reason of Executive's death, shall be communicated by the Party terminating this Agreement to the other Party by written Notice of Termination that is delivered in accordance with Section 8.2. For purposes of this Agreement, a "Notice of Termination" means a written notice that (a) indicates the specific provision in this Agreement being relied upon for such termination, (b) to the extent applicable, sets forth in reasonable detail the facts and circumstances claimed to provide a basis for termination of Executive's employment under the provision so indicated, and (c) specifies the Termination Date. The failure by the Company or Executive to set forth in the Notice of Termination any fact or circumstance that contributes to a showing of Cause or the basis of a Good Reason Termination, respectively, shall not waive any right of the Company or Executive hereunder or preclude the Company or Executive from asserting such fact or circumstance in enforcing the Company's or Executive's rights hereunder.

**3.6** **Termination Date**. For purposes of this Agreement, "Termination Date" means:

(a) if Executive's employment is terminated by the Company for Cause or by Executive in a Good Reason Termination, the date specified in the Notice of Termination, subject to the timing requirements set forth in the definitions of Cause and Good Reason Termination, as applicable;

(b) if Executive's employment is terminated by the Company without Cause or due to Disability, the date specified in the Notice of Termination;

7

**(c)**     if Executive's employment is terminated by Executive not in a Good Reason Termination, the thirtieth (30th) day following the date of such Notice of Termination; and

**(d)**     if Executive's employment is terminated by reason of death, the date of Executive's death.

**3.7     Notice Period**. During the period between the date of any Notice of Termination and the Termination Date (such period, the "Notice Period"), the Board, in its sole discretion at any time during any such Notice Period, may elect to (a) continue Executive's active and full-time employment, (b) continue Executive's employment on a part-time or as-needed basis, (c) continue Executive's employment on an inactive basis (i.e., place Executive on "garden leave"), or (d) terminate Executive's employment; provided, however, in each case, that Executive shall continue to be paid his Salary and provided with all benefits under all Company Arrangements throughout the entire applicable Notice Period.

**3.8     No Duplicative Severance.** Notwithstanding anything elsewhere to the contrary, to the extent that the employment of Executive with the Company is terminated during the Term or upon expiration of the Term, Executive shall not be entitled to, and waives any rights under or with respect to, severance or other benefits under any existing or future severance plans, policies, programs or guidelines established or published by the Company.

**3.9     No Mitigation/No Offset.** Executive shall be under no obligation to seek other employment or otherwise mitigate the obligations of the Company under this Agreement, and there shall be no offset against amounts or benefits due Executive under this Agreement or otherwise on account of any claim (other than any preexisting debts then due in accordance with their terms) the Company or its affiliates may have against him or any remuneration or other benefit earned or received by Executive after such termination.

**4.     Confidential Information.**

**4.1     Acknowledgements by Executive.** Executive acknowledges that (a) while employed by the Company and as a part of Executive's employment, Executive will be afforded access to Confidential Information (as defined below); (b) public disclosure of such Confidential Information could have an adverse effect on the Company and its business; (c) because Executive possesses substantial technical expertise and skill with respect to the Company's business, the Company desires to obtain exclusive ownership of each invention by Executive, and the Company will be at a substantial competitive disadvantage if it fails to acquire exclusive ownership of each invention by Executive; and (d) the provisions of this Section 4 are reasonable and necessary to prevent the improper use or disclosure of Confidential Information and to provide the Company with exclusive ownership of all inventions and works made or created by Executive.

**4.2     Confidential Information**. Executive acknowledges that while employed by the Company, Executive will have access to and may obtain, develop, or learn of "Confidential Information" (as defined below in this Section 4.2) under and pursuant to a relationship of trust and confidence. Executive shall hold such Confidential Information in strictest confidence and never at any time, during or after the termination of Executive's employment, directly or indirectly use for Executive's own benefit or otherwise (except in connection with the performance of duties

8

for the Company or any of its affiliates) any Confidential Information, or divulge, reveal, disclose or communicate any Confidential Information to any unauthorized natural person, partnership, limited liability company, association, corporation, company, trust, business trust, governmental authority or other entity (each, a "<u>Person</u>") in any manner whatsoever except (v) to the Company and its affiliates, or to any authorized agent or representative of any of them, (w) in connection with performing services for the Company and its affiliates, (x) when required to do so by law or by a court, governmental agency, legislative body, arbitrator or other Person with apparent jurisdiction to order him to divulge, disclose or make accessible such information, (y) in the course of any proceeding under Sections 5.8 or 8.5 or (z) in confidence to an attorney or other professional advisor for the purpose of securing professional advice. In the event that Executive intends to disclose any Confidential Information pursuant to clause (x) or (y) of the immediately preceding sentence, he shall (i) first promptly give the Company notice that such disclosure is or may be made and (ii) cooperate with the Company, at its reasonable request and subject to such reasonable conditions as he may reasonably establish, in seeking to protect the confidentiality of the Confidential Information.

As used in this Agreement, the term "<u>Confidential Information</u>" shall include, but shall not be limited to, any of the following information relating to the Company learned by Executive while employed by the Company or as a result of Executive's employment with the Company:

      **(a)**     information regarding the Company's business proposals, manner of the Company's operations, and methods of selling or pricing any products or services;

      **(b)**     the identity of persons or entities actually conducting or considering conducting business with the Company, and any information in any form relating to such persons or entities and their relationship or dealings with the Company or its affiliates;

      **(c)**     any trade secret or confidential information of or concerning any business operation or business relationship;

      **(d)**     computer databases, software programs and information relating to the nature of the hardware or software and how said hardware or software are used in combination or alone;

      **(e)**     information concerning Company personnel, confidential financial information, customer or customer prospect information, information concerning subscribers, subscriber and customer lists and data, methods and formulas for estimating costs and setting prices, engineering design standards, testing procedures, research results (such as marketing surveys, programming trials or product trials), cost data (such as billing, equipment and programming cost projection models), compensation information and models, business or marketing plans or strategies, deal or business terms, budgets, vendor names, programming operations, product names, information on proposed acquisitions or dispositions, actual performance compared to budgeted performance, long-range plans, internal financial information (including but not limited to financial and operating results for certain offices, divisions, departments, and key market areas that are not disclosed to the public in such form), results of internal analyses, computer programs and programming information, techniques and designs, and trade secrets;

(f)     information concerning the Company's employees, officers, directors and shareholders; and

(g)     any other trade secret or information of a confidential or proprietary nature.

Executive shall not make or use any notes or memoranda relating to any Confidential Information except for the benefit of the Company, and shall, at the Company's request, return or destroy each original and every copy of any and all notes, memoranda, correspondence, diagrams or other records, in written or other form, that Executive may then or later have within his possession or control that contain any Confidential Information.

Notwithstanding the foregoing, Confidential Information shall not include information which has come within the public domain through no fault of or action by Executive or which has become rightfully available to Executive on a non-confidential basis from any third party, the disclosure of which to Executive does not violate any contractual or legal obligation such third party has to the Company or its affiliates with respect to such Confidential Information. None of the foregoing obligations and restrictions applies to any part of the Confidential Information that became generally available to the public other than as a result of a disclosure by Executive or by any other Person bound by a confidentiality obligation to the Company in respect of such Confidential Information.

Executive shall not remove from the Company's premises (except to the extent such removal is for purposes of performing his duties, or except as otherwise specifically authorized by the Company) any Company document, record, notebook, plan, model, component, device, or computer software or code, whether embodied in a disk or in any other form (collectively, the "Proprietary Items"). Executive recognizes that, as between the Company and Executive, all of the Proprietary Items, whether or not developed by Executive, are the exclusive property of the Company.

On or promptly following the Termination Date, Executive shall promptly return to the Company (or destroy) all documents, and other data repositories, containing Confidential Information that are then in his possession or control; provided that nothing in this Agreement or elsewhere shall prevent Executive from retaining and utilizing copies of benefits plans and programs in which he retains an interest or other documents relating to his personal entitlements and obligations, his desk calendars, his rolodex, and the like, or such other records and documents as may reasonably be approved by the Company.

**4.3     Proprietary Developments**. Executive shall, promptly upon reasonable request, disclose to Company all inventions (whether patentable or not), trade secrets, trademark concepts, and advertising and marketing concepts (collectively, hereinafter referred to as "Developments"), that he makes, alone or with others, during his employment with Company relating to its business. "Developments" do not include anything (a) possessed or created by Executive before Executive commenced employment with the Company or (b) for which no equipment, supplies, facility, trade secret information or Confidential Information of the Company was used and which were developed entirely on Executive's time, and (i) which do not relate (A) to the business of the Company or (B) to the actual or demonstrably anticipated research or

10

development of the Company, and (ii) which do not result from any work performed by Executive for the Company. The Company will exclusively own all Developments. Executive hereby assigns to the Company all rights that he has or acquires in any Developments, and he shall execute any documents and take any actions as reasonably requested by the Company necessary to effect that assignment. Executive need not incur any cost related to that assignment or the creation of any related intellectual property rights. The Parties agree that Developments are Confidential Information.

**4.4    Cooperation.** Both while employed by the Company and thereafter, Executive shall fully cooperate with the Company's reasonable requests in the protection and enforcement of any intellectual property rights that relate to services performed by Executive for Company, whether under the terms of this Agreement or otherwise. This shall include, upon reasonable request by the Company, executing, acknowledging, and delivering to Company all documents or papers that may be necessary to enable Company to publish or protect such intellectual property rights. The Company shall bear all costs in connection with Executive's compliance with the terms of this Section 4.4.

**4.5    Defend Trade Secrets Act.** 18 U.S.C. § 1833(b) provides: "An individual shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that-(A) is made-(i) in confidence to a Federal, State, or local government official, either directly or indirectly, or to an attorney; and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (B) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal." Nothing in this Agreement is intended to conflict with 18 U.S.C. § 1833(b) or create liability for disclosures of trade secrets that are expressly allowed by 18 U.S.C. § 1833(b). Accordingly, the Parties to this Agreement have the right to disclose in confidence trade secrets to federal, state, and local government officials, or to an attorney, for the sole purpose of reporting or investigating a suspected violation of law. The Parties also have the right to disclose trade secrets in a document filed in a lawsuit or other proceeding, but only if the filing is made under seal and protected from public disclosure.

**5.    Non-Competition and Non-Solicitation.**

**5.1    Acknowledgments by Executive.** Executive acknowledges and agrees that: (a) the services to be performed by Executive under this Agreement are of a special, unique, unusual, extraordinary, and intellectual character; (b) the Company competes with other businesses that are or could be located in any part of the world; and (c) the provisions of this Section 5 are reasonable and necessary to protect the Company's business and lawful protectable interests, and do not impair Executive's ability to earn a living. For purposes of Section 4 and this Section 5, the term "Company" includes the Company and its direct and indirect subsidiaries.

**5.2    Covenants of Executive.** For purposes of this Section 5.2, the term "Restricted Period" shall mean the period commencing on the Effective Date and terminating on the first anniversary of the Termination Date. In consideration of the compensation and benefits to be paid or provided to Executive by the Company, Executive covenants and agrees that during the Restricted Period, Executive will not, directly or indirectly, for Executive's own benefit or for the

benefit of any other person or entity other than the Company, other than in connection with his services for the Company and its affiliates:

        **(a)**     perform services for, or otherwise have involvement with (whether as an officer, director, partner, consultant, security holder, owner, employee, independent contractor or otherwise), any Person that competes materially (whether directly or indirectly) with the Company in the "Business" (as such term is defined below in this Section 5.2) anywhere in the world; provided that Executive may in any event own up to a 5% passive ownership interest in any public or private entity and serve on the boards of the Permitted Entities; or

        **(b)**     personally solicit, or personally aid in the solicitation of, (whether directly or indirectly) any individual who is, at the time of such solicitation, employed as an employee of the Company (or who was so employed at any time within a period of twelve (12) months immediately prior to the date on which Executive solicited or aided in the solicitation of such individual) to cease such employment; or

        **(c)**     personally solicit, or personally aid in the solicitation of, (whether directly or indirectly) any Person that Executive knows was (or has been informed by the Company that such person was) a customer or a prospective customer (a prospective customer being one to whom the Company had made a business proposal within twelve (12) months prior to the time Executive's employment terminated) of the Company at any time while Executive is employed by the Company for the purpose of (a) selling services or products to such Person in competition with the Company (and its affiliates) in the Business or (b) inducing such Person to cancel, transfer or cease doing Business in whole or in part with the Company or any of its affiliates.

For purposes of this Agreement, the term "Business" means the business of mining cryptocurrency and any other business engaged in by the Company during the Term or that, as of the Termination Date, the Company has taken active steps to engage that Executive was aware of. If Executive violates any covenant contained in this Section 5.2, then the term of such covenant shall be extended by the period of time Executive was in violation of the same.

        **5.3**     **Provisions Pertaining to the Covenants.** Executive recognizes that the existing business of the Company extends throughout the world and may extend hereafter to other countries and territories and agrees that the scope of Section 5.2 shall extend the entire world. It is agreed that Executive's services hereunder are special, unique, unusual and extraordinary giving them peculiar value, the loss of which cannot be reasonably or adequately compensated for by damages, and in the event of Executive's breach of this Section 5.3, the Company shall be entitled to obtain equitable relief by way of temporary or permanent injunction, temporary restraining order or similar relief.

        **5.4**     **Non-Disparagement.** Executive agrees not to intentionally make, or intentionally cause any other Person to make, any public statement that is intended to criticize or disparage the Company, its affiliates, or any of their respective senior executive officers or directors. The Company agrees to instruct its senior executive officers and directors not to, intentionally make, or intentionally cause any other Person to make, any public statement that is intended to criticize or disparage Executive. This Section 5.4 shall not be construed to prohibit any

Person from responding publicly to incorrect public statements or from making truthful statements when required by law, subpoena, court order, or the like.

      **5.5**    **Severability; Waiver**. If any provision of Section 4 or 5 of this Agreement is deemed to be unenforceable by a court or arbitrator (whether because of the subject matter of the provision, the duration of a restriction, the geographic or other scope of a restriction or otherwise), that provision shall not be rendered void but the Parties instead agree that the court or arbitrator shall amend and alter such provision to such lesser degree, time, scope, extent and/or territory as will grant the Company the maximum restriction on Executive's activities permitted by applicable law in such circumstances. The Company's failure to exercise its rights to enforce the provisions of this Agreement shall not be affected by the existence or non-existence of any other similar agreement for anyone else employed by the Company or by the Company's failure to exercise any of its rights under any such agreement.

      **5.6**    **Notices**. In order to preserve the Company's rights under Sections 4 and 5, the Company and Executive are each authorized to advise any potential or future employer, any third party with whom Executive may become employed or enter into any business or contractual relationship with, and any third party whom Executive may contact for any such purpose, of the existence of this Agreement and the terms of Sections 4 and 5, and the Company shall not be liable if it does so.

      **5.7**    **Injunctive Relief and Additional Remedies**. The Parties acknowledge that any injury that would be suffered as a result of a material breach of the provisions of Sections 4 and 5 of this Agreement could be irreparable and that an award of monetary damages for such a material breach could be an inadequate remedy. Therefore, in the event of any actual or threatened breach by a Party of any of the provisions of Section 4 or 5 above, the other Party shall be entitled to seek, through arbitration in accordance with Section 8.5 or from any court with jurisdiction over the matter and the defendant(s), temporary, preliminary and permanent equitable/injunctive relief restraining the defendant(s) from violating such provision and to seek, in addition, but solely through arbitration in accordance with Section 8.5, money damages, together with any and all other remedies available under applicable law.

      **5.8**    **Whistleblower Protections**. Notwithstanding anything to the contrary contained herein, no provision of this Agreement shall be interpreted so as to impede Executive (or any other individual) from reporting possible violations of federal law or regulation to any governmental agency or entity, including but not limited to the Department of Justice, the Securities and Exchange Commission, the Congress, and any agency Inspector General, or making other disclosures under the whistleblower provisions of federal law or regulation. Executive does not need the prior authorization of the Company to make any such reports or disclosures and Executive shall not be required to notify the Company that such reports or disclosures have been made.

      **6.**    **Indemnification.**

      **6.1**    If Executive is made a party, is threatened to be made a party, or reasonably anticipates being made a party, to any actual, threatened or reasonably anticipated action, suit or proceeding, whether civil, criminal, administrative, investigative, appellate, formal, informal, or

13

other (a "<u>Proceeding</u>") by reason of the fact that he is or was a director, officer, member, employee, agent, manager, trustee, consultant or representative of the Company or any of its subsidiaries or affiliates, or is or was serving at the request of the Company or any of its subsidiaries or affiliates or in connection with his service hereunder, as a director, officer, member, employee, agent, manager, trustee, fiduciary, consultant or representative of another Person, or if any claim, demand, request, investigation, dispute, controversy, threat, discovery request, or request for testimony or information (a "<u>Claim</u>") is made, is threatened to be made, or is reasonably anticipated to be made, that arises out of or relates to Executive's service in any of the foregoing capacities or his agreeing to become employed hereunder, then Executive shall promptly be indemnified and held harmless to the fullest extent permitted or authorized by the Certificate of Incorporation or Bylaws of the Company, or if greater, by applicable law, against any and all costs, expenses, liabilities and losses (including, without limitation, attorneys' and other professional fees and charges, judgments, interest, expenses of investigation, penalties, fines, and amounts paid or to be paid in settlement) incurred or suffered by Executive in connection therewith or in connection with seeking to enforce his rights under this Section 6.1, and such indemnification shall continue as to Executive even if he has ceased to be an officer, member, employee, agent, manager, trustee, fiduciary, consultant or representative of the Company or other applicable entity and shall inure to the benefit of his heirs, executors and administrators.

        **6.2**     To the extent permitted by applicable law, Executive shall be entitled to prompt advancement of any and all costs and expenses (including attorneys' and other professional fees and charges) incurred by him in connection with any such Proceeding or Claim, or in connection with seeking to enforce his rights under this Section 6.1, any such advancement to be made within fifteen (15) days after Executive gives written notice, supported by reasonable documentation, requesting such advancement. Such notice shall include an undertaking by Executive to repay the amount advanced if he is ultimately determined by a non-reviewable decision of a court or arbitrator, as applicable, not to be entitled to indemnification against such costs and expenses. Nothing in this Agreement shall operate to limit or extinguish any right to indemnification, advancement of expenses, or contribution that Executive would otherwise have (including by agreement or under applicable law).

        **6.3**     A directors' and officers' liability insurance policy (or policies) shall be kept in place, during the Term and thereafter until the sixth anniversary of the Termination Date, providing coverage to Executive that is no less favorable to him in any respect (including with respect to scope, exclusions, amounts, and deductibles) than the coverage then being provided to any other present or former senior executive or director of the Company.

      **7.**     **Representations And Further Agreements.**

        **7.1**     Executive represents, warrants and covenants to the Company that:

        **(a)**     on or prior to the date hereof, Executive has informed the Company of any judgment, order, agreement or arrangement of which he is currently aware and which may affect his right to enter into this Agreement and to fully perform his duties hereunder;

        **(b)**     Executive is knowledgeable and sophisticated as to business matters, and that prior to assenting to the terms of this Agreement, or giving the representations

14

and warranties herein, he has been given a reasonable time to review it and has consulted with counsel of his choice;

   **(c)** in entering into this Agreement, Executive is not knowingly breaching or violating any provision of any law or regulation; and

   **(d)** Executive has not knowingly provided to the Company, nor been requested by the Company to provide, any confidential or non-public document or information of a former employer that constitutes or contains any protected trade secret, and shall not knowingly use any protected trade secrets of any former employer in the course of his employment hereunder.

   **7.2** The Company represents and warrants that (a) it is fully authorized by action of the Board (and of any other Person or body whose action is required) to enter into this Agreement and to perform its obligations under it, (b) the execution, delivery and performance of this Agreement by it does not violate any applicable law, regulation, order, judgment or decree or any agreement, arrangement, plan or corporate governance document to which it is a party or by which it is bound and (c) upon the execution and delivery of this Agreement by the Parties, this Agreement shall be a valid and binding obligation of the Company, enforceable against it in accordance with its terms, except to the extent that enforceability may be limited by applicable bankruptcy, insolvency or similar laws affecting the enforcement of creditors' rights generally.

   **7.3** During the Restricted Period, Executive shall, upon reasonable request and subject to such reasonable condition as Executive may reasonably establish: (a) cooperate with the Company in connection with any matter that arose during Executive's employment and that relates to the business or operations of the Company or any of its subsidiary corporations, or of which Executive may have any knowledge or involvement; and (b) consult with and provide information to the Company and its representatives concerning such matters. Such cooperation shall be rendered at reasonable times and places and in a manner that does not unreasonably interfere with any other employment in which Executive may then be engaged. Nothing in this Agreement shall be construed or interpreted as requiring Executive to provide any testimony or affidavit that is not truthful.

  **8.**  **General Provisions.**

   **8.1** **Binding Effect; Delegation of Duties Prohibited.** No rights or obligations of the Company under this Agreement may be assigned or transferred by the Company except that such rights and obligations may be assigned or transferred pursuant to a merger or consolidation, or the sale or liquidation of all or substantially all of the business and assets of the Company, provided that the assignee or transferee is the successor to all or substantially all of the business and assets of the Company and such assignee or transferee assumes the liabilities, obligations and duties of the Company, as contained in this Agreement, either contractually or as a matter of law. In the event of any merger, consolidation, other combination, sale of business and assets, or liquidation as described in the preceding sentence, the Company shall use its best reasonable efforts to cause such assignee or transferee to promptly and expressly assume the liabilities, obligations and duties of the Company hereunder. The duties and covenants of Executive under this Agreement, being personal, may not be assigned or delegated.

**8.2     Notices.** Any notice, consent, demand, request, or other communication given to a Person in connection with this Agreement shall be in writing and shall be deemed to have been duly given to such Person (x) when delivered personally to such Person or (y), provided that a written acknowledgment of receipt is obtained, five days after being sent by prepaid certified or registered mail, or two days after being sent by a nationally recognized overnight courier, to the address (if any) specified below for such Person (or to such other address as such Person shall have specified by ten days' advance notice given in accordance with this Section 8.2) or (z), in the case of the Company only, on the first business day after it is sent by facsimile to the facsimile number set forth below (or to such other facsimile number as shall have specified by ten days' advance notice given in accordance with this Section 8.2), with a confirmatory copy sent by certified or registered mail or by overnight courier in accordance with this Section 8.2.

If to the Company:

_____
_____
_____
_____

If to Executive:

The address of his principal residence as it appears in the Company's records, with a copy to him (during the Term) at his principal office

If to a successor or beneficiary of Executive:

The address most recently specified by Executive or his successor or beneficiary.

**8.3     Miscellaneous.**

**(a)** This Agreement contains the entire agreement between the Parties with respect to its specific subject matter and supersedes all prior oral and written communications, agreements and understandings between the Parties concerning the subject matter hereof.

**(b)** No provision in this Agreement may be amended unless such amendment is set forth in a writing that expressly refers to the provision of this Agreement that is being amended and that is signed by Executive and by an authorized (or apparently authorized) officer of the Company. No waiver by any Person of any breach of any condition or provision contained in this Agreement shall be deemed a waiver of any similar or dissimilar condition or provision at the same or any prior or subsequent time. To be effective, any waiver must be set forth in a writing signed by the waiving Person and must specifically refer to the condition(s) or provision(s) of this Agreement being waived.

**(c)** The headings of the Sections and sub-sections contained in this Agreement are for convenience only and shall not be deemed to control or affect the meaning or construction of any provision of this Agreement. When used in this Agreement, the word "including" shall not be construed as limiting any preceding words or terms.

16

(d)     Except as otherwise set forth in this Agreement, the respective rights and obligations of the Parties hereunder shall survive any termination of Executive's employment.

(e)     To the extent that any provision or portion of this Agreement shall be determined to be invalid or unenforceable for any reason, in whole or in part, the remaining provisions of this Agreement shall remain in full force and effect so as to achieve the intentions of the Parties, as set forth in this Agreement, to the maximum extent possible.

(f)     This Agreement is deemed to be accepted and entered into in the State of New York and shall be governed by and construed and interpreted according to the internal laws of the State of New York without reference to conflicts of law principles. With respect to orders in aid or enforcement of arbitration awards and injunctive relief, venue and jurisdiction is proper in the state and federal courts located in Manhattan, New York City, and Executive and the Company waive all objections to jurisdiction in any such forum and any defense or claim that either such forum is not a proper forum, is not the most convenient forum, or is an inconvenient forum.

**8.4     Beneficiaries/References.** Executive shall be entitled, to the extent permitted under applicable law and applicable Company Arrangements, to select and change a beneficiary or beneficiaries to receive any compensation or benefit hereunder following Executive's death by giving written notice thereof. In the event of Executive's death or a judicial determination of his incompetence, references in this Agreement to Executive shall be deemed, where appropriate, to refer to his beneficiary, estate or other legal representative.

**8.5     Arbitration.** Any claim arising out of or relating to this Agreement, any other agreement between the Parties, Executive's employment with the Company, or any termination thereof (each, a "Covered Claim") shall (except to the extent otherwise provided in Section 5.7 with respect to certain requests for injunctive relief) be resolved by binding confidential arbitration, to be held in New York, New York, before a panel or three arbitrators in accordance with the National Rules for Resolution of Employment Disputes of the American Arbitration Association and this Section 8.5. Judgment upon the award rendered by the arbitrators may be entered in any court having jurisdiction thereof. In the event of any such proceeding, the losing party (as determined by the arbitrators) shall reimburse the prevailing party upon entry of a final award resolving the subject of the dispute for all reasonable legal expenses incurred.

**8.6     Withholding Taxes.** The Company may withhold from any amounts payable under this Agreement (or otherwise) any Federal, state, local or other taxes that it is required to withhold pursuant to any applicable law or regulation.

**8.7     Counterparts; Facsimile Signatures**. This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original copy of this Agreement and all of which, when taken together, shall be deemed to constitute one and the same agreement. This Agreement may be executed by facsimile signatures.

*[signature page follows]*

17

**IN WITNESS WHEREOF**, the Parties have executed and delivered this Agreement as of March __, 2022.

**Genesis Digital Assets Limited**


By: _____
Name:
Title:


**Executive**


_____
Christian Anderson

**ANNEX A**

**PERMITTED ENTITIES**

- New Residential Investment Corp.

- Mr. Cooper Group Inc.

- Bumble Inc.

- PennyMac Financial Services, Inc.

- Doma Holdings Inc.

**EXHIBIT A**

**RELEASE OF CLAIMS**

This Release of Claims (this "Release") is made as of the "Termination Date" (as defined in that certain Employment Agreement, effective as of March [ ], 2022, to which Executive and the Company are parties, as such agreement is from time to time amended in accordance with its terms (the "Employment Agreement")), by and between Genesis Digital Assets Limited (together with its successors and assigns, the "Company"), and Christian Anderson, an individual ("Executive").

1.      **Release of Claims by Executive**.

        **(a)**      Pursuant to Section 3.3(c) of the Employment Agreement, Executive, with the intention of binding himself and his heirs, executors, administrators and assigns (collectively, and together with Executive, the "Executive Releasors"), hereby releases, remises, acquits and forever discharges the Company and each of its subsidiaries and affiliates (the "Company Affiliated Group"), and their past and present directors, employees, agents, attorneys, accountants, representatives, plan fiduciaries, and the successors, predecessors and assigns of each of the foregoing (collectively, and together with the members of the Company Affiliated Group, the "Company Released Parties"), of and from (and agrees to promptly and fully indemnify each Company Released Party against) any and all claims, actions, causes of action, complaints, charges, demands, rights, damages, debts, sums of money, accounts, financial obligations, suits, expenses, attorneys' fees and liabilities of whatever kind or nature in law, equity or otherwise, whether accrued, absolute, contingent, unliquidated or otherwise and whether now known or unknown, suspected or unsuspected, that arise out of, or relate in any way to, Executive's employment with the Company or the termination thereof (collectively, "Executive Released Claims") and that Executive, individually or as a member of a class, now has, owns or holds, or has at any time heretofore had, owned or held, against any Company Released Party in any capacity, including any and all Executive Released Claims (i) arising out of or in any way connected with Executive's service to any member of the Company Affiliated Group (or the predecessors thereof) in any capacity (including as an employee, officer or director), or the termination of such service in any such capacity, (ii) for severance or vacation benefits, unpaid wages, salary or incentive payments, (iii) for breach of contract, wrongful discharge, impairment of economic opportunity, defamation, intentional infliction of emotional harm or other tort, (iv) for any violation of applicable state and local labor and employment laws (including all laws concerning unlawful and unfair labor and employment practices) (v) for employment discrimination under any applicable federal, state or local statute, provision, order or regulation, and including, without limitation, any claim under Title VII of the Civil Rights Act of 1964 ("Title VII"), the Age Discrimination in Employment Act ("ADEA"), (vi) for violation of the New York Labor Law, the New York State Human Rights Law and the New York City Administrative Code; the New York City Earned Sick Time Act and any similar or analogous state statute, excepting only that no claim in respect of any of the following rights shall constitute an Executive Released Claim:

                (1)      any right arising under, or preserved by, this Release or 3, 4, 5, 6, 7.3 or 8 of the Employment Agreement;

(2)      any rights as a stockholder of the Company;

(3)      any vested rights (or rights that may become vested pursuant to the terms therein) under any equity or equity-based plan or agreement between the Company or its affiliates and Executive;

(4)      any right to indemnification under (i) applicable corporate law, (ii) the Employment Agreement, (iii) the by-laws or certificate of incorporation of any Company Released Party, (iv) any other agreement between Executive and a Company Released Party or (v) as an insured under any director's and officer's liability insurance policy now or previously in force;

(5)      any claim for benefits under any health, disability, retirement, life insurance or similar employee benefit plan of the Company Affiliated Group;

(6)      any rights to unemployment, state disability and/or paid family leave insurance benefits pursuant to the terms of applicable law;

(7)      any violation of any federal, state or local statutory and/or public policy right or entitlement that, by applicable law, may not be waived; or

(8)      any claim that is based on any act or omission that occurs after the date Executive executes and delivers this Release.

**(b)**      No Executive Releasor shall file or cause to be filed any action, suit, claim, charge or proceeding with any governmental agency, court or tribunal relating to any Executive Released Claim within the scope of this Section 1.

**(c)**      In the event any action, suit, claim, charge or proceeding within the scope of this Section 1 is brought by any government agency, putative class representative or other third party to vindicate any alleged rights of Executive, (i) Executive shall, except to the extent required or compelled by law, legal process or subpoena, refrain from participating, testifying or producing documents therein, and (ii) all damages, inclusive of attorneys' fees, if any, required to be paid to Executive by the Company as a consequence of such action, suit, claim, charge or proceeding shall be repaid to the Company by Executive within ten (10) days of his receipt thereof.

**(d)**      Certain amounts and other benefits set forth in Section 3.3 of the Employment Agreement, to which Executive would not otherwise be entitled, are being paid to Executive in return for this Release and Executive's agreements and covenants contained in the Employment Agreement. Executive acknowledges and agrees that the release of claims set forth in this Section 1 is not to be construed in any way as an admission of any liability whatsoever by any Company Released Party, any such liability being expressly denied.

**(e)**      The release of claims set forth in this Section 1 applies to any relief in respect of any Executive Released Claim of any kind, no matter how called, including wages, back pay, front pay, compensatory damages, liquidated damages, punitive damages, damages for pain or suffering, costs, and attorneys' fees and expenses. Executive specifically acknowledges that his acceptance of the terms of the release of claims set forth in this Section 1 is, among other

things, a specific waiver of his rights, claims and causes of action under Title VII, ADEA and any state or local law or regulation in respect of discrimination of any kind; provided, however, that nothing herein shall be deemed, nor does anything contained herein purport, to be a waiver of any right or claim or cause of action which by law Executive is not permitted to waive.

     **2.**    **Voluntary Execution of Agreement**.

BY HIS SIGNATURE BELOW, EXECUTIVE ACKNOWLEDGES THAT:

     **(a)**    HE HAS RECEIVED A COPY OF THIS RELEASE AND WAS OFFERED A PERIOD OF TWENTY-ONE (21) DAYS TO REVIEW AND CONSIDER IT;

     **(b)**    IF HE SIGNS THIS RELEASE PRIOR TO THE EXPIRATION OF TWENTY-ONE (21) DAYS, HE KNOWINGLY AND VOLUNTARILY WAIVES AND GIVES UP THIS RIGHT OF REVIEW;

     **(c)**    HE HAS THE RIGHT TO REVOKE THIS RELEASE FOR A PERIOD OF SEVEN DAYS AFTER HE SIGNS IT BY MAILING OR DELIVERING A WRITTEN NOTICE OF REVOCATION TO THE COMPANY NO LATER THAN THE CLOSE OF BUSINESS ON THE SEVENTH DAY AFTER THE DAY ON WHICH HE SIGNED THIS RELEASE;

     **(d)**    THIS RELEASE SHALL NOT BECOME EFFECTIVE OR ENFORCEABLE UNTIL THE FOREGOING SEVEN-DAY REVOCATION PERIOD HAS EXPIRED WITHOUT THE RELEASE HAVING BEEN REVOKED;

     **(e)**    THIS RELEASE WILL, EXCEPT AS OTHERWISE PROVIDED IN 3.3(c) OF THE EMPLOYMENT AGREEMENT, BE FINAL AND BINDING AFTER THE EXPIRATION OF THE FOREGOING REVOCATION PERIOD REFERRED TO IN SECTION 2(c), AND FOLLOWING SUCH REVOCATION PERIOD EXECUTIVE AGREES NOT TO CHALLENGE ITS ENFORCEABILITY;

     **(f)**    HE IS AWARE OF HIS RIGHT TO CONSULT AN ATTORNEY, HAS BEEN ADVISED IN WRITING TO CONSULT WITH AN ATTORNEY, AND HAS HAD THE OPPORTUNITY TO CONSULT WITH AN ATTORNEY, IF DESIRED, PRIOR TO SIGNING THIS RELEASE;

     **(g)**    NO PROMISE OR INDUCEMENT FOR THIS RELEASE HAS BEEN MADE EXCEPT AS SET FORTH IN THE EMPLOYMENT AGREEMENT AND THIS RELEASE;

     **(h)**    HE HAS CAREFULLY READ THIS RELEASE, ACKNOWLEDGES THAT HE HAS NOT RELIED ON ANY REPRESENTATION OR STATEMENT, WRITTEN OR ORAL, NOT SET FORTH IN THIS DOCUMENT OR THE EMPLOYMENT AGREEMENT, AND WARRANTS AND REPRESENTS THAT HE IS SIGNING THIS RELEASE KNOWINGLY AND VOLUNTARILY.

**3.**     <u>Automatic Revocation</u>. This Release Agreement shall become null and void if not countersigned by an authorized officer of the Company, and returned to Executive, within fifteen (15) days after it is signed by Executive and delivered to the Company in accordance with the notice provisions in the Employment Agreement.

**4.**     <u>Miscellaneous</u>.

The provisions of Sections 7.1(b), 7.1(c), 7.2, 8.1, 8.2, 8.3(b), 8.3(d), 8.3(e), 8.3(f), 8.4 (second sentence only), 8.5 and 8.7 of the Employment Agreement (relating, respectively, to representations, successors, notices, amendments/waivers, headings, severability, choice of law, references, arbitration and counterparts/faxed signatures), shall apply to this Release as if set fully forth in full herein, with references in such Sections to "this Agreement" being deemed, as appropriate, to be references to this Release. For avoidance of doubt, this Section 5 has been included in this Release solely for the purpose of avoiding the need to repeat herein the full text of the referenced provisions of the Employment Agreement.

*[signature page follows]*

      **IN WITNESS WHEREOF**, the Company and Executive have acknowledged, executed and delivered this Release as of the Termination Date.

Executive

_____

Christian Anderson


Genesis Digital Assets Limited


By: _____
Name:
Title:

**EXHIBIT B**

**OPTION AGREEMENT**

[To come.]

# EXHIBIT C

## RESTRICTED SHARE UNIT AGREEMENT

[To come.]

# Exhibit 9

The Wayback Machine - https://web.archive.org/web/20220527022012/ht...

# US Offices





### New York City

One World Trade Center,
85th Floor

New York, NY 10007,
USA

We use cookies on our website to give you the most relevant experience by remembering your preferences and repeat visits. By clicking "Accept", you consent to the use of ALL the cookies.

Cookie settings        ACCEPT





## Houston

To be announced

Houston, Texas
USA

We use cookies on our website to give you the most relevant experience by remembering your preferences and repeat visits. By clicking "Accept", you consent to the use of ALL the cookies.

Cookie settings     ACCEPT

# Exhibit 10

 

(https://genesisdigitalassets.com/)

# Contact us

Have an inquiry or suggestion? We'd love to hear about it.

**First name** *

**Last name** *

**Email address** *

**Company name** *

**Your message** *

**Submit**

PRESS

Privacy · Terms

 press@genesisda.com(mailto:press@genesisda.com)

 (https://genesisdigitalassets.com/)

≡

# Our Offices



## Houston

1100 Louisiana St #2750,
Houston, Texas
USA



# GDA
(https://genesisdigitalassets.com/)

## Dubai

Index Tower, Happiness St,

DIFC, Dubai,

UAE

**GET IN TOUCH**

Contact us →
(https://genesisdigitalassets.com/contact-us/)

**CONNECT**

Linkedin →
(https://www.linkedin.com/company/genesis-digital-assets)

**PRESS**




press@genesisda.com →
(mailto:press@genesisda.com)
(https://genesisdigitalassets.com/)

≡



**About Us**

**News & insights**

**Careers**

**Privacy Policy**

© 2026 Genesis Digital Assets

The information on this website does not convey an offer of any type and is not intended to be, and should not be construed as, an offer to sell, or the solicitation of an offer to buy, any securities, commodities, or other financial products. In addition, the information on this website does not constitute the provision of investment advice. No assurances can be made that any aims, assumptions, expectations, strategies, and/or goals expressed or implied herein were or will be realized or that the activities or any performance described did or will continue at all or in the same manner as is described on this website.

Community Warning: Beware of Scammers. Please be aware of scams that impersonate GDA or GDA employees, whether through spoofing the GDA domain (genesisdigitalassets.com), phishing, or other means. Always (1) take a close look at the domain URL and make sure there's an SSL certificate, and (2) check email domains from suspicious mail against those from trusted contacts. GDA shall not be liable or responsible for any claims, losses, damages, expenses or other inconvenience resulting from or in any way connected to the actions of scammers. GDA does not accept investment from the public and does not sell any product or service to the public.

# Exhibit 11

| | | | | | | |
|---|---|---|---|---|---|---|
| KZT/USD ex rate | 465.95 | | | | | |
| EUR/USD ex rate | 0.8923 | | | | | |

| Borrower | Lender | Loan agreement # | Loan / assignment agreement date | Interest rate | Currency | Initial amount, original currency |
|---|---|---|---|---|---|---|
| **Intra-Group loans** | | | | | | |
| AISolutions | Genesis Digital Assets | SPA and assignment agr #12 | 9/30/20 | 0.0% | USD | 358,911 |
| AISolutions | Genesis Digital Assets | SPA and assignment agr #2 | 9/30/20 | 3.0% | USD | 892,171 |
| AISolutions | Genesis Digital Assets | w/o number | 6/4/20 | 2.0% | USD | 3,810,200 |
| AISolutions | Genesis Digital Assets | Assignment agreement #4 | 5/8/20 | 0.0% | USD | 3,773,776 |
| AISolutions | Genesis Digital Assets | w/o number | 2/2/21 | 2.0% | EUR | 30,205,000 |
| AISolutions | Genesis Digital Assets | Assignment agreement #1 | 5/25/21 | 1.5% | USD | 2,376,981 |
| AISolutions | Genesis Digital Assets | Договор купли-продажи №22-11A от 22.1 | 11/22/21 | 0.0% | USD | 10,505,250 |
| BCD Company | Genesis Digital Assets | w/o number | 6/4/20 | 2.0% | USD | 3,493,500 |
| BCD Company | Genesis Digital Assets | Assignment agreement #6 | 5/8/20 | 0.0% | USD | 23,234,260 |
| BCD Company | Genesis Digital Assets | Assignment agreement | 5/25/21 | 1.5% | USD | 2,763,198 |
| BCD Company | Genesis Digital Assets | Assignment agreement | 5/25/21 | 0.0% | USD | 923,870 |
| BCD Company | Genesis Digital Assets | w/o number | 2/2/21 | 2.0% | EUR | 2,280,000 |
| BCD Company | DDH Switzerland AG | Agreement # 02/12 | 12/2/20 | 0.0% | USD | 352,088 |
| BCD Company | Genesis Digital Assets | Equipment purchase agreement # 09-06B | 6/9/21 | 0.0% | USD | 9,743,869 |
| BCD Company | Genesis Digital Assets | Договор №21-10В от 21/10/2021г | 10/21/21 | 0.0% | USD | 35,701,260 |
| BCD Company | Genesis Digital Assets | Договор №14-10В от 14.10.2021г | 10/14/21 | 0.0% | USD | 6,089,429 |
| KZ Systems | Genesis Digital Assets | Assignment agreement #1 | 5/8/20 | 0.0% | USD | 1,905,079 |
| KZ Systems | Genesis Digital Assets | Assignment agreement #2 | 5/8/20 | 2.0% | USD | 426,385 |
| KZ Systems | Genesis Digital Assets | Assignment agreement #3 | 5/8/20 | 0.0% | EUR | 894 |
| KZ Systems | Genesis Digital Assets | Assignment agreement #3 | 5/8/20 | 0.0% | USD | 6,852 |
| KZ Systems | Genesis Digital Assets | Assignment agreement #1 | 5/25/21 | 1.5% | USD | 1,781,144 |
| KZ Systems | Genesis Digital Assets | Assignment agreement | 5/26/21 | 0.0% | EUR | 1,117,940 |
| KZ Systems | Genesis Digital Assets | w/o number | 2/2/21 | 2.0% | EUR | 500,000 |
| KZ Systems | DDH Switzerland AG | Agreement # 02/12/2 | 12/2/20 | 0.0% | USD | 4,731,898 |
| KZ Systems | Genesis Digital Assets | Договор 09-06K от 09.06.2021 | 6/9/21 | 0.0% | USD | 23,390,194 |
| KZ Systems | Genesis Digital Assets | Договор №23-08K от от 23.08.2021 | 8/23/21 | 0.0% | USD | 23,825,831 |
| KZ Systems | Genesis Digital Assets | Договор купли-продажи №22-11K от 22/1 | 11/22/21 | 0.0% | USD | 1,071,000 |
| East Systems | Genesis Digital Assets | SPA and assignment agr #3 | 9/30/20 | 3.0% | USD | 1,500,000 |
| East Systems | Genesis Digital Assets | SPA and assignment agr #4 | 9/30/20 | 2.0% | USD | 1,000,000 |
| East Systems | Genesis Digital Assets | SPA and assignment agr #5 | 9/30/20 | 2.0% | USD | 38,500 |
| East Systems | Genesis Digital Assets | w/o number | 2/2/21 | 2.0% | EUR | 954,301 |

| | | | | | | |
|---|---|---|---|---|---|---|
| East Systems | Genesis Digital Assets | w/o number | 4/23/21 | 2.0% | EUR | 599,925 |
| CloudTechnologies | Genesis Digital Assets | SPA and assignment agr #12 | 9/30/20 | 0.0% | KZT | 506,624,175 |
| CloudTechnologies | Genesis Digital Assets | w/o number | 8/3/21 | 1.5% | EUR | 4,499,899 |
| Sogrynsk CHP | Genesis Digital Assets | SPA and assignment agr #15 | 9/30/20 | 3.5% | USD | 500,000 |
| Sogrynsk CHP | Genesis Digital Assets | SPA and assignment agr #16 | 9/30/20 | 3.5% | USD | 499,982 |
| PP Solutions | Genesis Digital Assets | SPA and assignment agr #6 | 9/30/20 | 5.0% | USD | 500,000 |
| PP Solutions | Genesis Digital Assets | SPA and assignment agr #7 | 9/30/20 | 5.0% | USD | 200,000 |
| PP Solutions | Genesis Digital Assets | SPA and assignment agr #8 | 9/30/20 | 2.0% | USD | 600,000 |
| PP Solutions | Genesis Digital Assets | SPA and assignment agr #9 | 9/30/20 | 0.0% | KZT | 26,073,313 |
| PP Solutions | Genesis Digital Assets | SPA and assignment agr #10 | 9/30/20 | 0.0% | KZT | 7,000,000 |
| PP Solutions | Genesis Digital Assets | SPA and assignment agr #11 | 9/30/20 | 0.0% | KZT | 10,000,000 |
| PP Solutions | AISolutions | # 04-03 | 3/4/21 | 0.0% | KZT | 32,150,000 |
| PP Solutions | AISolutions | # 28-01 | 1/28/21 | 0.0% | KZT | 10,500,000 |
| PP Solutions | BCD Company | # 09-02 | 2/9/21 | 0.0% | KZT | 6,637,660 |
| PP Solutions | BCD Company | # 10-12 | 12/10/20 | 0.0% | KZT | 19,878,315 |
| PP Solutions | BCD Company | # 04-03 | 3/4/21 | 0.0% | KZT | 29,590,000 |
| Prima | Genesis Digital Assets | SPA and assignment agr #13 | 9/30/20 | 3.0% | USD | 1,500,000 |
| Prima | Genesis Digital Assets | SPA and assignment agr #14 | 9/30/20 | 3.0% | USD | 150,000 |
| Prima | Genesis Digital Assets | SPA | 9/30/20 | 0.0% | USD | 554,960 |
| Genesis Digital Asse | DDH AG | LA 22.01.2021 | 1/22/21 | 1.5% | USD | 24,498,619 |
| Genesis Digital Asse | DDH AG | LA 05.03.2021 | 3/5/21 | 1.5% | USD | 156,937,075 |
| Danolio Ltd. | Genesis Digital Assets | LA 25.01.2021 | 1/25/21 | 1.5% | USD | 24,498,619 |
| Danolio Ltd. | Genesis Digital Assets | LA 08.03.2021 AM 05.01.2022 | 3/8/21 | 1.5% | USD | 195,891,381 |
| BAT Energy | Genesis Digital Assets | LA 09.04.2021 | 4/9/21 | 1.5% | USD | 499,000 |
| DDH AG | Genesis Digital Assets | LA 14.10.2020 | 10/14/20 | 1.5% | USD | -64,701 |
| Powerry LLC | Genesis Digital Assets | LA 29.03.2021 | 3/29/21 | 1.5% | EUR | 400,000 |
| Powerry LLC | Genesis Digital Assets | LA 11.08.2021 AM 26.11.2021 | 8/11/21 | 1.5% | EUR | 1,439,714 |
| Sogra GMBH | Genesis Digital Assets | LA 09.04.2021 | 4/9/21 | 1.5% | USD | 500,000 |
| DDH NA Inc. | Genesis Digital Assets | LA 21.06.2021 AM 14.02.2022 | 6/21/21 | 1.5% | USD | 21,930,400 |

| | | | | | | |
|---|---|---|---|---|---|---|
| DDH NA Inc. | GDA US Inc. | LA 23.12.2021 | 12/27/21 | 4.6% | USD | 10,424,234 |
| DDH Cholla LLC | Genesis Digital Assets | LA 08.12.2021 | 12/8/21 | 1.5% | USD | 12,000,000 |
| DDH OK 1 LLC | Genesis Digital Assets | LA 25.01.2022 | 1/25/22 | 1.5% | EUR | 1,000,000 |
| GDA Sweden | DDH Digital Data Hub | LA 18.01.2022 | 1/18/22 | 3.0% | EUR | 100,000 |
| GDA US Inc. | Genesis Digital Assets | LA 23.12.2021 | 12/27/21 | 4.6% | USD | 11,049,934 |

**Total intra-group loans**

| Initial amount, USD | Interest as of 24.02.2022, original currency | Interest as of 24.02.2022, USD | Comments |
|---|---|---|---|
| 358,911 | 0 | 0 | |
| 892,171 | 39,744 | 39,744 | |
| 3,810,200 | 129,365 | 129,365 | |
| 3,773,776 | 0 | 0 | This assumes the repayment of $750,192 on or around 28th of February 2022 |
| 33,850,723 | 555,290 | 622,313 | |
| 2,376,981 | 57,210 | 57,210 | |
| 10,505,250 | 0 | 0 | |
| 3,493,500 | 120,117 | 120,117 | |
| 23,234,260 | 0 | 0 | |
| 2,763,198 | 28,442 | 28,442 | |
| 923,870 | 0 | 0 | |
| 2,555,194 | 48,767 | 54,653 | |
| 352,088 | 0 | 0 | |
| 9,743,869 | 0 | 0 | |
| 35,701,260 | 0 | 0 | |
| 6,089,429 | 0 | 0 | |
| 1,905,079 | 0 | 0 | This assumes the repayment of $400,000 on or around 28th of February 2022 |
| 426,385 | 55,805 | 55,805 | |
| 1,001 | 0 | 0 | |
| 6,852 | 0 | 0 | |
| 1,781,144 | 42,002 | 42,002 | |
| 1,252,875 | 0 | 0 | |
| 560,350 | 10,694 | 11,985 | |
| 4,731,898 | 0 | 0 | |
| 23,390,194 | 0 | 0 | |
| 23,825,831 | 0 | 0 | |
| 1,071,000 | 0 | 0 | |
| 1,500,000 | 159,164 | 159,164 | |
| 1,000,000 | 67,890 | 67,890 | |
| 38,500 | 2,120 | 2,120 | |
| 1,069,484 | 14,840 | 16,631 | |

| | | | |
|---|---|---|---|
| 672,336 | 9,132 | 10,234 | |
| 1,188,450 | 0 | 0 | |
| 5,043,034 | 30,645 | 34,344 | |
| 500,000 | 54,435 | 54,435 | |
| 499,982 | 38,887 | 38,887 | |
| 500,000 | 84,236 | 84,236 | |
| 200,000 | 33,167 | 33,167 | |
| 600,000 | 30,846 | 30,846 | |
| 61,163 | 0 | 0 | |
| 16,421 | 0 | 0 | |
| 23,458 | 0 | 0 | |
| 68,999 | 0 | 0 | |
| 22,535 | 0 | 0 | |
| 14,245 | 0 | 0 | |
| 42,662 | 0 | 0 | |
| 63,505 | 0 | 0 | |
| 1,500,000 | 185,918 | 185,918 | |
| 150,000 | 14,881 | 14,881 | |
| 554,960 | 0 | 0 | |
| 24,498,619 | 359,425 | 359,425 | |
| 156,937,075 | 864,815 | 864,815 | This includes $10,000,000 which are going to be provided on or around 28th of February |
| 24,498,619 | 479,234 | 479,234 | |
| 195,891,381 | 1,306,221 | 1,306,221 | This includes $20,000,000 which are going to be provided on or around 28th of February |
| 499,000 | 10,290 | 10,290 | |
| -64,701 | 0 | 0 | |
| 448,280 | 5,400 | 6,052 | |
| 1,613,487 | 568 | 637 | |
| 500,000 | 6,625 | 6,625 | |
| 21,930,400 | 56,614 | 56,614 | This includes $10,000,000 which are going to be provided on or around 28th of February |

| | | |
|---|---|---|
| 10,424,234 | 78,587 | 78,587 |
| 12,000,000 | 23,625 | 23,625 |
| 1,120,699 | 1,167 | 1,307 |
| 112,070 | 31 | 35 |
| 11,049,934 | 83,304 | 83,304 |
| **676,166,119** | | **5,171,161** |

# Exhibit 12

| Machine | Qty | Price unit | Total | INCO Terms | Date | Estimated Arrival Date | Bill of Lading # | Containers # | Invoice # | invoice | Departing Port | Arrival Port | Transported by | Export Broker | Logistics Agent | Shipping sum | Taxes estimation |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

The detailed data rows of this large spreadsheet are rendered at a resolution too low to transcribe individual cell values reliably. Legible group/label rows include:

- 5*40Cont / 4*40Cont / 2*40Cont (Avalon 1246-85T, Avalon 1246-87T, Avalon 1246-90T lines)
- Canaan Convoy Co - GDA- DDH NA   10,000   (5th batch from 20 000units ago)   DELIVERED
- Canaan Convoy Co - GDA- DDH NA   6000   (December batch from 25 500units ago)   $16,580,000.00
- Canaan Convoy Co - GDA- DDH NA   10,000   (2nd batch from 20 000units ago)
- Canaan Convoy Co - GDA- DDH NA   14,720   (1st batch from 30 000units ago)   $97,292,541.20
- Bitmain's miners from 6000unit ago   (260pcs will be shipped with 5000units)
- MEDUP965661 / MEDUP965667 (S19j Pro 100 TH lines)   Total 885   3,0975   $5,254,073.34
- Bitmain's miners from 2800unit ago   4454
- MEDUP965661 / MEDUP965667 (S19j Pro 100 TH lines)   mixed one: 468

Shipping/port details noted across groups: DAP/ TX 79777, Tianjin, Houston TX, Charleston, Sea, CF&S Estonia AS LLP, Limco Logistics, Inc.

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| MEDU9656687 and MEDU9656661 | S19 Pro 104 TH | 900 | $ 6,062.21 | $5,455,989.00 | | | | 35; | Invoice No.: 30- 850 pcs and Invoice 36- 50 pcs | | | | |
| Nov + December batch | **Total** | 3549 | 12.4215 | **$20,950,649.30** | | | | | | | | | |
| | | 12423.3 | | | | | | | | | | | |

**Bitmain's miners from 6000unit agr.**

| Jan n Feb. batch | S19 95 TH | 252 | $ 4.336.13 | $1 092 704.76 | DPU// TX 79777 | May15 May24 May | 22 July, 17 July, 25 July **DELIVERED** | There are 3 BOL: QNS9X925YFE (3*40, 1*20= 1260units): TGBU9657405, OOLU0662010/20', CSNU7758099; TCNU5716560 QNS9X855WYFE (5*40, 1*20= 1260units); MAGU2324702/20', SEKU4350079; CSNU7760543, UITU5154084, CBHU9418549; CSNU7653619 QNS9X910920 (01*40= 3711units): KOCU4529405, KOCU4575740, KOCU5124274, KOCU4615627, CAIU7370713, HMMU6302050, HDMU6001405, KOCU4771867, BSIU9228570, HMMU6304607 | | Busan | Houston, TX | SEA | SJLogistics | | total shipping+insurance costs of 3988+ 991+ 1972 pcs = $603,520 | |
| | S19 90 TH | 254 | $ 4 107.92 | $961 255.05 | | | | | | | | | |
| | S19 90 TH | 112 | $ 3 530.57 | $395 425.84 | | | | | | | | | |
| | **Total** | 393 | $ 3 694.54 | $1 451 954.22 | | | | | | | | | |
| | **Total** | 991 | 0.58685 | **$5,901,336.10** | | | | | | | | | |
| | | 3868.5 | | | | | | | | | | | |

**Bitmain's miners from 24000unit agr.**

| Jan n Feb. batch | S19 84 TH | 361 | $ 3 909.09 | $1 411 181.49 | DPU// TX 79777 | May15 May24 May | 22 July, 17 July, 25 July **DELIVERED** | There are 5 BOL: QNS9X925YFE (3*40, 1*20= 1260units): TGBU9657405, OOLU0662010/20', CSNU7758099; TCNU5716560 QNS9X855WYFE (5*40, 1*20= 1260units); MAGU2324702/20', SEKU4350079; CSNU7760543, UITU5154084, CBHU9418549; CSNU7653619 QNS9X910920 (01*40= 3711units): KOCU4529405, KOCU4575740, KOCU5124274, KOCU4615627, CAIU7370713, HMMU6302050, HDMU6001405, KOCU4771867, BSIU9228570, HMMU6304607 | | Busan | Houston, TX | SEA | SJLogistics | | total shipping+insurance costs of 3988+ 991+ 1972 pcs = $603,520 | |
| | S19 84 TH | 901 | $ 4 318.18 | $3 890 680.18 | | | | | | | | | |
| | S19 84 TH | 704 | $ 4 090.91 | $2 880 000.64 | | | | | | | | | |
| | S19 84 TH | 495 | $ 3 515.91 | $1 740 575.45 | | | | | | | | | |
| | S19 90 TH | 1527 | $ 3 679.20 | $5 618 238.40 | | | | | | | | | |
| | **Total** | 3988 | 13.956 | **$15,540,376.16** | | | | | | | | | |
| | | 13956 | | | | | | | | | | | |

**Bitmain's miners from 8250 unit agr.**

| Jan n Feb. batch | S19i PRO 92 TH | 29 | $ 6 094.44 | $170 644.52 | DPU// TX 79777 | May15 May24 May | 22 July, 17 July, 25 July **DELIVERED** | There are 5 BOL: QNS9X925YFE (3*40, 1*20= 1260units): TGBU9657405, OOLU0662010/20', CSNU7758099; TCNU5716560 QNS9X855WYFE (5*40, 1*20= 1260units); MAGU2324702/20', SEKU4350079; CSNU7760543, UITU5154084, CBHU9418549; CSNU7653619 SJL22WW0IND24 (01*40= 3711units): KOCU5236624, KOCU4529405, KOCU4575740, KOCU5124274, KOCU4615627, CAIU7370713, HMMU6302050, HDMU6001405, KOCU4771867, BSIU9228570, HMMU6304607 | | Busan | Houston, TX | SEA | SJLogistics | | total shipping+insurance costs of 3988+ 991+ 1972 pcs = $603,520 | |
| | S19i PRO 96 TH | 61 | $ 6 559.65 | $387 938.65 | | | | | | | | | |
| | S19i PRO 100 TH | 92 | $ 6 624.85 | $609 486.20 | | | | | | | | | |
| | S19i PRO 92 TH | 792 | $ 6 890.05 | $5 456 919.60 | | | | | | | | | |
| | S19i PRO 92 TH | 54 | $ 6 094.44 | $329 099.76 | | | | | | | | | |
| | S19i PRO 96 TH | 236 | $ 6 559.65 | $1 500 977.40 | | | | | | | | | |
| | S19i PRO 100 TH | 340 | $ 6 624.85 | $2 252 449.00 | | | | | | | | | |
| | S19i PRO 104 TH | 369 | $ 6 890.05 | $2 542 428.45 | | | | | | | | | |
| | **Total** | 1972 | 6.902 | **$6,624,954** | | | | | | | | | |

**Delivered — Canaan**

| 56 * 40 HC | Avalon 1246-85T | 756 | $3,654.26 | $2,674,815.56 | DPU// TX 79777 | 18 May | TSNM0927500 -25 June, TSNM0927500 -3 July **DELIVERED** | 2 BOL: TSNM6077061, TSNM0927500 | Invoice 42 and Invoice 43 | Tianjin- Busan | Houston, TX | SEA | SJLogistics | RGY trucking 20120 US Hwy 281 N. Ste 207 SAN ANTONIO, TX 78260 Phone: 210-817-2752 ALICE BROWN Business Development Manager Website: rgykagency.com | shipping+ insurance costs = 509 6005 | $ 16,909,623.97 |
| | Avalon 1246-85T | 6012 | $3,719.77 | $22,363,269.26 | | | | | | | | | | | | |
| | Avalon 1246-90T | 3484 | $3,840.04 | $13,406,571.36 | | | | | | | | | | | | |
| | Avalon 1246-95T | 8 | $4,101.30 | $32,810.40 | | | | | | | | | | | | |
| from main 20k agr. | **Total** | 10260 | 35.84 | **$39,477,466.58** Directly to Pyote | | | | | | | | | | | | $38,589,421.57 |

**Bitmain's miners from 6000unit agr.**

| March batch | S19 90 TH | 272 | $3,574.50 | $972,264.00 | DPU// TX 79777 | 19 June | 34 September | PENE22060005 | MSMU3454233 MSMU9344391 FFAU2319622 | Penang | Houston, TX | SEA | A-Sonic Logistics | A-Sonic Logistics | total shipping +insurance costs of 1995+ 488+ 998 pcs = $356 463.09 | $ 5,020,947.56 |
| | S19 95 TH | 216 | $3,773.91 | $815,034.96 | | | **DELIVERED** | | | | | | | | | |
| | **Total** | 488 | | **$1,787,298.96** | | | | | | | | | | | | |

**Bitmain's miners from 24000unit agr.**

| March batch | S19 84 TH | 500 | $ 3 243.68 | $1 621 840.00 | DPU// TX 79777 | 19 June | 22 September | PENE22060004 | MSDU9427730 INKU2283220 TGHU9854697 MSDU5414657 | Penang | Houston, TX | SEA | A-Sonic Logistics | A-Sonic Logistics | total shipping +insurance costs of 1995+ 488+ 998 pcs = $356 463.09 | |
| | S19 90 TH | 605 | $ 3 559.64 | $2 153 582.20 | | | **DELIVERED** | | | | | | | | | |
| | S19 90 TH | 890 | $ 3 757.62 | $3 344 281.80 | | | | | | | | | | | | |
| | **Total** | 1995 | | **$ 7 119 704.00** | | | | | | | | | | | | |

**Bitmain's miners from 8250 unit agr.**

| March batch | S19i PRO 92 TH | 90 | $ 5,736.53 | $ 516 287.97 | DPU// TX 79777 | 19 June | 22 September | FFAU1246604 MEDU9656174 TCLU9057292 | | Penang | Houston, TX | SEA | A-Sonic Logistics | A-Sonic Logistics | total shipping +insurance costs of 1995+ 488+ 998 pcs = $356 463.09 | |
| | S19i PRO 96 TH | 193 | $ 5,985.95 | $1 167 299.76 | | | **DELIVERED** | | | | | | | | | |
| | S19i PRO 96 TH | 288 | $ 6,235.36 | $1 795 784.25 | | | | | | | | | | | | |
| | S19i PRO 104 TH | 425 | $ 6,484.78 | $2 756 030.00 | | | | | | | | | | | | |
| | **Total** | 996 | | **$ 6 235 361.98** | | | | | | | | | | | | |
| | Jan_feb batch | 6951 | | | | | | | | | | | | | | |
| | March batch in sep total | 3481 | | | | | | | | | | | | | | |
| | Nov / Dec batch may delivery | 4434 | | total | 14866 | | | | | | | | | | | |

**HYDRO Containers Bitmain**

| | supercomputing data center (Av | 12 | $76,350.00 | $ 916,200.00 | DPU// TX 79777 | 29 June | 4 August | SIL22060070 | BTMU2000018/J TU217562012/ BTMU2000028/J TU217543202/ BTMU2000033/J TU217542010/ BTMU2000043/J TU217543207/ BTMU2000060/J TU217543205/ BTMU2000075/J TU217574206/ BTMU2000091/J TU217543203/ BTMU2000099/J TU217543211/ BTMU2000103/J TU217543204/ BTMU2000141/J TU217574203/ BTMU2000156/J TU217574226/ BTMU2000179/J TU217574202/ BTMU2000015/J TU217524802/ JVJU1100854/J HLD12044431/ | #50 | ANTIAN, CHINA | Houston, TX | SEA, Final dest: 12567 FM G LOGISTICS CO., LTD on ARCADIA, CA 91006 Tel: 62 3430 Vernon, TX 76384. | $400,776.00 | $ 363,793.91 |

| | Description | Qty | Unit Price | Total | Terms | Date 1 | Date 2 | Ref | Notes | # | Origin | Destination | Mode | Carrier | Logistics | Amount | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Water-cooling tower | 12 | $ 35,630.00 | $ 427,560.00 | | 2 July | 12 August | SLL22060071 | JYJU1100001/HLD12064442/ JYJU1109920/HLD12064484/ JYJU1100941/HLD12064541/ JYJU1010091/HLD12064542/ JYJU1101172/HLD12064543/ JYJU1101073/HLD12064544/ JYJU1011306/HLD12064598/ JYJU1101249/HLD12064599/ | #58-2 | | | | | | $490,776.00 | |
| | **Total** | 24 | $111,980.00 | $3,343,760 | | | **DELIVERED** | | | | | | | | | $490,776.00 | **$383,793.91** |
| Chinese Containers 2000KVA | File digital power distribution cab | 5 | $62,036.92 | $ 310,184.60 | DPU/ TX 79777 | 2 July | 9/1/2022 | SZJL002915tA, SZJL002913tB, SZJL002913tC, SZJL002913tD, SZJL002913tE | DPSU7839438/ 40HQ/ TSP1100960/ FSCU8574420/ 40HQ/ TSP1100952/ TSSU3049775/ 40HQ/ TSP1101029/ TSSU5090991/ 40HQ/ TSP1100970/ TXGU6670297/ 40HQ/ TSP1100934/ | #59 | NANSHA, CHINA | CHARLESTON, SC | | SEA, final destination ADD: 240 Harris Plant Circle, Rutherfordton, NC, 28139,USA | BEN MASON INTL FF CO | FIRST RD., SUITE 209, CITY | $102,425.00 | |
| | **Total** | 5 | $62,036.92 | $310,185 | | | **DELIVERED** | | | | | | | | | $102,425.00 | **$88,592.42** |
| Main distribution board (MANUFACTURER: ARGUS CROATIA) | Electric Switchboards | 24 | €19,417.75 | €466,026.00 | CPI IAH Airport TX | 3 September | 6/9/2022 Delivered to Pyote | AWB 700-6052 1322 | Pallet Number Pcs Weight PMC22425 X7 2/8 3270 kg PMC25060 X7 2/8 3270 kg PMC21650 X7 2/8 3270 kg PMC22715 X7 2/8 3270 kg | 625/VPI/1 | ZAGREB airport,Croat | airport,Houston, | Airfreight | Cargo Partners C.O.O. | A-Sonic Logistics | €78,473.70 | |
| | Switchboards | 24 | €19,417.75 | €466,026.00 | CIF Port of Houston | 22 August | 9/15/2022 Delivered to Pyote | CTLT05010005777 | BMOL5102991/ 40HQ/ HL108432 | 595/VPI/2 | GENOA,ITALY | Houston, TX | Sea | ConsolTainerLine | A-Sonic Logistics | €18,802.50 | |
| | Switchboards | 24 | €19,417.75 | €466,026.00 | CIF Port of Houston | 2 September | 9/26/2022 Delivered | CTLT05010005798 | HLBU1921325/40HQ/HL109013 | 640/VPI/2 | GENOA,ITALY | Houston, TX | Sea | ConsolTainerLine | A-Sonic Logistics | €18,802.50 | |
| | Switchboards | 24 | €19,417.75 | €466,026.00 | CIF Port of Houston | 9 September | 15 October | CTLT05010005801 | HLBU2406138/40HQ/HL109919 | 669/VPI/1 | GENOA,ITALY | Houston, TX | Sea | ConsolTainerLine | A-Sonic Logistics | €18,802.50 | |
| | **Total** | 96 | 19,417.75 | €1,398,078.00 | | | | | | | | | | | | €134,881.20 | **$399,307.75** |
| Main distribution board (MANUFACTURER: ARGUS d.o.o. CROATIA) | Switchboards | 48 | €19,417.75 | €932,052.00 | CIF Port of Houston | 2 October | 28 October | CTLT05010005844 | CAIU 422.058-7/ 40HQ/ HL10900; BMOU 665.552-6/ 40HQ/ HL109900 | 717/VPI/1 | GENOA,ITALY | Houston, TX | Sea | ConsolTainerLine | A-Sonic Logistics | €57,605.00 | |
| | Switchboards | 24 | €19,417.75 | €466,026.00 | | 29 October | 21 November | CGPN5010005967 | FSCU 723 818-8 | 792/VPI/1 | GENOA,ITALY | | Sea | ConsolTainerLine | A-Sonic Logistics | €18,802.50 | |
| | Switchboards | 21 | €19,417.75 | €407,772.75 | CPI Houston Airport | 25 October | 10/25/2022 delivered to site | 220BIN91710561188 | - | 795/VPI/1 | ETD Liege | Houston, TX | AIR | CARGO-PARTNER d.o.o. | A-Sonic Logistics | €64,125.15 | |
| | Switchboards | 24 | €19,417.75 | €466,026.00 | CPI Houston Airport | 6 November | 8 November | 700-6052 4900 House-AWB ZAG20106055 | - | 807/VPI/1 | ETD Liege | Houston, TX | AIR | CARGO-PARTNER d.o.o. | A-Sonic Logistics | €74,865.00 | |
| | Switchboards | 23 | €19,417.75 | €446,608.25 | CPI Houston Airport | 13 November | 13 November | 700-605 25076 | - | 846/VPI/1 | ETD Liege | Houston, TX | AIR | CARGO-PARTNER d.o.o. | A-Sonic Logistics | €75,958.60 | |
| | Switchboards | 50 | €19,417.75 | €582,532.50 | CPI Houston Airport | 20 November | 20 November | 700-605 25080 | - | 847/VPI/1 | ETD Liege | Houston, TX | AIR | CARGO-PARTNER d.o.o. | A-Sonic Logistics | €96,186.00 | |
| | **Total** | 170 | 19,417.75 | €3,301,017.50 | | | | | | | | | | | | €369,442.25 | **€942,810.40** |

**Bitmain's miners from Malaysia Warehouse PKFZ**

| | | Qty | Unit | Amount | | Date 1 | Date 2 | Ref | Notes | # | | Port | Mode | Carrier | Logistics | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| from Malaysian warehouse 11*40HC | S19 82 TH | 54 | $ | 175,541.78 | DPU/ Anderson, SC | 23 November | 27 December | BL: MY22110075 | EMCPDX5232 2. EGHU9455074/ EMCPDX5632 3. EISU7440629/ EMCPDL5582 4. TCNU3327055/ EMCPGT1672 5. BSIU9040429/ EMCPHA9222 6. EITU9179951/ EMCPHA6552 7. EMCU9742252/ EMCPHA9252 8. TCNU2106394/ EMCPHA7862 9. TGHU6532601/ EMCPHA9372 10.EMCU9405098/ EMCPHA9302 13.HMCU2024446/ | M1501022-A1 | WestPort, Klang | Charleston, SC | SEA | CF&S Estonia LLP | Global Shipping LLP | Transportation for USD 12 101 x 11 = USD 133 111 + insurance 236 904,73 = $ 370 015,73 |
| | S19 96 TH | 180 | $ | 612,937.80 | | | | | | | | | | | | |
| | S19 90 TH | 18 | $ | 64,140.48 | | | | | | | | | | | | |
| | S19 95 TH | 56 | $ | 155,415.80 | | | | | | | | | | | | |
| | S19j PRO 96 TH | 182 | $ | 561,012.74 | | | | | | | | | | | | |
| | S19j PRO 92 TH | 720 | $ | 2,743,026.54 | | | | | | | | | | | | |
| | S19j PRO 96 TH | 650 | $ | 2,343,264.16 | | | | | | | | | | | | |
| | S19j PRO 100 TH | 1482 | $ | 6,107,056.51 | | | | | | | | | | | | |
| | S19j PRO 104 TH | 659 | $ | 3,602,205.90 | | | | | | | | | | | | |
| | **Total** | 3941 | $10,234,405.71 | | | | | | | | | | | | | |
| from Malaysian warehouse 5*40HC | S19 95 TH | 878 | $ | 3,678,795.90 | DPU/ Pyote,TX 79777 | 28 November | 1 January | HBL SJL22WW11044 | 1. HMMU6140708/ 191697618 2. GAOU4211022/ 191697611 3. KOCU4639927/ 191695031 4. KOCU3071908/ 191697638 5. HMMU6160298/ 191697655 | M2201022-A1 | WestPort, Klang | Houston, TX | SEA | SJ Logistics South Korea | SJL America | Transportation fee + insurance |
| | S19 95 TH | 292 | $ | 972,679.28 | | | | | | | | | | | | |
| | S19 95 TH | 103 | $ | 342,383.93 | | | | | | | | | | | | |
| | S19 95 TH | 139 | $ | 425,499.11 | | | | | | | | | | | | |
| | S19 PRO 104 TH | 60 | $ | 346,686.00 | | | | | | | | | | | | |
| | S19j PRO 104 TH | 228 | $ | 1,328,743.92 | | | | | | | | | | | | |
| | **Total** | 1800 | $6,094,787.54 | | | | | | | | | | | | | |
| | S19 90 TH | 72 | $ | 227,730.96 | | | | | | | | | | | | |
| | S19 95 TH | 155 | $ | 508,359.45 | | | | | | | | | | | | |

| | | Qty | Amount | | | | | Container | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| from Malaysian warehouse 3*40HC | S19 95 TH | 9 | $ 50,042.72 | // Fountain Inn,SC 296 | 29 November | 1 January | SJL22WW11065 | KOCU4806997/21085542 HMMU6540264/21085513 | M220122-A2 | | WestPort, Klang | Charleston, SC | SEA | SJ Logistics South Korea | SJL America | Transportation fee + insurance |
| | S19 PRO 96 TH | 12b | $ 651,052.10 | | | | | | | | | | | | |
| | S19j PRO 104 TH | 522 | $ 2,584,234.08 | | | | | | | | | | | | |
| | S19j PRO 104 TH | 216 | $ 1,260,911.44 | | | | | | | | | | | | |
| | Total | 1080 | $5,242,209.75 | | | | | | | | | | | | |

| | | Qty | Amount | | | | | Container | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| from Malaysian warehouse 7*40HC | S19 92 TH | 250 | $ 661,397.20 | DPU / Pyote,TX 79777 | 5 December | 25 January | BL: SJL22WW12007 | 05697752 DF5L7566021/1916t0750 CAIL7181812/195 | MX001122-A1 | | WestPort, Klang | Charleston, SC | SEA | SJ Logistics South Korea | SJL America | Transportation fee + insurance |
| | S19 86 TH | 149 | $ 507,376.29 | | | | | | | | | | | | |
| | S19 96 TH | 110 | $ 333,093.20 | | | | | | | | | | | | |
| | S19 96 TH | 12 | $ 40,905.12 | | | | | | | | | | | | |
| | S19 90 TH | 138 | $ 492,255.66 | | | | | | | | | | | | |
| | S19 90 TH | 526 | $ 1,974,327.36 | | | | | | | | | | | | |
| | S19 90 TH | 419 | $ 1,319,720.11 | | | | | | | | | | | | |
| | S19 90 TH | 255 | $ 808,235.25 | | | | | | | | | | | | |
| | S19 90 TH | 35 | $ 110,702.55 | | | | | | | | | | | | |
| | S19 90 TH | 592 | $ 1,868,555.52 | | | | | | | | | | | | |
| | S19 PRO 96 TH | 36 | $ 191,976.84 | | | | | | | | | | | | |
| | S19 PRO 100 TH | 9 | $ 44,903.52 | | | | | | | | | | | | |
| | S19 PRO 104 TH | 10 | $ 58,370.00 | | | | | | | | | | | | |
| | Total | 2520 | $8,311,799.52 | | | | | | | | | | | | |

| 9541 | $38,685,202.52 |
|---|---|

# Exhibit 13

| | |
|---|---|
| **From:** | Marco Streng[marco.streng@genesisda.com] |
| **Sent:** | Tue 7/26/2022 4:14:59 PM (UTC) |
| **To:** | Ramnik Arora[ramnik@ftx.com]; Adam Jin[adam.jin@ftx.com] |
| **Cc:** | Katharina Haid[katharina.haid@genesis-group.com] |
| **Subject:** | Upcoming Site Visit |

Hey Ramnik, Adam,
Hope you are both well!

I just wanted to provide you some details for our upcoming trip to our Pyote site:
* The airport to fly to is MAF (Midland Airport)
* The hotel where I will stay is Marriott Odessa . I recommend you also stay there or somewhere close to make it most efficient.
* We will visit the site on the 10th ideally in the morning when the sun is not too hot (you should still be prepared for temperatures around 100F ;))
* I plan to already be there on the 9th in the evening so happy to do a dinner together if you will also be already there

Looking very much forward to the trip and showing you the progress on our site and spending some time together!

Exciting times ahead!

Greetings,
Marco


--
Marco Streng
CEO & Founder

marco.streng@genesisda.com

Genesis Digital Assets
GenesisDigitalAssets.com

# Exhibit 14

| | |
|---|---|
| **From:** | Adam Jin[adam.jin@ftx.com] |
| **Sent:** | Fri 8/5/2022 5:53:06 PM (UTC) |
| **To:** | Katharina Haid[katharina.haid@genesis-group.com] |
| **Cc:** | Marco Streng[marco.streng@genesisda.com]; Ramnik Arora[ramnik@ftx.com] |
| **Subject:** | Re: Agenda Site Visit |

Great, thanks Katharina.

On Fri, Aug 5, 2022 at 1:38 PM Katharina Haid <katharina.haid@genesis-group.com> wrote:

> Hi Adam,
>
> Marco will be happy to pick you up from the airport and take you to the hotel. 😊
>
> If you have any questions please let me know!
>
> Kind regards,
> Katharina
>
> On Fri, 5 Aug 2022 at 15:33, Adam Jin <adam.jin@ftx.com> wrote:
>
>> Hey Marco, Katharina
>> When we arrive at Midland on the 9th evening, what would be the best way to get to
>> Odessa? Would it be easier to get a taxi or would you send someone to pick us up?
>>
>> Thanks,
>>
>> On Thu, Aug 4, 2022 at 2:02 PM Adam Jin <adam.jin@ftx.com> wrote:
>>
>>> Yup we will arrive at 9:32pm on 8/9 (Tue), onsite on 8/10 (Wed), and leave on the 8/11
>>> (Thur) morning 7am.
>>>
>>> On Thu, Aug 4, 2022 at 1:13 PM Marco Streng <marco.streng@genesisda.com> wrote:
>>>
>>>> Sounds good! We can also move the dinner to Wednesday if you are all still there? Let me
>>>> know if this would work for you.
>>>>
>>>> I will leave on the 11th.
>>>>
>>>> Greetings,
>>>> Marco
>>>>
>>>> On Thu 4. Aug 2022 at 17:48, Adam Jin <adam.jin@ftx.com> wrote:
>>>>
>>>>> Hi Marco,
>>>>> Thanks for the plan. Re: Tuesday the 9th, we might need to skip the dinner as the only
>>>>> flight we can connect in IAH from Nassau lands at 9:32 pm local time.
>>>>> Wed 10th schedule looks good. I'll update you shortly.

Best,

On Thu, Aug 4, 2022 at 10:40 AM Marco Streng <marco.streng@genesisda.com> wrote:

Ramnik, Adam, Zack,
Hope you are well! Here is the agenda for the upcoming site visit on 10th of August:

Tuesday (9th):

8.30 pm: Joint dinner in Odessa (close to hotel)

Wednesday (10th):

9.00 am - 10 am: Drive to GDA "Lone Star" Mining Site near Pyote
10.00 am - 12 pm: GDA Site visit "Lone Star"
12 pm - 1 pm: Lunch on site together with the team
1 pm - 2 pm: Drive back to Odessa

Katharina will follow up and help coordinate!

Looking forward to seeing you all together! Please get ready for "large scale" :)

Exciting times ahead!

Greetings,
Marco


--
Marco Streng
CEO & Founder

marco.streng@genesisda.com

Genesis Digital Assets
GenesisDigitalAssets.com

--
Marco Streng
CEO & Founder

marco.streng@genesisda.com

**Genesis Digital Assets**
GenesisDigitalAssets.com

--
**Katharina Haid**
Executive Assistant for Management

Email: katharina.haid@genesis-group.com

www.genesis-group.com

Follow us on: LinkedIn

Confidentiality Note:
This email is intended only for the person or entity to which it is addressed and may contain information that is privileged, confidential or otherwise protected from disclosure. Unauthorized use, dissemination, distribution or copying of this email or the information herein or taking any action in reliance on the contents of this email or the information herein, by anyone other than the intended recipient, or an employee or agent responsible for delivering the message to the intended recipient, is strictly prohibited. If you have received this email in error, please notify the sender immediately and destroy the original message, any attachments thereto and all copies. Please refer to the firm's privacy policy for important information on this policy.

# Exhibit 15

| | |
|---|---|
| **From:** | Katharina Haid[katharina.haid@genesis-group.com] |
| **Sent:** | Sun 9/25/2022 5:59:18 PM (UTC) |
| **To:** | Ramnik Arora[ramnik@ftx.com] |
| **Subject:** | Agenda for Midland, Texas - Sept 27th - 28th |
| **Attachment:** | 2022-09-27_GDA_Site Visit Agenda Midland, Texas.pdf |
| **Attachment:** | 2022-09-27_GDA Opening Event Pyote Invite-Agenda.pdf |

Dear Ramnik,

Please find attached the Agenda for the Midland, Texas Trip from Sept 27th till 28th and the Agenda for the Opening Ceremony on Sept 28th.

As you may have heard, many flights to the Bahamas have been cancelled due to Hurricane Ian. Marco Streng and Manny have made the decision to cancel the Bahamas portion of the trip. The GDA Board meeting will now take place over Zoom.

Many guests are now flying directly into Midland on 27th Sept, as the private flight from Nassau to Midland had to be cancelled.


Can you confirm that You will now not fly to the Bahamas at all but will now fly directly to Texas? If confirmed, I'll cancel the hotel room for tomorrow night and please let me know asap your arrival time and flight number when you land in Midland. I will take care of transportation!


  Kindly let me know if you have any questions or concerns!

Thank you and kind regards,
Katharina


--
**Katharina Haid**
Executive Assistant

Email: katharina.haid@genesis-group.com

www.genesis-group.com

Follow us on: LinkedIn

Confidentiality Note:
This email is intended only for the person or entity to which it is addressed and may contain information that is privileged, confidential or otherwise protected from disclosure. Unauthorized use, dissemination, distribution or copying of this email or the information herein or taking any action in reliance on the contents of this email or the information herein, by anyone other than the intended recipient, or an employee or agent responsible for delivering the message to the intended recipient, is strictly prohibited. If you have received this email in error, please notify the sender immediately and destroy the original message, any attachments thereto and all copies. Please refer to the firm's privacy policy for important information on this policy.

# Exhibit 16

**From:**          Marco Streng[marco.streng@genesisda.com]
**Sent:**          Thur 1/6/2022 7:00:24 AM (UTC)
**To:**            sam@ftx.com[sam@ftx.com]
**Cc:**            Christian Anderson[christian.anderson@mac.com]
**Subject:**       Connect Sam - Christian

Hey Sam,
I wanted to connect you with Christian so that you can have a dedicated 1on1 on CFO. You
obviously know each other already and are in touch so you can just take it from here :)

Thank you both!

Exciting times ahead!

Greetings,
Marco
--
Marco Streng
CEO & Founder

marco.streng@genesisda.com

Genesis Digital Assets
GenesisDigitalAssets.com

# Exhibit 17

**From:**          Anderson, Christian [christian.anderson@citi.com]
**Sent:**          Sun 1/9/2022 10:45:06 PM (UTC)
**To:**            sam@ftx.com[sam@ftx.com]
**Subject:**       RE:

Perhaps pressure test the following.

Model at current BTC.

Result would be more like

2022

Down 250 revenue
500 EBITDA
Negative 750 FCF

2023

Down revenue 1.5bn
1.25bn EBITDA
Negative 500 FCF

Valuation 5x 2023 EBITDA

Just back of envelope

Another way to consider.

FCF to fund deliveries is very important

Understand equity round closing in 2-3 weeks?

CA


_____

Christian Anderson
Citi
Global Head
Financial Institutions & Fintech
+1917 2268760

**From:** [ftx.com] Sam Bankman-Fried <sam@ftx.com>
**Date:** Sunday, Jan 09, 2022, 5:15 PM
**To:** Anderson, Christian [ICG-BCMA] <ca51821@citi.com>
**Subject:** Re:

| **This Message is From an External Sender** |
| This message came from outside of your organization. |

heh yeah all seem in jeopardy

I also love how people mark BTC to something other than the current price in their models, as if a competitive strategy wasn't "just buy BTC", or "do what you do but hedge the BTC"

—

Sam Bankman-Fried
.

> On January 8, 2022, 12:36 PM EST christian.anderson@citi.com wrote:
>
> Sam,
>
> Look at page 17.
>
> Some questions for you;
>
> - does the 500 series fund?
> - is the 1bn IPO a viable goal?
> - is the 1bn cash flow still a reasonable estimate with BTC @ 42 ( model estimate for 21/22/23 is 48, 63, 89 per page 10).
>
> Happy to discuss.
>
> Christian
>
>
> _____
> Christian Anderson
> Citi
> Global Head, Financial Institutions & Fintech
>
> +1 917 226-8760
> +1 212 816-9964

# Exhibit 18



**BrokerCheck Report**

# CHRISTIAN JAMES ANDERSON

CRD# 4605121

| Section Title | Page(s) |
| --- | --- |
| Report Summary | 1 |
| Broker Qualifications | 2 - 8 |
| Registration and Employment History | 10 |



When communicating online or investing with any professional, make sure you know who you're dealing with. Imposters might link to sites like BrokerCheck from phishing or similar scam websites, or through social media, trying to steal your personal information or your money.

Please contact FINRA with any concerns.



**About BrokerCheck®**

BrokerCheck offers information on all current, and many former, registered securities brokers, and all current and former registered securities firms. FINRA strongly encourages investors to use BrokerCheck to check the background of securities brokers and brokerage firms before deciding to conduct, or continue to conduct, business with them.

- **What is included in a BrokerCheck report?**
- BrokerCheck reports for individual brokers include information such as employment history, professional qualifications, disciplinary actions, criminal convictions, civil judgments and arbitration awards. BrokerCheck reports for brokerage firms include information on a firm's profile, history, and operations, as well as many of the same disclosure events mentioned above.
- Please note that the information contained in a BrokerCheck report may include pending actions or allegations that may be contested, unresolved or unproven. In the end, these actions or allegations may be resolved in favor of the broker or brokerage firm, or concluded through a negotiated settlement with no admission or finding of wrongdoing.
- **Where did this information come from?**
- The information contained in BrokerCheck comes from FINRA's Central Registration Depository, or CRD® and is a combination of:
  - ○ information FINRA and/or the Securities and Exchange Commission (SEC) require brokers and brokerage firms to submit as part of the registration and licensing process, and
  - ○ information that regulators report regarding disciplinary actions or allegations against firms or brokers.
- **How current is this information?**
- Generally, active brokerage firms and brokers are required to update their professional and disciplinary information in CRD within 30 days. Under most circumstances, information reported by brokerage firms, brokers and regulators is available in BrokerCheck the next business day.
- **What if I want to check the background of an investment adviser firm or investment adviser representative?**
- To check the background of an investment adviser firm or representative, you can search for the firm or individual in BrokerCheck. If your search is successful, click on the link provided to view the available licensing and registration information in the SEC's Investment Adviser Public Disclosure (IAPD) website at https://www.adviserinfo.sec.gov. In the alternative, you may search the IAPD website directly or contact your state securities regulator at http://www.finra.org/Investors/ToolsCalculators/BrokerCheck/P455414.
- **Are there other resources I can use to check the background of investment professionals?**
- FINRA recommends that you learn as much as possible about an investment professional before deciding to work with them. Your state securities regulator can help you research brokers and investment adviser representatives doing business in your state.
-

**Thank you for using FINRA BrokerCheck.**



Using this site/information means that you accept the FINRA BrokerCheck Terms and Conditions. A complete list of Terms and Conditions can be found at

brokercheck.finra.org



For additional information about the contents of this report, please refer to the User Guidance or www.finra.org/brokercheck.  It provides a glossary of terms and a list of frequently asked questions, as well as additional resources. For more information about FINRA, visit www.finra.org.



## CHRISTIAN J. ANDERSON
CRD# 4605121

**Currently employed by and registered with the following Firm(s):**

**B CITIGROUP GLOBAL MARKETS INC.**
388 GREENWICH STREET
NEW YORK, NY  10013
CRD# 7059
Registered with this firm since: 12/03/2002

# Report Summary for this Broker

This report summary provides an overview of the broker's professional background and conduct. Additional information can be found in the detailed report.

## Broker Qualifications

**This broker is registered with:**

- 27 Self-Regulatory Organizations
- 53 U.S. states and territories

**This broker has passed:**

- 2 Principal/Supervisory Exams
- 3 General Industry/Product Exams
- 1 State Securities Law Exam

## Registration History

**This broker was previously registered with the following securities firm(s):**

No information reported.

## Disclosure Events

All individuals registered to sell securities or provide investment advice are required to disclose customer complaints and arbitrations, regulatory actions, employment terminations, bankruptcy filings, and criminal or civil judicial proceedings.

Are there events disclosed about this broker?   **No**

©2025 FINRA. All rights reserved. Report about CHRISTIAN J. ANDERSON.

# Broker Qualifications



## Registrations

This section provides the self-regulatory organizations (SROs) and U.S. states/territories the broker is currently registered and licensed with, the category of each license, and the date on which it became effective. This section also provides, for every brokerage firm with which the broker is currently employed, the address of each branch where the broker works.

**This individual is currently registered with 27 SROs and is licensed in 53 U.S. states and territories through his or her employer.**

## Employment 1 of 1

| | |
|---|---|
| Firm Name: | **CITIGROUP GLOBAL MARKETS INC.** |
| Main Office Address: | **388 GREENWICH STREET** |
| | **TOWER BUILDING** |
| | **NEW YORK, NY  10013** |
| Firm CRD#: | **7059** |

| | SRO | Category | Status | Date |
|---|---|---|---|---|
| B | 24X National Exchange LLC | General Securities Principal | Approved | 10/19/2025 |
| B | 24X National Exchange LLC | General Securities Representative | Approved | 10/19/2025 |
| B | BOX Exchange LLC | General Securities Principal | Approved | 10/30/2024 |
| B | BOX Exchange LLC | General Securities Representative | Approved | 10/30/2024 |
| B | Cboe BYX Exchange, Inc. | General Securities Principal | Approved | 09/24/2013 |
| B | Cboe BYX Exchange, Inc. | General Securities Representative | Approved | 09/24/2013 |
| B | Cboe BZX Exchange, Inc. | General Securities Principal | Approved | 09/24/2013 |
| B | Cboe BZX Exchange, Inc. | General Securities Representative | Approved | 09/24/2013 |
| B | Cboe C2 Exchange, Inc. | General Securities Principal | Approved | 10/30/2024 |
| B | Cboe C2 Exchange, Inc. | General Securities Representative | Approved | 10/30/2024 |
| B | Cboe EDGA Exchange, Inc. | General Securities Principal | Approved | 05/14/2015 |
| B | Cboe EDGA Exchange, Inc. | General Securities Representative | Approved | 05/14/2015 |
| B | Cboe EDGX Exchange, Inc. | General Securities Principal | Approved | 05/14/2015 |
| B | Cboe EDGX Exchange, Inc. | General Securities Representative | Approved | 05/14/2015 |
| B | Cboe Exchange, Inc. | General Securities Representative | Approved | 03/08/2011 |

**Broker Qualifications**



## Employment 1 of 1, continued

| | SRO | Category | Status | Date |
|---|---|---|---|---|
| B | Cboe Exchange, Inc. | General Securities Principal | Approved | 10/30/2024 |
| B | FINRA | General Securities Representative | Approved | 12/03/2002 |
| B | FINRA | Investment Banking Representative | Approved | 02/17/2010 |
| B | FINRA | General Securities Principal | Approved | 07/20/2010 |
| B | FINRA | Investment Banking Principal | Approved | 10/01/2018 |
| B | Investors' Exchange LLC | General Securities Principal | Approved | 08/19/2016 |
| B | Investors' Exchange LLC | General Securities Representative | Approved | 08/19/2016 |
| B | Long-Term Stock Exchange, Inc. | General Securities Principal | Approved | 10/30/2024 |
| B | Long-Term Stock Exchange, Inc. | General Securities Representative | Approved | 10/30/2024 |
| B | MEMX LLC | General Securities Principal | Approved | 10/30/2024 |
| B | MEMX LLC | General Securities Representative | Approved | 10/30/2024 |
| B | MIAX Emerald, LLC | General Securities Principal | Approved | 10/30/2024 |
| B | MIAX Emerald, LLC | General Securities Representative | Approved | 10/30/2024 |
| B | MIAX PEARL, LLC | General Securities Principal | Approved | 10/30/2024 |
| B | MIAX PEARL, LLC | General Securities Representative | Approved | 10/30/2024 |
| B | MIAX Sapphire | General Securities Principal | Approved | 10/30/2024 |
| B | MIAX Sapphire | General Securities Representative | Approved | 10/30/2024 |
| B | Miami International Securities Exchange, LLC | General Securities Principal | Approved | 10/30/2024 |
| B | Miami International Securities Exchange, LLC | General Securities Representative | Approved | 10/30/2024 |
| B | NYSE American LLC | General Securities Principal | Approved | 07/12/2011 |
| B | NYSE American LLC | General Securities Representative | Approved | 07/12/2011 |

**Broker Qualifications**



## Employment 1 of 1, continued

| | SRO | Category | Status | Date |
|---|-----|----------|--------|------|
| B | NYSE American LLC | Securities Manager | Approved | 01/29/2014 |
| B | NYSE Arca, Inc. | General Securities Principal | Approved | 05/14/2015 |
| B | NYSE Arca, Inc. | General Securities Representative | Approved | 05/14/2015 |
| B | NYSE National, Inc. | General Securities Principal | Approved | 07/06/2018 |
| B | NYSE National, Inc. | General Securities Representative | Approved | 07/06/2018 |
| B | NYSE Texas, Inc. | General Securities Principal | Approved | 05/14/2015 |
| B | NYSE Texas, Inc. | General Securities Representative | Approved | 05/14/2015 |
| B | Nasdaq BX, Inc. | General Securities Principal | Approved | 08/28/2013 |
| B | Nasdaq BX, Inc. | General Securities Representative | Approved | 08/28/2013 |
| B | Nasdaq GEMX, LLC | General Securities Principal | Approved | 10/30/2024 |
| B | Nasdaq GEMX, LLC | General Securities Representative | Approved | 10/30/2024 |
| B | Nasdaq ISE, LLC | General Securities Principal | Approved | 05/14/2015 |
| B | Nasdaq ISE, LLC | General Securities Representative | Approved | 05/14/2015 |
| B | Nasdaq MRX, LLC | General Securities Principal | Approved | 10/30/2024 |
| B | Nasdaq MRX, LLC | General Securities Representative | Approved | 10/30/2024 |
| B | Nasdaq PHLX LLC | General Securities Principal | Approved | 11/18/2011 |
| B | Nasdaq PHLX LLC | General Securities Representative | Approved | 11/18/2011 |
| B | Nasdaq Stock Market | General Securities Representative | Approved | 07/12/2006 |
| B | Nasdaq Stock Market | General Securities Principal | Approved | 07/20/2010 |
| B | New York Stock Exchange | General Securities Representative | Approved | 12/03/2002 |
| B | New York Stock Exchange | General Securities Principal | Approved | 01/29/2014 |
| B | New York Stock Exchange | Securities Manager | Approved | 01/29/2014 |

**Broker Qualifications**



## Employment 1 of 1, continued

| | U.S. State/ Territory | Category | Status | Date |
|---|---|---|---|---|
| B | Alabama | Agent | Approved | 05/11/2017 |
| B | Alaska | Agent | Approved | 05/11/2017 |
| B | Arizona | Agent | Approved | 05/11/2017 |
| B | Arkansas | Agent | Approved | 05/11/2017 |
| B | California | Agent | Approved | 05/11/2017 |
| B | Colorado | Agent | Approved | 05/11/2017 |
| B | Connecticut | Agent | Approved | 05/11/2017 |
| B | Delaware | Agent | Approved | 05/11/2017 |
| B | District of Columbia | Agent | Approved | 05/11/2017 |
| B | Florida | Agent | Approved | 05/11/2017 |
| B | Georgia | Agent | Approved | 05/11/2017 |
| B | Hawaii | Agent | Approved | 05/11/2017 |
| B | Idaho | Agent | Approved | 05/11/2017 |
| B | Illinois | Agent | Approved | 05/11/2017 |
| B | Indiana | Agent | Approved | 05/11/2017 |
| B | Iowa | Agent | Approved | 05/11/2017 |
| B | Kansas | Agent | Approved | 05/11/2017 |
| B | Kentucky | Agent | Approved | 05/11/2017 |
| B | Louisiana | Agent | Approved | 05/11/2017 |
| B | Maine | Agent | Approved | 05/11/2017 |
| B | Maryland | Agent | Approved | 05/11/2017 |

**Broker Qualifications**



## Employment 1 of 1, continued

| | U.S. State/ Territory | Category | Status | Date |
|---|---|---|---|---|
| B | Massachusetts | Agent | Approved | 05/11/2017 |
| B | Michigan | Agent | Approved | 05/11/2017 |
| B | Minnesota | Agent | Approved | 05/11/2017 |
| B | Mississippi | Agent | Approved | 05/11/2017 |
| B | Missouri | Agent | Approved | 05/11/2017 |
| B | Montana | Agent | Approved | 05/11/2017 |
| B | Nebraska | Agent | Approved | 05/11/2017 |
| B | Nevada | Agent | Approved | 05/11/2017 |
| B | New Hampshire | Agent | Approved | 05/11/2017 |
| B | New Jersey | Agent | Approved | 05/11/2017 |
| B | New Mexico | Agent | Approved | 05/11/2017 |
| B | New York | Agent | Approved | 01/17/2003 |
| B | North Carolina | Agent | Approved | 05/11/2017 |
| B | North Dakota | Agent | Approved | 05/11/2017 |
| B | Ohio | Agent | Approved | 05/12/2017 |
| B | Oklahoma | Agent | Approved | 05/11/2017 |
| B | Oregon | Agent | Approved | 05/11/2017 |
| B | Pennsylvania | Agent | Approved | 05/11/2017 |
| B | Puerto Rico | Agent | Approved | 05/11/2017 |
| B | Rhode Island | Agent | Approved | 05/11/2017 |
| B | South Carolina | Agent | Approved | 05/11/2017 |





# Broker Qualifications

## Employment 1 of 1, continued

| U.S. State/ Territory | Category | Status | Date |
|---|---|---|---|
| South Dakota | Agent | Approved | 05/11/2017 |
| Tennessee | Agent | Approved | 06/14/2017 |
| Texas | Agent | Approved | 05/11/2017 |
| Utah | Agent | Approved | 05/11/2017 |
| Vermont | Agent | Approved | 05/11/2017 |
| Virgin Islands | Agent | Approved | 05/11/2017 |
| Virginia | Agent | Approved | 05/11/2017 |
| Washington | Agent | Approved | 05/11/2017 |
| West Virginia | Agent | Approved | 05/11/2017 |
| Wisconsin | Agent | Approved | 05/11/2017 |
| Wyoming | Agent | Approved | 05/11/2017 |

## Branch Office Locations

**CITIGROUP GLOBAL MARKETS INC.**
388 GREENWICH STREET
NEW YORK, NY  10013

**Broker Qualifications**



## Industry Exams this Broker has Passed

This section includes all securities industry exams that the broker has passed. Under limited circumstances, a broker may attain a registration after receiving an exam waiver based on exams the broker has passed and/or qualifying work experience. Any exam waivers that the broker has received are not included below. A passed exam or exam waiver does not permit a broker to do business without an active SRO or state registration.

**This individual has passed 2 principal/supervisory exams, 3 general industry/product exams, and 1 state securities law exam.**

### Principal/Supervisory Exams

| Exam | Category | Date |
|------|----------|------|
| B  General Securities Sales Supervisor - General Module Examination | Series 10 | 01/02/2023 |
| B  General Securities Principal Examination | Series 24 | 07/19/2010 |

### General Industry/Product Exams

| Exam | Category | Date |
|------|----------|------|
| B  Investment Banking Registered Representative Examination | Series 79TO | 01/02/2023 |
| B  Securities Industry Essentials Examination | SIE | 10/01/2018 |
| B  General Securities Representative Examination | Series 7 | 12/02/2002 |

### State Securities Law Exams

| Exam | Category | Date |
|------|----------|------|
| B  Uniform Securities Agent State Law Examination | Series 63 | 12/10/2002 |

Additional information about the above exams or other exams FINRA administers to brokers and other securities professionals can be found at www.finra.org/brokerqualifications/registeredrep/.

**Broker Qualifications**



**Professional Designations**

This section details that the representative has reported **0** professional designation(s).

No information reported.

# Registration and Employment History



## Registration History

The broker previously was registered with the following firms:

| Registration Dates | Firm Name | CRD# | Branch Location |
|---|---|---|---|
| No information reported. | | | |

## Employment History

This section provides up to 10 years of an individual broker's employment history as reported by the individual broker on the most recently filed Form U4.

**Please note that the broker is required to provide this information only while registered with FINRA or a national securities exchange and the information is not updated via Form U4 after the broker ceases to be registered. Therefore, an employment end date of "Present" may not reflect the broker's current employment status.**

| Employment | Employer Name | Position | Investment Related | Employer Location |
|---|---|---|---|---|
| 06/2001 - Present | CITIGROUP GLOBAL MARKETS INC. | ASSOCIATE CLASS OF 1998 | Y | NEW YORK, NY, United States |

## Other Business Activities

This section includes information, if any, as provided by the broker regarding other business activities the broker is currently engaged in either as a proprietor, partner, officer, director, employee, trustee, agent or otherwise. This section does not include non-investment related activity that is exclusively charitable, civic, religious or fraternal and is recognized as tax exempt.

CJGA PTY LTD (AUSTRALIAN ENTITY)
QUEENSLAND, AUSTRALIA
NOT INVESTMENT BUSINESS RELATED
AFFILIATION BEGAN 2005
TITLE:  DIRECTOR, SOLE SHAREHOLDER
DUTIES:  SHELF COMPANY FOR ESTATE PLANNING
ONE HOUR PER YEAR IS DEVOTED TO THE BUSINESS.///LMJA PTY LTD (AUSTRALIAN ENTITY)
QUEENSLAND, AUSTRALIA NOT INVESTMENT BUSINESS RELATED AFFILIATION BEGAN 2005
TITLE:  DIRECTOR, SOLE SHAREHOLDER
DUTIES:  SHELF COMPANY FOR ESTATE PLANNING
ONE HOUR PER YEAR IS DEVOTED TO THE BUSINESS.



**End of Report**

**This page is intentionally left blank.**

# Exhibit 19

| | |
|---|---|
| **From:** | Christian Anderson[christian.anderson@mac.com] |
| **Sent:** | Wed 3/23/2022 10:48:55 PM (UTC) |
| **To:** | Ramnik Arora[ramnik@ftx.com] |
| **Subject:** | Fwd: CFO Position |

This was original prop when theoretical valuation was 8.5bn.

RSU now grossed up for new valuation plus comp calibration below. My ask and a re trade.

Also my 2022/2023 comp is guaranteed at 12mm.

Re current document;

The PUT mechanics and President title are new for me but the agreed acceleration referenced below has been declined.

Christian

Begin forwarded message:


> **From:** Marco Streng <marco.streng@genesisda.com>
> **Date:** December 27, 2021 at 12:10:54 PM AST
> **To:** Christian Anderson <christian.anderson@mac.com>
> **Cc:** Abdumalik Mirakhmedov <abdumalik.mirakhmedov@genesisda.com>
> **Subject: Re: CFO Position**


> Hey Christian,
> Thanks a lot for providing your opinion and forming this counter proposal.
>
> In order to move forward I suggest you speak with Abdumalik as a next step.
>
> I am adding him here on cc.
>
> Thank you and I'm looking forward to catching up afterwards.
>
> Greetings,
> Marco
>
> On Mon, Dec 27, 2021 at 7:23 PM Christian Anderson <christian.anderson@mac.com> wrote:
>
> Marco,

As discussed see **framework** below.

I tried to alleviate some of the walk away economics from Citi and create further upside incentives based on performance (versus time vesting alone as proposed).

Happy to discuss.

Christian

**Title, Role & Reporting**

* Chief Financial Officer
* Reporting to Chief Executive Officer
* Financial Reporting, Capital Markets & Treasury, Investor & Banking Relationships, M&A /Strategy

**Compensation**

*Salary*

Base Salary: 500k
Target Bonus: 1X Base Salary

*Time Based RSU*

0.2 % Earlier of 6 months following IPO or January 1,2023

*Time Based Options* (strike at last capital raise)

0.125% January 1, 2023
0.125% January 1, 2024
0.125% January 1, 2025

*Performance Based Options* (strike at last capital raise)

0.1% vest @ 2x last capital raise (~$16 bn)
0.1% vest @ 2.25x last capital raise (~$18 bn)
0.1% vest @ 2.5x last capital raise (~$20 bn)

# Assumes last capital raise at $8 bn

**Acceleration**

All vesting will accelerate, subject still to any performance requirements, upon change of control, termination without cause, material title, job function or job location change, or if IPO doesn't occur with 12 months.

**Other**

* Comprehensive Health Care Insurance
* Corporate Travel & Leave Policy (TBD)
* 'Remote First' Location
* Start Date February 2021

Regards,

Christian


On Dec 22, 2021, at 2:20 AM, Marco Streng
<marco.streng@genesisda.com> wrote:


Hello Christian,
Thanks for your thoughts and transparency.

In order to move forward I suggest you speak to Abdumalik as a
next step.

We understand your current position and hope we can find a
solution!

Greetings,
Marco


On Wed, Dec 22, 2021 at 12:55 AM Christian Anderson
<christian.anderson@mac.com> wrote:

Marco,

Hope you had a good trip back home from NYC. It was great to see
you.

Good time to get out of NYC. Covid is spreading. As I mentioned I
am in quarantine as my family has all tested positive.

I have given a lot of thought to your offer to become CFO of
Genesis. I remain extremely interested in pursuing but wanted to
give you some feedback on the compensation package.

To reiterate, your offer was;

0.1% RSU 6 month following IPO
0.1% options annually for three years (strike at recent valuation).

I have a high degree of transparency around my compensation at Citi for 2022 and 2023. I expect it to be ~10mm with 60% in Citi stock. Given my years of service my future stock is fully vested but liquidates over 3 years.

My current deferred compensation from prior years is scheduled to be paid so long as I remain employed at Citi is ~$9mm.

I recently declined an offer for 12mm + 10mm + 10mm with an escalator and replacement of my deferred compensation.

I believe you and I could make a great team and drive Genesis to great success well beyond the IPO. I am a big believer in the sector, the company and your team / board.

However, I would likely need additional RSU's at signing to get closer to a break even event. I understand the potential upside associated with the IPO and options but I am giving up a promising and lucrative career at Citi.

I genuinely would like to find a path for us to make this work. Please let me know if you want to have a conversation and try and get a mutually acceptable outcome.

Many thanks,

Christian


--
Marco Streng
CEO & Founder

marco.streng@genesisda.com

Genesis Digital Assets
GenesisDigitalAssets.com

--

Marco Streng
CEO & Founder

marco.streng@genesisda.com

**Genesis Digital Assets**
GenesisDigitalAssets.com

# Exhibit 20

**From:** Marco Streng[marco.streng@genesisda.com]

**Sent:** Wed 1/5/2022 2:13:29 PM (UTC)

**To:** Manuel Stotz[ms@kingswaycap.com]; Ross Stevens[ross.stevens@stoneridgeam.com]; Matt Huang[matt@paradigm.xyz]; sam@ftx.com[sam@ftx.com]; Abdumalik Mirakhmedov[abdumalik.mirakhmedov@genesisda.com]; Andrey Kim[andrey.kim@genesisda.com]

**Subject:** CFO

Hello Everyone,
I hope you had a great start into the new year!

Things are moving well on GDA side and I wanted to inform you that from our final 3 candidates for our CFO we have chosen Christian Anderson ( https://www.linkedin.com/in/christian-anderson-0bb48451) who is very happy to join us subject to GDA board approval.

We think Christian is a great fit for GDA and that he brings a lot of additional value to the company particularly due to his experience with Citi in IPOs and generally in US public markets. As a next step I will introduce him to all of you and it would be amazing if we could do those interviews already this week to then make a timely board decision together.

Exciting times ahead and looking forward to a great next year 2022 together!

Greetings,
Marco